**EXHIBIT 1**



*Substitute House Bill No. 5150*

# *Public Act No. 24-76*

### *AN ACT CONCERNING CANNABIS AND HEMP REGULATION.*

Be it enacted by the Senate and House of Representatives in General Assembly convened:

Section 1. Section 21a-240 of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

The following words and phrases, as used in this chapter, shall have the following meanings, unless the context otherwise requires:

(1) "Abuse of drugs" means the use of controlled substances solely for their stimulant, depressant or hallucinogenic effect upon the higher functions of the central nervous system and not as a therapeutic agent prescribed in the course of medical treatment or in a program of research operated under the direction of a physician or pharmacologist.

(2) "Administer" means the direct application of a controlled substance, whether by injection, inhalation, ingestion or any other means, to the body of a patient or research subject by: (A) A practitioner, or, in the practitioner's presence, by the practitioner's authorized agent**;** **[**, or**]** (B) the patient or research subject at the direction and in the presence of the practitioner**; [,]** or (C) a nurse or intern under the direction and supervision of a practitioner.

*Substitute House Bill No. 5150*

(3) "Agent" means an authorized person who acts on behalf of or at the direction of a manufacturer, distributor, dispenser or prescribing practitioner, but does not include a common or contract carrier, public warehouseman **[,]** or employee of the carrier or warehouseman.

(4) "Amphetamine-type substances" include amphetamine, optical isomers thereof, salts of amphetamine and its isomers, and chemical compounds which are similar thereto in chemical structure or which are similar thereto in physiological effect, and which show a like potential for abuse, which are controlled substances under this chapter unless modified.

(5) "Barbiturate-type drugs" include barbituric acid and its salts, derivatives thereof and chemical compounds which are similar thereto in chemical structure or which are similar thereto in physiological effect, and which show a like potential for abuse, which are controlled substances under this chapter unless modified.

(6) "Bureau" means the Bureau of Narcotics and Dangerous Drugs, United States Department of Justice, or its successor agency.

(7) "Cannabis-type substances" include all parts of any plant, or species of the genus cannabis or any infra specific taxon thereof whether growing or not; **[the seeds thereof;]** the resin extracted from any part of such a plant; and every compound, manufacture, salt, derivative, mixture or preparation of such plant, **[its seeds]** or <u>its</u> resin; but shall not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture or preparation of such mature stalks, except the resin extracted therefrom, fiber, oil or cake, the **[sterilized]** seed of such plant<u>,</u> **[which is incapable of germination,]** or hemp, as defined in 7 USC 1639o, as amended from time to time. Included are cannabinon, cannabinol, cannabidiol and chemical compounds which are similar to cannabinon, cannabinol or cannabidiol

*Substitute House Bill No. 5150*

in chemical structure or which are similar thereto in physiological effect, and which show a like potential for abuse, which are controlled substances under this chapter unless derived from hemp, as defined in section 22-61*l*, as amended by this act.

(8) "Controlled drugs" are those drugs which contain any quantity of a substance which has been designated as subject to the federal Controlled Substances Act, or which has been designated as a depressant or stimulant drug pursuant to federal food and drug laws, or which has been designated by the Commissioner of Consumer Protection pursuant to section 21a-243, as having a stimulant, depressant or hallucinogenic effect upon the higher functions of the central nervous system and as having a tendency to promote abuse or psychological or physiological dependence, or both. Such controlled drugs are classifiable as amphetamine-type, barbiturate-type, cannabis-type, cocaine-type, hallucinogenic, morphine-type and other stimulant and depressant drugs. Specifically excluded from controlled drugs and controlled substances are alcohol, nicotine and caffeine.

(9) "Controlled substance" means a drug, substance **[,]** or immediate precursor in schedules I to V, inclusive, of the Connecticut controlled substance scheduling regulations adopted pursuant to section 21a-243.

(10) "Counterfeit substance" means a controlled substance which, or the container or labeling of which, without authorization, bears the trademark, trade name or other identifying mark, imprint, number or device, or any likeness thereof, of a manufacturer, distributor or dispenser other than the person who in fact manufactured, distributed or dispensed the substance.

(11) "Deliver or delivery" means the actual, constructive or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship.

*Substitute House Bill No. 5150*

(12) "Dentist" means a person authorized by law to practice dentistry in this state.

(13) "Dispense" means to deliver a controlled substance to an ultimate user or research subject by or pursuant to the lawful order of a practitioner, including the prescribing, administering, packaging, labeling or compounding necessary to prepare the substance for the delivery.

(14) "Dispenser" means a practitioner who dispenses.

(15) "Distribute" means to deliver other than by administering or dispensing a controlled substance.

(16) "Distributor" means a person who distributes and includes a wholesaler who is a person supplying or distributing controlled drugs which the person personally has not produced or prepared to hospitals, clinics, practitioners, pharmacies, other wholesalers, manufacturers and federal, state and municipal agencies.

(17) "Drug" means: (A) **[**substances**]** Substances recognized as drugs in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; (B) substances intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man or animals; (C) substances, other than food, intended to affect the structure or any function of the body of man or animals; and (D) substances intended for use as a component of any article specified in subparagraph (A), (B) or (C) of this subdivision. **[**It**]** "Drug" does not include devices or their components, parts or accessories.

(18) "Drug dependence" means a psychoactive substance dependence on drugs as that condition is defined in the most recent edition of the "Diagnostic and Statistical Manual of Mental Disorders" of the American Psychiatric Association.

*Substitute House Bill No. 5150*

(19) "Drug-dependent person" means a person who has a psychoactive substance dependence on drugs as that condition is defined in the most recent edition of the "Diagnostic and Statistical Manual of Mental Disorders" of the American Psychiatric Association.

(20) (A) "Drug paraphernalia" means equipment, products and materials of any kind that are used, intended for use or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing or concealing, or ingesting, inhaling or otherwise introducing into the human body, any controlled substance contrary to the provisions of this chapter, including, but not limited to: (i) Kits intended for use or designed for use in planting, propagating, cultivating, growing or harvesting of any species of plant that is a controlled substance or from which a controlled substance can be derived; (ii) kits used, intended for use or designed for use in manufacturing, compounding, converting, producing, processing or preparing controlled substances; (iii) isomerization devices used or intended for use in increasing the potency of any species of plant that is a controlled substance; (iv) testing equipment used, intended for use or designed for use in identifying or analyzing the strength, effectiveness or purity of controlled substances; (v) dilutents and adulterants, including, but not limited to, quinine hydrochloride, mannitol, mannite, dextrose and lactose used, intended for use or designed for use in cutting controlled substances; (vi) separation gins and sifters used, intended for use or designed for use in removing twigs and seeds from, or in otherwise cleaning or refining, marijuana; (vii) capsules and other containers used, intended for use or designed for use in packaging small quantities of controlled substances; (viii) containers and other objects used, intended for use or designed for use in storing or concealing controlled substances; and (ix) objects used, intended for use or designed for use in ingesting, inhaling, or otherwise introducing

*Substitute House Bill No. 5150*

marijuana, cocaine, hashish **[,]** or hashish oil into the human body, including, but not limited to, wooden, acrylic, glass, stone, plastic or ceramic pipes with screens, permanent screens, hashish heads or punctured metal bowls; water pipes; carburetion tubes and devices; smoking and carburetion masks; roach clips; miniature cocaine spoons and cocaine vials; chamber pipes; carburetor pipes; electric pipes; air-driven pipes; chillums; bongs; ice pipes and chillers. "Drug paraphernalia" does not include a product used by a manufacturer licensed pursuant to this chapter for the activities permitted under the license or by an individual to test any substance prior to injection, inhalation or ingestion of the substance to prevent accidental overdose by injection, inhalation or ingestion of the substance, provided the licensed manufacturer or individual is not using the product to engage in the unlicensed manufacturing or distribution of controlled substances. As used in this subdivision, "roach clip" means an object used to hold burning material, including, but not limited to, a marijuana cigarette, that has become too small or too short to be held between the fingers.

(B) "Factory" means any place used for the manufacturing, mixing, compounding, refining, processing, packaging, distributing, storing, keeping, holding, administering or assembling illegal substances contrary to the provisions of this chapter, or any building, rooms or location which contains equipment or paraphernalia used for this purpose.

(21) "Federal Controlled Substances Act, 21 USC 801 et seq." means Public Law 91-513, the Comprehensive Drug Abuse Prevention and Control Act of 1970.

(22) "Federal food and drug laws" means the federal Food, Drug and Cosmetic Act, as amended, Title 21 USC 301 et seq.

(23) "Hallucinogenic substances" are psychodysleptic substances,

other than cannabis-type substances, which assert a confusional or disorganizing effect upon mental processes or behavior and mimic acute psychotic disturbances. Exemplary of such drugs are mescaline, peyote, psilocyn and d-lysergic acid diethylamide, which are controlled substances under this chapter unless modified.

(24) "Hospital", as used in sections 21a-243 to 21a-283, inclusive, means an institution for the care and treatment of the sick and injured, approved by the Department of Public Health or the Department of Mental Health and Addiction Services as proper to be entrusted with the custody of controlled drugs and substances and professional use of controlled drugs and substances under the direction of a licensed practitioner.

(25) "Intern" means a person who holds a degree of doctor of medicine or doctor of dental surgery or medicine and whose period of service has been recorded with the Department of Public Health and who has been accepted and is participating in training by a hospital or institution in this state. Doctors meeting the foregoing requirements and commonly designated as "residents" and "fellows" shall be regarded as interns for purposes of this chapter.

(26) "Immediate precursor" means a substance which the Commissioner of Consumer Protection has found to be, and by regulation designates as being, the principal compound commonly used or produced primarily for use, and which is an immediate chemical intermediary used or likely to be used, in the manufacture of a controlled substance, the control of which is necessary to prevent, curtail or limit manufacture.

(27) "Laboratory" means a laboratory approved by the Department of Consumer Protection as proper to be entrusted with the custody of controlled substances and the use of controlled substances for scientific and medical purposes and for purposes of instruction, research or

*Substitute House Bill No. 5150*

analysis.

(28) "Manufacture" means the production, preparation, cultivation, growing, propagation, compounding, conversion or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container, except that this term does not include the preparation or compounding of a controlled substance by an individual for the individual's own use or the preparation, compounding, packaging or labeling of a controlled substance: (A) By a practitioner as an incident to the practitioner administering or dispensing of a controlled substance in the course of such practitioner's professional practice; **[,]** or (B) by a practitioner, or by the practitioner's authorized agent under such practitioner's supervision, for the purpose of, or as an incident to, research, teaching or chemical analysis and not for sale.

(29) "Marijuana" means all parts of any plant, or species of the genus cannabis or any infra specific taxon thereof, whether growing or not; **[**the seeds thereof;**]** the resin extracted from any part of the plant; every compound, manufacture, salt, derivative, mixture **[,]** or preparation of such plant, <u>or</u> its **[**seeds or**]** resin; **[,]** any high-THC hemp product; manufactured cannabinoids; **[**, synthetic cannabinoids, except as provided in subparagraph (E) of this subdivision;**]** or cannabinon, cannabinol or cannabidiol and chemical compounds which are similar to cannabinon, cannabinol or cannabidiol in chemical structure or which are similar thereto in physiological effect, which are controlled substances under this chapter, except cannabidiol derived from hemp, as defined in section 22-61*l*<u>, as amended by this act</u>, that is not a high-THC hemp product. "Marijuana" does not include: (A) The mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt,

derivative, mixture or preparation of such mature stalks, except the resin extracted from such mature stalks or fiber, oil or cake; (B) the **[**sterilized**]** seed of such plant; **[**which is incapable of germination;**]** (C) hemp, as defined in section 22-61*l*, as amended by this act, (i) with a total THC concentration of not more than three-tenths per cent on a dry-weight basis, and (ii) that is not a high-THC hemp product; (D) any substance approved by the federal Food and Drug Administration or successor agency as a drug and reclassified in any schedule of controlled substances or unscheduled by the federal Drug Enforcement Administration or successor agency which is included in the same schedule designated by the federal Drug Enforcement Administration or successor agency; or (E) **[**synthetic cannabinoids which are controlled substances that are designated by the Commissioner of Consumer Protection, by whatever official, common, usual, chemical or trade name designation, as controlled substances and are classified in the appropriate schedule in accordance with subsections (i) and (j) of section 21a-243**]** infused beverages, as defined in section 26 of this act.

(30) "Narcotic substance" means any of the following, whether produced directly or indirectly by extraction from a substance of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis: (A) Morphine-type: (i) Opium or opiate, or any salt, compound, derivative, or preparation of opium or opiate which is similar to any such substance in chemical structure or which is similar to any such substance in physiological effect and which shows a like potential for abuse, which is a controlled substance under this chapter unless modified; (ii) any salt, compound, isomer, derivative, or preparation of any such substance which is chemically equivalent or identical to any substance referred to in clause (i) of this **[**subdivision**]** subparagraph, but not including the isoquinoline alkaloids of opium; (iii) opium poppy or poppy straw; or (iv) (I) fentanyl or any salt, compound, derivative or preparation of fentanyl which is similar to any such substance in

*Substitute House Bill No. 5150*

chemical structure or which is similar to any such substance in physiological effect and which shows a like potential for abuse, which is a controlled substance under this chapter unless modified, or (II) any salt, compound, isomer, derivative or preparation of any such substance which is chemically equivalent or identical to any substance referred to in subclause (I) of this clause; or (B) cocaine-type; coca leaves or any salt, compound, derivative or preparation of coca leaves, or any salt, compound, isomer, derivatives or preparation of any such substance which is chemically equivalent or identical to any such substance or which is similar to any such substance in physiological effect and which shows a like potential for abuse, but not including decocainized coca leaves or extractions of coca leaves which do not contain cocaine or ecgonine.

(31) "Nurse" means a person performing nursing as defined in section 20-87a.

(32) "Official written order" means an order for controlled substances written on a form provided by the bureau for that purpose under the federal Controlled Substances Act.

(33) "Opiate" means any substance having an addiction-forming or addiction-sustaining liability similar to morphine or being capable of conversion into a drug having addiction-forming or addiction-sustaining liability; it does not include, unless specifically designated as controlled under this chapter, the dextrorotatory isomer of 3-methoxy-n-methylmorthinan and its salts (dextro-methorphan) but shall include its racemic and levorotatory forms.

(34) "Opium poppy" means the plant of the species papaver somniferum l., except its seed.

(35) Repealed by P.A. 99-102, S. 51.

(36) "Other stimulant and depressant drugs" means controlled

substances other than amphetamine-type, barbiturate-type, cannabis-type, cocaine-type, hallucinogenics and morphine-type which are found to exert a stimulant and depressant effect upon the higher functions of the central nervous system and which are found to have a potential for abuse and are controlled substances under this chapter.

(37) "Person" includes any corporation, limited liability company, association or partnership, or one or more individuals, government or governmental subdivisions or agency, business trust, estate, trust, or any other legal entity. Words importing the plural number may include the singular; words importing the masculine gender may be applied to females.

(38) "Pharmacist" means a person authorized by law to practice pharmacy pursuant to section 20-590, 20-591, 20-592 or 20-593.

(39) "Pharmacy" means an establishment licensed pursuant to section 20-594.

(40) "Physician" means a person authorized by law to practice medicine in this state pursuant to section 20-9.

(41) "Podiatrist" means a person authorized by law to practice podiatry in this state.

(42) "Poppy straw" means all parts, except the seeds, of the opium poppy, after mowing.

(43) "Practitioner" means: (A) A physician, dentist, veterinarian, podiatrist, scientific investigator or other person licensed, registered or otherwise permitted to distribute, dispense, conduct research with respect to or to administer a controlled substance in the course of professional practice or research in this state; and (B) a pharmacy, hospital or other institution licensed, registered or otherwise permitted to distribute, dispense, conduct research with respect to or to administer

*Substitute House Bill No. 5150*

a controlled substance in the course of professional practice or research in this state.

(44) "Prescribe" means order or designate a remedy or any preparation containing controlled substances.

(45) "Prescription" means a written, oral or electronic order for any controlled substance or preparation from a licensed practitioner to a pharmacist for a patient.

(46) "Production" includes the manufacture, planting, cultivation, growing or harvesting of a controlled substance.

(47) "Registrant" means any person licensed by this state and assigned a current federal Bureau of Narcotics and Dangerous Drug Registry Number as provided under the federal Controlled Substances Act.

(48) "Registry number" means the alphabetical or numerical designation of identification assigned to a person by the federal Drug Enforcement Administration, or other federal agency, which is commonly known as the federal registry number.

(49) "Restricted drugs or substances" are the following substances without limitation and for all purposes: Datura stramonium; hyoscyamus niger; atropa belladonna, or the alkaloids atropine; hyoscyamine; belladonnine; apatropine; or any mixture of these alkaloids such as daturine, or the synthetic homatropine or any salts of these alkaloids, except that any drug or preparation containing any of the above-mentioned substances which is permitted by federal food and drug laws to be sold or dispensed without a prescription or written order shall not be a controlled substance; amyl nitrite; the following volatile substances to the extent that said chemical substances or compounds containing said chemical substances are sold, prescribed, dispensed, compounded, possessed or controlled or delivered or

*Substitute House Bill No. 5150*

administered to another person with the purpose that said chemical substances shall be breathed, inhaled, sniffed or drunk to induce a stimulant, depressant or hallucinogenic effect upon the higher functions of the central nervous system: Acetone; benzene; butyl alcohol; butyl nitrate and its salts, isomers, esters, ethers or their salts; cyclohexanone; dichlorodifluoromethane; ether; ethyl acetate; formaldehyde; hexane; isopropanol; methanol; methyl cellosolve acetate; methyl ethyl ketone; methyl isobutyl ketone; nitrous oxide; pentochlorophenol; toluene; toluol; trichloroethane; trichloroethylene; 1,4 butanediol.

(50) "Sale" is any form of delivery which includes barter, exchange or gift, or offer therefor, and each such transaction made by any person whether as principal, proprietor, agent, servant or employee.

(51) "State", when applied to a part of the United States, includes any state, district, commonwealth, territory or insular possession thereof, and any area subject to the legal authority of the United States of America.

(52) "State food, drug and cosmetic laws" means the Uniform Food, Drug and Cosmetic Act, section 21a-91 et seq.

(53) "Ultimate user" means a person who lawfully possesses a controlled substance for the person's own use or for the use of a member of such person's household or for administering to an animal owned by such person or by a member of such person's household.

(54) "Veterinarian" means a person authorized by law to practice veterinary medicine in this state.

(55) "Wholesaler" means a distributor or a person who supplies controlled substances that the person personally has not produced or prepared to registrants.

(56) "Reasonable times" means the time or times any office, care-

giving institution, pharmacy, clinic, wholesaler, manufacturer, laboratory, warehouse, establishment, store or place of business, vehicle or other place is open for the normal affairs or business or the practice activities usually conducted by the registrant.

(57) "Unit dose drug distribution system" means a drug distribution system used in a hospital or chronic and convalescent nursing home in which drugs are supplied in individually labeled unit of use packages, each patient's supply of drugs is exchanged between the hospital pharmacy and the drug administration area or, in the case of a chronic and convalescent nursing home between a pharmacy and the drug administration area, at least once each twenty-four hours and each patient's medication supply for this period is stored within a patient-specific container, all of which is conducted under the direction of a pharmacist licensed in Connecticut and, in the case of a hospital, directly involved in the provision and supervision of pharmaceutical services at such hospital at least thirty-five hours each week.

(58) "Cocaine in a free-base form" means any substance which contains cocaine, or any compound, isomer, derivative or preparation thereof, in a nonsalt form.

(59) "THC" means tetrahydrocannabinol, including, but not limited to, delta-7, delta-8-tetrahydrocannabinol, delta-9-tetrahydrocannabinol and delta-10-tetrahydrocannabinol, and any material, compound, mixture or preparation which contain their salts, isomers and salts of isomers, whenever the existence of such salts, isomers and salts of isomers is possible within the specific chemical designation, regardless of the source, except: (A) Dronabinol substituted in sesame oil and encapsulated in a soft gelatin capsule in a federal Food and Drug Administration or successor agency approved product; **[,]** or (B) any tetrahydrocannabinol product that has been approved by the federal Food and Drug Administration or successor agency to have a medical use and reclassified in any schedule of controlled substances or

unscheduled by the federal Drug Enforcement Administration or successor agency.

(60) "Total THC" means the sum of the percentage by weight of tetrahydrocannabinolic acid, multiplied by eight hundred seventy-seven-thousandths, plus the percentage of weight of THC.

(61) "Manufactured cannabinoid" means cannabinoids [naturally occurring from a source other than marijuana that are similar in chemical structure or physiological effect to cannabinoids derived from marijuana, as defined in section 21a-243, but are derived by a chemical or biological process] created by directly converting one cannabinoid to a different cannabinoid through: (A) Application of light or heat; (B) decarboxylation of naturally occurring acidic forms of cannabinoids; or (C) an alternate extraction or conversion process approved by the Department of Consumer Protection and published on the department's Internet web site.

(62) "Synthetic cannabinoid" (A) means [any material, compound, mixture or preparation which contains any quantity of a substance having a psychotropic response primarily by agonist activity at cannabinoid-specific receptors affecting the central nervous system that is produced artificially and not derived from an organic source naturally containing cannabinoids, unless listed in another schedule pursuant to section 21a-243] any substance converted, by a chemical process, to create a cannabinoid or cannabinoid-like substance that (i) has structural features which allow interaction with at least one of the known cannabinoid-specific receptors, or (ii) has any physiological or psychotropic response on at least one cannabinoid-specific receptor, (B) includes, but is not limited to, hexahydrocannabinol (HHC and HXC) and hydrox4phc (PHC), and (C) does not include any manufactured cannabinoid.

(63) "High-THC hemp product" (A) prior to October 1, 2024, means a

*Substitute House Bill No. 5150*

manufacturer hemp product, as defined in section 22-61*l*, as amended by this act, that has, or is advertised, labeled or offered for sale as having, total THC that exceeds **[**(A)**]** (i) for a hemp edible, hemp topical or hemp transdermal patch **[**(i)**]** (I) one milligram on a per-serving basis, or **[**(ii)**]** (II) five milligrams on a per-container basis, **[**(B)**]** (ii) for a hemp tincture, including, but not limited to, oil intended for ingestion by swallowing, buccal administration or sublingual absorption **[**(i)**]** (I) one milligram on a per-serving basis, or **[**(ii)**]** (II) twenty-five milligrams on a per-container basis, **[**(C)**]** (iii) for a hemp concentrate or extract, including, but not limited to, a vape oil, wax or shatter, twenty-five milligrams on a per-container basis, or **[**(D)**]** (iv) for a manufacturer hemp product not described in subparagraph **[**(A)**]** (A)(i), **[**(B)**]** (A)(ii) or **[**(C)**]** (A)(iii) of this subdivision, **[**(i)**]** (I) one milligram on a per-serving basis, **[**(ii)**]** (II) five milligrams on a per-container basis, or **[**(iii)**]** (III) three-tenths per cent on a dry-weight basis for cannabis flower or cannabis trim, (B) on and after October 1, 2024, means a manufacturer hemp product, as defined in section 22-61*l*, as amended by this act, that has, or is advertised, labeled or offered for sale as having, total THC that exceeds (i) one milligram per serving with up to five milligrams per-container, or (ii) three-tenths per cent on a dry-weight basis for cannabis flower or cannabis trim, and (C) does not include an infused beverage, as defined in section 26 of this act. As used in this subdivision, "container" means an object that is offered, intended for sale or sold to a consumer and directly contains a high-THC hemp product, and does not include an object or packaging that indirectly contains, or contains in bulk for transportation purposes, a high-THC hemp product.

Sec. 2. Section 21a-408 of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

As used in this section, sections 21a-408a to 21a-408o, inclusive, **[**and**]** sections 21a-408r to 21a-408v, inclusive, and section 3 of this act, unless

*Substitute House Bill No. 5150*

the context otherwise requires:

(1) "Advanced practice registered nurse" means an advanced practice registered nurse licensed pursuant to chapter 378;

(2) "Cannabis establishment" has the same meaning as provided in section 21a-420, as amended by this act;

(3) "Cannabis testing laboratory" means a person who (A) is located in this state, (B) is licensed by the department to analyze marijuana, and (C) meets the licensure requirements established in section 21a-408r and the regulations adopted pursuant to subsection (d) of section 21a-408r;

(4) "Cannabis testing laboratory employee" means a person who is (A) employed at a cannabis testing laboratory, and (B) registered pursuant to section 21a-408r and the regulations adopted pursuant to subsection (d) of section 21a-408r;

(5) "Caregiver" means a person, other than the qualifying patient and the qualifying patient's physician, physician assistant or advanced practice registered nurse, who is eighteen years of age or older and has agreed to undertake responsibility for managing the well-being of the qualifying patient with respect to the palliative use of marijuana, provided (A) in the case of a qualifying patient (i) under eighteen years of age and not an emancipated minor, or (ii) otherwise lacking legal capacity, such person shall be a parent, guardian or person having legal custody of such qualifying patient, and (B) in the case of a qualifying patient eighteen years of age or older or an emancipated minor, the need for such person shall be evaluated by the qualifying patient's physician, physician assistant or advanced practice registered nurse and such need shall be documented in the written certification;

(6) "Cultivation" includes planting, propagating, cultivating, growing and harvesting;

(7) "Debilitating medical condition" means (A) cancer, glaucoma, positive status for human immunodeficiency virus or acquired immune deficiency syndrome, Parkinson's disease, multiple sclerosis, damage to the nervous tissue of the spinal cord with objective neurological indication of intractable spasticity, epilepsy or uncontrolled intractable seizure disorder, cachexia, wasting syndrome, Crohn's disease, posttraumatic stress disorder, irreversible spinal cord injury with objective neurological indication of intractable spasticity, cerebral palsy, cystic fibrosis or terminal illness requiring end-of-life care, except, if the qualifying patient is under eighteen years of age, "debilitating medical condition" means terminal illness requiring end-of-life care, irreversible spinal cord injury with objective neurological indication of intractable spasticity, cerebral palsy, cystic fibrosis, severe epilepsy or uncontrolled intractable seizure disorder, or (B) any medical condition, medical treatment or disease approved for qualifying patients by the Department of Consumer Protection and posted online pursuant to section 21a-408*l*;

(8) "Dispensary facility" means a place of business where marijuana may be dispensed, sold or distributed in accordance with this chapter and any regulations adopted thereunder to qualifying patients and caregivers and for which the department has issued a dispensary facility license pursuant to this chapter;

(9) "Employee" has the same meaning as provided in section 21a-420, as amended by this act;

(10) "Institutional animal care and use committee" means a committee that oversees an organization's animal program, facilities and procedures to ensure compliance with federal policies, guidelines and principles related to the care and use of animals in research;

(11) "Institutional review board" means a specifically constituted review body established or designated by an organization to protect the

*Substitute House Bill No. 5150*

rights and welfare of persons recruited to participate in biomedical, behavioral or social science research;

(12) "Licensed dispensary" or "dispensary" means an individual who is a licensed pharmacist employed by a dispensary facility or hybrid retailer;

(13) "Marijuana" **[**means marijuana, as defined**]** has the same meaning as provided in section 21a-240, as amended by this act;

(14) "Nurse" means a person who is licensed as a nurse under chapter 378;

(15) "Palliative use" means the acquisition, distribution, transfer, possession, use or transportation of marijuana or paraphernalia relating to marijuana, including the transfer of marijuana and paraphernalia relating to marijuana from the patient's caregiver to the qualifying patient, to alleviate a qualifying patient's symptoms of a debilitating medical condition or the effects of such symptoms, but does not include any such use of marijuana by any person other than the qualifying patient;

(16) "Paraphernalia" means drug paraphernalia, as defined in section 21a-240, as amended by this act;

(17) "Physician" means a person who is licensed as a physician under chapter 370;

(18) "Physician assistant" means a person who is licensed as a physician assistant under chapter 370;

(19) "Producer" means a person who is licensed as a producer pursuant to section 21a-408i;

(20) "Qualifying patient" means a person who **[**:**]** (A) **[**Is**]** is a resident of Connecticut, (B) has been diagnosed by a physician, physician

*Substitute House Bill No. 5150*

assistant or advanced practice registered nurse as having a debilitating medical condition, and (C) (i) is eighteen years of age or older, (ii) is an emancipated minor, or (iii) has written consent from a custodial parent, guardian or other person having legal custody of such person that indicates that such person has permission from such parent, guardian or other person for the palliative use of marijuana for a debilitating medical condition and that such parent, guardian or other person will (I) serve as a caregiver for the qualifying patient, and (II) control the acquisition and possession of marijuana and any related paraphernalia for palliative use on behalf of such person. "Qualifying patient" does not include an inmate confined in a correctional institution or facility under the supervision of the Department of Correction;

(21) "Research program" means a study approved by the Department of Consumer Protection in accordance with this chapter and undertaken to increase information or knowledge regarding the growth or processing of marijuana, or the medical attributes, dosage forms, administration or use of marijuana to treat or alleviate symptoms of any medical conditions or the effects of such symptoms;

(22) "Research program employee" means a person who (A) is registered as a research program employee under section 21a-408t, or (B) holds a temporary certificate of registration issued pursuant to section 21a-408t;

(23) "Research program subject" means a person registered as a research program subject pursuant to section 21a-408v;

(24) "Usable marijuana" means the dried leaves and flowers of the marijuana plant, and any mixtures or preparations of such leaves and flowers, that are appropriate for the palliative use of marijuana, but does not include the seeds, stalks and roots of the marijuana plant; and

(25) "Written certification" means a written certification issued by a

physician, physician assistant or advanced practice registered nurse pursuant to section 21a-408c.

Sec. 3. (NEW) (*Effective July 1, 2024*) (a) Each cannabis establishment shall submit marijuana samples to a cannabis testing laboratory for testing as set forth in subsection (b) of this section.

(b) (1) A cannabis testing laboratory shall test each marijuana sample submitted pursuant to subsection (a) of this section (A) for microbiological contaminants, mycotoxins, heavy metals and pesticide chemical residue, and (B) for purposes of conducting an active ingredient analysis, if applicable.

(2) Microbiological contaminant testing conducted pursuant to subparagraph (A) of subdivision (1) of this subsection shall include, but not be limited to, microbiological contaminant testing for Aspergillus species as set forth by the Department of Consumer Protection and posted on the department's Internet web site.

(c) When conducting microbiological testing as set forth in subsection (b) of this section, the marijuana sample shall be tested by using (1) a molecular method that (A) includes quantitative polymerase chain reaction, (B) is certified for identifying microbiological DNA, and (C) is approved by (i) the Association of Official Analytical Collaboration International, or (ii) a comparable national or international standards organization designated by the Commissioner of Consumer Protection, or (2) an alternative testing method approved by the Department of Consumer Protection and posted on the department's Internet web site.

(d) If a marijuana sample does not pass the testing set forth in subsection (b) of this section, the cannabis establishment that submitted such failing marijuana sample to the cannabis testing laboratory shall:

(1) Repeat testing as set forth in subsections (a) and (b) of this section on the marijuana batch from which such marijuana sample was taken,

*Substitute House Bill No. 5150*

in a form and manner approved by the Department of Consumer Protection. If all repeated testing yields satisfactory results, the marijuana batch from which the marijuana samples were taken shall be released for sale;

(2) If such cannabis establishment submits to the Commissioner of Consumer Protection a remediation plan that is sufficient to ensure public health and safety, and the commissioner approves such remediation plan, remediate the marijuana batch from which such marijuana sample was taken and repeat all testing as set forth in subsections (a) and (b) of this section on such remediated marijuana batch, in a form and manner approved by the Department of Consumer Protection. If all repeated testing yields satisfactory results, the marijuana batch from which the marijuana samples were taken shall be released for sale; or

(3) If such cannabis establishment does not comply with subdivision (1) or (2) of this subsection, or if any subsequent laboratory testing does not yield satisfactory results for the testing set forth in subsections (a) and (b) of this section, dispose of the entire marijuana batch from which the marijuana sample was taken in accordance with procedures established by the Commissioner of Consumer Protection, as published on the Department of Consumer Protection's Internet web site.

(e) For purposes of the testing set forth in subsections (a) and (b) of this section, the quantity and number of marijuana samples taken shall be sufficient to ensure representative sampling of the corresponding marijuana batch size.

Sec. 4. Section 21a-420 of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

As used in RERACA, unless the context otherwise requires:

*Substitute House Bill No. 5150*

(1) "Responsible and Equitable Regulation of Adult-Use Cannabis Act" or "RERACA" means this section, sections 2-56j, 7-294kk, 7-294*ll*, 12-330*ll* to 12-330nn, inclusive, 14-227p, 21a-278b, 21a-278c, 21a-279c, 21a-279d, 21a-420a to 21a-420j, inclusive, 21a-420*l* to 21a-421r, inclusive, 21a-421aa to 21a-421ff, inclusive, 21a-421aaa to 21a-421hhh, inclusive, 21a-422 to 21a-422c, inclusive, 21a-422e to 21a-422g, inclusive, 21a-422j to 21a-422s, inclusive, 22-61n, as amended by this act, 23-4b, 47a-9a, 53-247a, 53a-213a, 53a-213b, 54-33p, 54-56q, 54-56r, 54-125k and 54-142u, sections 23, 60, 63 to 65, inclusive, 124, 144 and 165 of public act 21-1 of the June special session, and the amendments in public act 21-1 of the June special session to sections 7-148, 10-221, 12-30a, 12-35b, 12-412, 12-650, 12-704d, 14-44k, 14-111e, 14-227a to 14-227c, inclusive, 14-227j, 15-140q, 15-140r, 18-100h, 19a-342, 19a-342a, 21a-267, 21a-277, 21a-279, 21a-279a, 21a-408 to 21a-408f, inclusive, as amended by this act, 21a-408h to 21a-408p, inclusive, 21a-408r to 21a-408v, inclusive, 30-89a, 31-40q, 32-39, 46b-120, 51-164n, 53-394, 53a-39c, 54-1m, 54-33g, 54-41b, 54-56e, 54-56g, 54-56i, 54-56k, 54-56n, 54-63d, 54-66a and 54-142e, **[**and**]** section 20 of public act 23-79 and sections 3, 5 and 6 of this act;

(2) "Backer" means any individual with a direct or indirect financial interest in a cannabis establishment. "Backer" does not include an individual with an investment interest in a cannabis establishment if (A) the interest held by such individual and such individual's spouse, parent or child, in the aggregate, does not exceed five per cent of the total ownership or interest rights in such cannabis establishment, and (B) such individual does not participate directly or indirectly in the control, management or operation of the cannabis establishment;

(3) "Cannabis" means marijuana, as defined in section 21a-240, as amended by this act;

(4) "Cannabis establishment" means a producer, dispensary facility, cultivator, micro-cultivator, retailer, hybrid retailer, food and beverage manufacturer, product manufacturer, product packager, delivery

*Substitute House Bill No. 5150*

service or transporter;

(5) "Cannabis flower" means the flower, including abnormal and immature flowers, of a plant of the genus cannabis that has been harvested, dried, cured, chopped or ground, and prior to any processing whereby the flower material is transformed into a cannabis product. "Cannabis flower" does not include (A) the leaves or stem of such plant, or (B) hemp, as defined in section 22-61*l*, as amended by this act;

(6) "Cannabis testing laboratory" means a laboratory that (A) is located in this state, (B) is licensed by the department to analyze cannabis, and (C) meets the licensure requirements established in section 21a-408r and the regulations adopted pursuant to subsection (d) of section 21a-408r;

(7) "Cannabis testing laboratory employee" means an individual who is (A) employed at a cannabis testing laboratory, and (B) registered pursuant to section 21a-408r and the regulations adopted pursuant to subsection (d) of section 21a-408r;

(8) "Cannabis trim" means all parts, including abnormal or immature parts, of a plant of the genus cannabis, other than cannabis flower, that have been harvested, dried and cured, and prior to any processing, excluding chopping or grinding, whereby the plant material is transformed into a cannabis product. "Cannabis trim" does not include hemp, as defined in section 22-61*l*, as amended by this act;

(9) "Cannabis product" means cannabis, intended for use or consumption, that is in the form of (A) a cannabis concentrate, or (B) a product that contains cannabis and at least one other cannabis or noncannabis ingredient or component, excluding cannabis flower;

(10) "Cannabis concentrate" means any form of concentration, including, but not limited to, extracts, oils, tinctures, shatter and waxes, that is extracted from cannabis;

(11) "Cannabis-type substances" have the same meaning as "marijuana", as defined in section 21a-240, as amended by this act;

(12) "Commissioner" means the Commissioner of Consumer Protection and includes any designee of the commissioner;

(13) "Consumer" means an individual who is twenty-one years of age or older;

(14) "Control" means the power to direct, or cause the direction of, the management and policies of a cannabis establishment, regardless of whether such power is possessed directly or indirectly;

(15) "Cultivation" has the same meaning as provided in section 21a-408, as amended by this act;

(16) "Cultivator" means a person that is licensed to engage in the cultivation, growing and propagation of the cannabis plant at an establishment with not less than fifteen thousand square feet of grow space;

(17) "Delivery service" means a person that is licensed to deliver cannabis from (A) micro-cultivators, retailers and hybrid retailers to consumers and research program subjects, and (B) hybrid retailers and dispensary facilities to qualifying patients, caregivers and research program subjects, as defined in section 21a-408, as amended by this act, or to hospices or other inpatient care facilities licensed by the Department of Public Health pursuant to chapter 368v that have a protocol for the handling and distribution of cannabis that has been approved by the department, or a combination thereof;

(18) "Department" means the Department of Consumer Protection;

(19) "Dispensary facility" means a place of business where cannabis may be dispensed, sold or distributed in accordance with chapter 420f

and any regulations adopted pursuant to said chapter, to qualifying patients and caregivers, and to which the department has issued a dispensary facility license pursuant to chapter 420f and any regulations adopted pursuant to said chapter;

(20) "Disproportionately impacted area" means (A) for the period beginning July 1, 2021, and ending July 31, 2023, a United States census tract in the state that has, as determined by the Social Equity Council under subdivision (1) of subsection (i) of section 21a-420d, as amended by this act, (i) a historical conviction rate for drug-related offenses greater than one-tenth, or (ii) an unemployment rate greater than ten per cent, and (B) on and after August 1, 2023, a United States census tract in this state that has been identified by the Social Equity Council pursuant to subdivision (2) of subsection (i) of section 21a-420d;

(21) "Disqualifying conviction" means a conviction within the last ten years which has not been the subject of an absolute pardon under the provisions of section 54-130a, or an equivalent pardon process under the laws of another state or the federal government, for an offense under (A) section 53a-276, 53a-277 or 53a-278, **[;]** (B) section 53a-291, 53a-292 or 53a-293, **[;]** (C) section 53a-215, **[;]** (D) section 53a-138 or 53a-139, **[;]** (E) section 53a-142a, **[;]** (F) sections 53a-147 to 53a-162, inclusive, **[;]** (G) sections 53a-125c to 53a-125f, inclusive, **[;]** (H) section 53a-129b, 53a-129c or 53a-129d, **[;]** (I) subsection (b) of section 12-737, **[;]** (J) section 53a-48 or 53a-49, if the offense which is attempted or is an object of the conspiracy is an offense under the statutes listed in subparagraphs (A) to (I), inclusive, of this subdivision, **[;]** or (K) the law of any other state or of the federal government, if the offense on which such conviction is based is defined by elements that substantially include the elements of an offense under the statutes listed in subparagraphs (A) to (J), inclusive, of this subdivision;

(22) "Dispensary technician" means an individual who has had an active pharmacy technician or dispensary technician registration in this

*Substitute House Bill No. 5150*

state within the past five years, is affiliated with a dispensary facility or hybrid retailer and is registered with the department in accordance with chapter 420f and any regulations adopted pursuant to said chapter;

(23) "Edible cannabis product" means a cannabis product intended for humans to eat or drink;

(24) "Employee" means any person who is not a backer, but is a member of the board of a company with an ownership interest in a cannabis establishment, and any person employed by a cannabis establishment or who otherwise has access to such establishment or the vehicles used to transport cannabis, including, but not limited to, an independent contractor who has routine access to the premises of such establishment or to the cannabis handled by such establishment;

(25) "Equity" and "equitable" means efforts, regulations, policies, programs, standards, processes and any other functions of government or principles of law and governance intended to [:] (A) [Identify] identify and remedy past and present patterns of discrimination and disparities of race, ethnicity, gender and sexual orientation, [;] (B) ensure that such patterns of discrimination and disparities, whether intentional or unintentional, are neither reinforced nor perpetuated, [;] and (C) prevent the emergence and persistence of foreseeable future patterns of discrimination or disparities of race, ethnicity, gender and sexual orientation;

(26) "Equity joint venture" means a business entity that is controlled, and at least fifty per cent owned, by an individual or individuals, or such applicant is an individual, who meets the criteria of subparagraphs (A) and (B) of subdivision [(50)] (51) of this section;

(27) "Extract" means the preparation, compounding, conversion or processing of cannabis, either directly or indirectly by extraction or independently by means of chemical synthesis, or by a combination of

*Substitute House Bill No. 5150*

extraction and chemical synthesis to produce a cannabis concentrate;

(28) "Financial interest" means any right to, ownership, an investment or a compensation arrangement with another person, directly, through business, investment or family. "Financial interest" does not include ownership of investment securities in a publicly-held corporation that is traded on a national exchange or over-the-counter market, provided the investment securities held by such person and such person's spouse, parent or child, in the aggregate, do not exceed one-half of one per cent of the total number of shares issued by the corporation;

(29) "Food and beverage manufacturer" means a person that is licensed to own and operate a place of business that acquires cannabis and creates food and beverages;

(30) "Grow space" means the portion of a premises owned and controlled by a producer, cultivator or micro-cultivator that is utilized for the cultivation, growing or propagation of the cannabis plant, and contains cannabis plants in an active stage of growth, measured starting from the outermost wall of the room containing cannabis plants and continuing around the outside of the room. "Grow space" does not include space used to cure, process, store harvested cannabis or manufacture cannabis once the cannabis has been harvested;

(31) "Historical conviction count for drug-related offenses" means, for a given area, the number of convictions of residents of such area (A) for violations of sections 21a-267, 21a-277, 21a-278, 21a-279 and 21a-279a, and (B) who were arrested for such violations between January 1, 1982, and December 31, 2020, inclusive, where such arrest was recorded in databases maintained by the Department of Emergency Services and Public Protection;

(32) "Historical conviction rate for drug-related offenses" means, for a given area, the historical conviction count for drug-related offenses

*Substitute House Bill No. 5150*

divided by the population of such area, as determined by the five-year estimates of the most recent American Community Survey conducted by the United States Census Bureau;

(33) "Hybrid retailer" means a person that is licensed to purchase cannabis and sell cannabis and medical marijuana products;

(34) "Infused beverage" has the same meaning as provided in section 26 of this act;

[(34)] (35) "Key employee" means an employee with the following management position or an equivalent title within a cannabis establishment: (A) President or chief officer, who is the top ranking individual at the cannabis establishment and is responsible for all staff and overall direction of business operations; (B) financial manager, who is the individual who reports to the president or chief officer and who is responsible for oversight of the financial operations of the cannabis establishment, which financial operations include one or more of the following: (i) Revenue and expense management; (ii) distributions; (iii) tax compliance; (iv) budget development; and (v) budget management and implementation; or (C) compliance manager, who is the individual who reports to the president or chief officer and who is generally responsible for ensuring the cannabis establishment complies with all laws, regulations and requirements related to the operation of the cannabis establishment;

[(35)] (36) "Labor peace agreement" means an agreement between a cannabis establishment and a bona fide labor organization under section 21a-421d pursuant to which the owners and management of the cannabis establishment agree not to lock out employees and that prohibits the bona fide labor organization from engaging in picketing, work stoppages or boycotts against the cannabis establishment;

[(36)] (37) "Manufacture" means to add or incorporate cannabis into

*Public Act No. 24-76*                                      **29** *of 109*

*Substitute House Bill No. 5150*

other products or ingredients or create a cannabis product;

**[**(37)**]** (38) "Medical marijuana product" means cannabis that may be exclusively sold to qualifying patients and caregivers by dispensary facilities and hybrid retailers and which are designated by the commissioner as reserved for sale to qualifying patients and caregivers and published on the department's Internet web site;

**[**(38)**]** (39) "Micro-cultivator" means a person licensed to engage in the cultivation, growing and propagation of the cannabis plant at an establishment containing not less than two thousand square feet and not more than ten thousand square feet of grow space, prior to any expansion authorized by the commissioner;

**[**(39)**]** (40) "Municipality" means any town, city or borough, consolidated town and city or consolidated town and borough;

**[**(40)**]** (41) "Paraphernalia" means drug paraphernalia, as defined in section 21a-240, as amended by this act;

**[**(41)**]** (42) "Person" means an individual, partnership, limited liability company, society, association, joint stock company, corporation, estate, receiver, trustee, assignee, referee or any other legal entity and any other person acting in a fiduciary or representative capacity, whether appointed by a court or otherwise, and any combination thereof;

**[**(42)**]** (43) "Producer" means a person that is licensed as a producer pursuant to section 21a-408i and any regulations adopted pursuant to said section;

**[**(43)**]** (44) "Product manufacturer" means a person that is licensed to obtain cannabis, extract and manufacture products;

**[**(44)**]** (45) "Product packager" means a person that is licensed to package and label cannabis;

*Substitute House Bill No. 5150*

**[(45)]** __(46)__ "Qualifying patient" has the same meaning as provided in section 21a-408__, as amended by this act__;

**[(46)]** __(47)__ "Research program" has the same meaning as provided in section 21a-408__, as amended by this act__;

**[(47)]** __(48)__ "Retailer" means a person, excluding a dispensary facility and hybrid retailer, that is licensed to purchase cannabis from producers, cultivators, micro-cultivators, product manufacturers and food and beverage manufacturers and to sell cannabis to consumers and research programs;

**[(48)]** __(49)__ "Sale" or "sell" has the same meaning as provided in section 21a-240__, as amended by this act__;

**[(49)]** __(50)__ "Social Equity Council" or "council" means the council established under section 21a-420d__, as amended by this act__;

**[(50)]** __(51)__ "Social equity applicant" means a person that has applied for a license for a cannabis establishment, where such applicant is controlled, and at least sixty-five per cent owned, by an individual or individuals, or such applicant is an individual, who:

(A) Had an average household income of less than three hundred per cent of the state median household income over the three tax years immediately preceding such individual's application; and

(B) (i) Was a resident of a disproportionately impacted area for not less than five of the ten years immediately preceding the date of such application; or

(ii) Was a resident of a disproportionately impacted area for not less than nine years prior to attaining the age of eighteen;

**[(51)]** __(52)__ "THC" has the same meaning as provided in section 21a-240__, as amended by this act__;

*Substitute House Bill No. 5150*

**[(52)]** (53) "Third-party lottery operator" means a person, or a constituent unit of the state system of higher education, that conducts lotteries pursuant to section 21a-420g, as amended by this act, identifies the cannabis establishment license applications for consideration without performing any review of the applications that are identified for consideration, and that has no direct or indirect oversight of or investment in a cannabis establishment or a cannabis establishment applicant;

**[(53)]** (54) "Transfer" means to transfer, change, give or otherwise dispose of control over or interest in;

**[(54)]** (55) "Transport" means to physically move from one place to another;

**[(55)]** (56) "Transporter" means a person licensed to transport cannabis between cannabis establishments, cannabis testing laboratories and research programs; and

**[(56)]** (57) "Unemployment rate" means, in a given area, the number of people sixteen years of age or older who are in the civilian labor force and unemployed divided by the number of people sixteen years of age or older who are in the civilian labor force.

Sec. 5. (NEW) (*Effective July 1, 2024*) (a) (1) During the period beginning July 1, 2024, and ending March 31, 2025, a social equity applicant that has submitted an application to the department for a cultivator license pursuant to subsection (a) of section 21a-420o of the general statutes, as amended by this act, may withdraw such application and apply for a micro-cultivator license pursuant to this section if:

(A) The Social Equity Council has verified that the applicant meets the criteria for a social equity applicant pursuant to subdivision (1) of subsection (a) of section 21a-420o of the general statutes, as amended by this act;

*Substitute House Bill No. 5150*

(B) The social equity applicant is eligible to receive a provisional cultivator license pursuant to subsection (a) of section 21a-420o of the general statutes, as amended by this act;

(C) The department has not already issued a provisional cultivator license to the social equity applicant pursuant to subsection (a) of section 21a-420o of the general statutes, as amended by this act; and

(D) The social equity applicant submits to the department, in a form and manner prescribed by the commissioner, a written statement by the social equity applicant withdrawing the social equity applicant's application under subsection (a) of section 21a-420o of the general statutes, as amended by this act.

(2) No social equity applicant that withdraws an application in the manner set forth in subdivision (1) of this subsection shall be eligible to receive a refund for any fee paid in connection with such withdrawn application.

(b) During the period beginning July 1, 2024, and ending December 31, 2025, the department shall issue a provisional micro-cultivator license to a social equity applicant pursuant to this section:

(1) If the social equity applicant meets the eligibility criteria established in subdivision (1) of subsection (a) of this section;

(2) If during the period beginning July 1, 2024, and ending March 31, 2025, the social equity applicant submits to the department, in a form and manner prescribed by the commissioner:

(A) A completed micro-cultivator license application and other documentation required to determine eligibility as set forth in subsections (e) to (l), inclusive, of section 21a-420g of the general statutes, as amended by this act;

*Substitute House Bill No. 5150*

(B) A written statement by the social equity applicant disclosing whether any change occurred in the ownership or control of the social equity applicant after the Social Equity Council verified that the applicant met the criteria for a social equity applicant pursuant to subdivision (1) of subsection (a) of section 21a-420o of the general statutes, as amended by this act; and

(C) The application fee required under subdivision (1) of subsection (c) of this section; and

(3) If any change described in subparagraph (B) of subdivision (2) of this subsection has occurred:

(A) Such change in ownership or control is allowed under (i) section 21a-420g of the general statutes, as amended by this act, and (ii) any regulation adopted, or policy or procedure issued, pursuant to section 21a-420g of the general statutes, as amended by this act, or 21a-420h of the general statutes; and

(B) Pursuant to subsection (d) of this section, (i) the Social Equity Council has determined that the social equity applicant continues to meet the criteria for a social equity applicant, and (ii) the department has received a written notice from the Social Equity Council affirming that the Social Equity Council has determined that the social equity applicant continues to meet the criteria for a social equity applicant.

(c) (1) A social equity applicant that submits a micro-cultivator license application pursuant to subsection (b) of this section shall submit to the department an application fee in the amount of five hundred thousand dollars. All application fees collected pursuant to this subdivision shall be deposited in the consumer protection enforcement account established in section 21a-8a of the general statutes.

(2) The fee to renew a final micro-cultivator license issued pursuant to this section shall be the same as the fee to renew a final micro-

*Substitute House Bill No. 5150*

cultivator license as set forth in section 21a-420e of the general statutes, as amended by this act. All renewal fees collected pursuant to this subdivision shall be paid to the State Treasurer and credited to the General Fund.

(d) If any change described in subparagraph (B) of subdivision (2) of subsection (b) of this section has occurred, the Social Equity Council shall (1) determine whether the social equity applicant continues to meet the criteria for a social equity applicant, and (2) submit to the department, in a form and manner prescribed by the commissioner, a written notice disclosing such determination.

(e) No social equity applicant that receives a micro-cultivator license under this section shall be eligible to apply for a provisional license and a final license to create more than one equity joint venture to be approved by the Social Equity Council under section 21a-420d of the general statutes, as amended by this act, and no such social equity applicant shall operate any such equity joint venture unless such social equity applicant has received a micro-cultivator license under this section, commenced cultivation activities under such micro-cultivator license and submitted to the department both the application fee required under subdivision (1) of subsection (c) of this section and a conversion fee in the amount of five hundred thousand dollars. The conversion fee collected pursuant to this subsection shall be deposited in the Cannabis Social Equity and Innovation Fund established in section 21a-420f of the general statutes.

(f) Each application submitted to the department pursuant to subsection (b) of this section, and all information included in, or submitted with, any application submitted pursuant to said subsection, shall be subject to the provisions of subsection (g) of section 21a-420e of the general statutes.

(g) Notwithstanding any other provision of RERACA, and except as

otherwise provided in subsections (a) to (f), inclusive, of this section:

(1) Each application submitted pursuant to subsection (b) of this section shall be processed as any other micro-cultivator application that has been selected through the lottery; and

(2) Each social equity applicant, application submitted pursuant to subsection (b) of this section and micro-cultivator license issued pursuant to this section shall be subject to subsections (e) to (l), inclusive, of section 21a-420g of the general statutes, as amended by this act.

Sec. 6. (NEW) (*Effective July 1, 2024*) (a) For the purposes of this section:

(1) "Container" (A) means an object that is offered, intended for sale or sold to a consumer and directly contains an infused beverage or legacy infused beverage, and (B) does not include an object or packaging that indirectly contains, or contains in bulk for transportation purposes, an infused beverage or legacy infused beverage; and

(2) "Legacy infused beverage" has the same meaning as provided in section 26 of this act.

(b) A fee of one dollar shall be assessed by a dispensary facility, hybrid retailer or retailer on each infused beverage container and legacy infused beverage container sold by such cannabis establishment. Such fee shall not be subject to any sales tax or treated as income pursuant to any provision of the general statutes.

(c) On October 1, 2024, and every six months thereafter, each dispensary facility, hybrid retailer or retailer shall remit payment to the department for each infused beverage container and legacy infused beverage container sold during the preceding six-month period. The funds received by the department from infused beverage sales and legacy infused beverage sales shall be deposited in the consumer

*Substitute House Bill No. 5150*

protection enforcement account established in section 21a-8a of the general statutes for the purposes of (1) protecting public health and safety, (2) educating consumers and licensees, and (3) ensuring compliance with cannabis and liquor control laws.

Sec. 7. Section 21a-420c of the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(a) Except as provided in RERACA and chapter 420b or 420f, (1) no person, other than a retailer, hybrid retailer, micro-cultivator or delivery service, or an employee thereof in the course of **[**his or her**]** such employee's employment, may sell or offer cannabis to a consumer, and (2) no person, other than a hybrid retailer, dispensary facility or a delivery service, or an employee thereof in the course of **[**his or her**]** such employee's employment, may sell or offer cannabis to qualifying patients and caregivers.

(b) No person except a delivery service, or an employee **[**thereof**]** of a delivery service, subject to the restrictions set forth in section 21a-420z, acting in the course of **[**his or her**]** such employee's employment may deliver cannabis to consumers, patients or caregivers. **[**except that retailers, hybrid retailers, micro-cultivators and dispensary facilities may utilize their own employees to deliver cannabis to the same individuals they may sell to pursuant to subsection (a) of this section until thirty days after the date the first five delivery service licensees have commenced public operation, which date shall be published by the commissioner on the department's Internet web site, and thereafter all delivery to consumers, patients or caregivers shall be done through a delivery service licensee.**]**

Sec. 8. Section 21a-420c of the general statutes, as amended by section 7 of this act, is repealed and the following is substituted in lieu thereof (*Effective October 1, 2024*):

*Substitute House Bill No. 5150*

(a) Except as provided in RERACA and chapter 420b or 420f, (1) no person, other than a retailer, hybrid retailer, micro-cultivator or delivery service, or an employee thereof in the course of such employee's employment, may sell or offer cannabis to a consumer, and (2) no person, other than a hybrid retailer, dispensary facility or a delivery service, or an employee thereof in the course of such employee's employment, may sell or offer cannabis to qualifying patients and caregivers.

(b) No person except a delivery service, or an employee of a delivery service, subject to the restrictions set forth in section 21a-420z, acting in the course of such employee's employment may deliver cannabis to consumers, patients or caregivers.

(c) Any violation of the provisions of this section shall be deemed an unfair or deceptive trade practice under subsection (a) of section 42-110b.

(d) (1) Any municipality may, by vote of its legislative body, prohibit the operation of any business within such municipality that is found to be in violation of the provisions of this section or if such operation poses an immediate threat to public health and safety.

(2) If the chief executive officer of a municipality determines that a business within the municipality is operating in violation of the provisions of this section or poses an immediate threat to public health and safety, the chief executive officer may apply to the Superior Court for an order under subdivision (3) of this subsection.

(3) Upon an application under subdivision (2) of this subsection, the Superior Court, upon a finding that a business within the municipality is operating in violation of the provisions of this section or poses an immediate threat to public health and safety, may issue forthwith, ex parte and without a hearing, an order that shall direct the chief law

*Substitute House Bill No. 5150*

enforcement officer of the municipality to take from such business possession and control of any merchandise related to such violation or immediate threat to public health and safety, which merchandise shall include, but need not be limited to, (A) any cannabis or cannabis product, (B) any cigarette, tobacco or tobacco product, (C) any merchandise related to the merchandise described in subparagraphs (A) and (B) of this subdivision, and (D) any proceeds related to the merchandise described in subparagraphs (A) to (C), inclusive, of this subdivision.

(4) As used in this subsection, (A) "cigarette" has the same meaning as provided in section 4-28h, (B) "immediate threat to public health and safety" includes, but is not limited to, the presence of (i) any cannabis or cannabis product in connection with a violation of this section, or (ii) any cigarette or tobacco product alongside any cannabis or cannabis product, and (C) "operation" and "operating" mean engaging in the sale of, or otherwise offering for sale, goods and services to the general public, including, but not limited to, through indirect retail sales.

(e) (1) Any person who violates any provision of this section shall be assessed a civil penalty of thirty thousand dollars for each violation. Each day that such violation continues shall constitute a separate offense.

(2) Any person who aids or abets any violation of the provisions of this section shall be assessed a civil penalty of thirty thousand dollars for each violation. Each day that such person aids or abets such violation shall constitute a separate offense. For the purposes of this subdivision, no person shall be deemed to have aided or abetted a violation of the provisions of this section unless (A) such person was the owner, officer, controlling shareholder or in a similar position of authority that allowed such person to make command or control decisions regarding the operations and management of another person who (i) is prohibited from selling or offering any cannabis or cannabis product under this

*Substitute House Bill No. 5150*

section, and (ii) sold or offered any cannabis or cannabis product in violation of this section, (B) such person knew that such other person (i) is prohibited from selling or offering any cannabis or cannabis product under this section, and (ii) sold or offered any cannabis or cannabis product in violation of this section, (C) such person provided substantial assistance or encouragement in connection with the sale or offer of such cannabis or cannabis product in violation of this section, and (D) such person's conduct was a substantial factor in furthering the sale or offer of such cannabis or cannabis product in violation of this section.

(3) Any person who manages or controls a commercial property, or who manages or controls a commercial building, room, space or enclosure, in such person's capacity as an owner, lessee, agent, employee or mortgagor, who knowingly leases, rents or makes such property, building, room, space or enclosure available for use, with or without compensation, for the purpose of any sale or offer of any cannabis or cannabis product in violation of this section shall be assessed a civil penalty of ten thousand dollars for each violation. Each day that such violation continues shall constitute a separate offense.

(4) No person other than the Attorney General, upon complaint of the Commissioner of Consumer Protection, or a municipality in which the violation of this section occurred shall assess any civil penalty under this subsection or institute a civil action to recover any civil penalty imposed under this subsection. If a municipality institutes a civil action to recover any civil penalty imposed under this subsection, such penalty shall be paid first to the municipality to reimburse such municipality for the costs incurred in instituting such action. One-half of the remainder, if any, shall be payable to the treasurer of such municipality and one-half of such remainder shall be payable to the Treasurer and deposited in the General Fund.

(f) Nothing in this section shall be construed to prohibit the imposition of any criminal penalty on any person who (1) is prohibited

*Substitute House Bill No. 5150*

from selling or offering any cannabis or cannabis product under this section, and (2) sells or offers any cannabis or cannabis product in violation of this section.

Sec. 9. Subsection (k) of section 21a-420d of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(k) The council shall develop criteria for evaluating the ownership and control of any equity joint venture created under section 21a-420m, as amended by this act, 21a-420u, as amended by this act, [or] 21a-420j or section 5 of this act and shall review and approve or deny in writing such equity joint venture prior to such equity joint venture being licensed under section 21a-420m, as amended by this act, 21a-420u, as amended by this act, [or] 21a-420j or section 5 of this act. After developing criteria for social equity plans as described in subdivision (5) of subsection (h) of this section, the council shall review and approve or deny in writing any such plan submitted by a cannabis establishment as part of its final license application. The council shall not approve any equity joint venture applicant which shares with an equity joint venture any individual owner who meets the criteria established in subparagraphs (A) and (B) of subdivision [(50)] (51) of section 21a-420, as amended by this act, other than an individual owner in their capacity as a backer licensed under section 21a-420o, as amended by this act.

Sec. 10. Subsection (c) of section 21a-420e of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(c) Except as provided in subsection (d) of this section, the following fees shall be paid by each applicant:

(1) For a retailer license, the fee to enter the lottery shall be five hundred dollars, the fee to receive a provisional license shall be five

*Substitute House Bill No. 5150*

thousand dollars and the fee to receive a final license or a renewal of a final license shall be twenty-five thousand dollars.

(2) For a hybrid retailer license, the fee to enter the lottery shall be five hundred dollars, the fee to receive a provisional license shall be five thousand dollars and the fee to receive a final license or a renewal of a final license shall be twenty-five thousand dollars.

(3) For a cultivator license, the fee to enter the lottery shall be one thousand dollars, the fee to receive a provisional license shall be twenty-five thousand dollars and the fee to receive a final license or a renewal of a final license shall be seventy-five thousand dollars.

(4) For a micro-cultivator license, the fee to enter the lottery shall be two hundred fifty dollars, the fee to receive a provisional license shall be five hundred dollars and the fee to receive a final license or a renewal of a final license shall be one thousand dollars.

(5) (A) For a product manufacturer license, the fee to enter the lottery shall be seven hundred fifty dollars, the fee to receive a provisional license shall be five thousand dollars and the fee to receive a final license or a renewal of a final license shall be twenty-five thousand dollars.

(B) For a product manufacturer seeking authorization to expand the product manufacturer's authorized activities to include the authorized activities of a food and beverage manufacturer, the application fee for such expanded authorization shall be five thousand dollars and the fee to renew such expanded authorization shall be five thousand dollars. The fees due under this subparagraph shall be in addition to the fees due under subparagraph (A) of this subdivision.

(6) (A) For a food and beverage manufacturer license, the fee to enter the lottery shall be two hundred fifty dollars, the fee to receive a provisional license shall be one thousand dollars and the fee to receive a final license or a renewal of a final license shall be five thousand

*Substitute House Bill No. 5150*

dollars.

(B) For a food and beverage manufacturer seeking authorization to expand the food and beverage manufacturer's authorized activities to include the authorized activities of a product manufacturer, the application fee for such expanded authorization shall be twenty-five thousand dollars and the fee to renew such expanded authorization shall be twenty-five thousand dollars. The fees due under this subparagraph shall be in addition to the fees due under subparagraph (A) of this subdivision.

(7) (A) For a product packager license, the fee to enter the lottery shall be five hundred dollars, the fee to receive a provisional license shall be five thousand dollars and the fee to receive a final license or a renewal of a final license shall be twenty-five thousand dollars.

(B) For a product packager seeking authorization to expand the product packager's authorized activities to include the authorized activities of a product manufacturer, the application fee for such expanded authorization shall be thirty thousand dollars and the fee to renew such expanded authorization shall be twenty-five thousand dollars. The fees due under this subparagraph shall be in lieu of the fees due under subparagraph (A) of this subdivision.

(8) For a delivery service or transporter license, the fee to enter the lottery shall be two hundred fifty dollars, the fee to receive a provisional license shall be one thousand dollars and the fee to receive a final license or a renewal of a final license shall be five thousand dollars.

(9) For an initial or renewal of a backer license, the fee shall be one hundred dollars.

(10) For an initial or renewal of a key employee license, the fee shall be one hundred dollars.

*Substitute House Bill No. 5150*

(11) For an initial or renewal of a registration of an employee who is not a key employee, the fee shall be fifty dollars.

(12) The license conversion fee for a dispensary facility to become a hybrid retailer shall be one million dollars, except as provided in section 21a-420u, as amended by this act.

(13) The license conversion fee for a producer to engage in the adult use cannabis market shall be three million dollars, except as provided in section 21a-420*l*.

(14) For a dispensary facility license, the fee to enter the lottery shall be five hundred dollars, the fee to receive a provisional license shall be five thousand dollars and the fee to receive a final license or a renewal of a final license shall be five thousand dollars.

(15) For a producer license, the fee to enter the lottery shall be one thousand dollars, the fee to receive a provisional license shall be twenty-five thousand dollars and the fee to receive a final license or a renewal of a final license shall be seventy-five thousand dollars.

Sec. 11. Subsection (b) of section 21a-420g of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(b) Except as provided in section 21a-420o, as amended by this act, and section 5 of this act, prior to the first date that the department begins accepting applications for a license type, the department shall determine the maximum number of applications that shall be considered for such license type and post such information on its Internet web site. Fifty per cent of the maximum number of applications that shall be considered for each license type (1) shall be selected through a social equity lottery for such license type, and (2) shall be reserved by the department for social equity applicants. If, upon the close of the application period for a license type, the department receives more applications than the

TAG

*Substitute House Bill No. 5150*

maximum number to be considered in total or to be reserved for social equity applicants as set forth in this subsection, a third-party lottery operator shall conduct a lottery to identify applications for review by the department and the Social Equity Council.

Sec. 12. Subsection (b) of section 21a-420m of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(b) The equity joint venture shall be in any cannabis establishment licensed business, other than a cultivator license, provided such equity joint venture is at least fifty per cent owned and controlled by an individual or individuals who meet, or the equity joint venture applicant is an individual who meets, the criteria established in subparagraphs (A) and (B) of subdivision **[**(50)**]** (51) of section 21a-420, as amended by this act.

Sec. 13. Section 21a-420o of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(a) Thirty days after the Social Equity Council posts the criteria for social equity applicants on its Internet web site, the department shall open up a three-month application period for cultivators during which a social equity applicant may apply to the department for a provisional cultivator license and final license for a cultivation facility located in a disproportionately impacted area without participating in a lottery or request for proposals. Such application for a provisional license shall be granted upon: (1) **[**verification**]** Verification by the Social Equity Council that the applicant meets the criteria for a social equity applicant; (2) the applicant submitting to and passing a criminal background check; and (3) payment of a three-million-dollar fee to be deposited in the Cannabis Social Equity and Innovation Fund established in section 21a-420f. Upon granting such provisional license, the department shall notify the

*Substitute House Bill No. 5150*

applicant of the project labor agreement requirements of section 21a-421e, as amended by this act. The department shall not grant an application for a provisional cultivator license under this subsection after December 31, 2025.

(b) To obtain a final cultivator license under this section, the social equity applicant shall provide evidence of: (1) **[**a**]** A contract with an entity providing an approved electronic tracking system as described in section 21a-421n; (2) a right to exclusively occupy **[**a**]** the location **[**in a disproportionately impacted area**]** at which the cultivation facility will be located, which location shall be situated (A) in a disproportionately impacted area, (B) on any reservation, as defined in section 47-63, of the Schaghticoke, Paucatuck Eastern Pequot or Golden Hill Paugussett indigenous tribe recognized by this state under subsection (b) of section 47-59a, provided such reservation includes at least ten acres of contiguous land and such land comprised part of such reservation on July 1, 2024, (C) on any parcel of land owned in fee simple by any indigenous tribe recognized by this state under subsection (b) of section 47-59a, provided such parcel includes at least ten acres of contiguous land and is located in a municipality that, prior to July 1, 2024, contained any portion of a disproportionately impacted area, or (D) in the case of an exclusively outdoor grow, in a municipality containing any portion of a disproportionately impacted area, provided (i) such outdoor grow is conducted on land that such municipality has approved for agricultural or farming uses, and (ii) all cultivation complies with the provisions of the regulations adopted, and policies and procedures issued, pursuant to section 21a-421j, as amended by this act, permitting the outdoor cultivation of cannabis; (3) any necessary local zoning approval and permits for the cultivation facility; (4) a business plan; (5) a social equity plan approved by the Social Equity Council; (6) written policies for preventing diversion and misuse of cannabis and sales of cannabis to underage persons; and (7) blueprints of the facility and all other security requirements of the department.

*Substitute House Bill No. 5150*

Sec. 14. Section 21a-420p of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(a) On and after July 1, 2021, the department may issue or renew a license for a person to be a micro-cultivator. No person may act as a micro-cultivator or represent that such person is a licensed micro-cultivator unless such person has obtained a license from the department pursuant to this section.

(b) A micro-cultivator is authorized to cultivate, grow, propagate, manufacture and package the cannabis plant at an establishment containing not less than two thousand square feet and not more than ten thousand square feet of grow space, prior to any expansion authorized by the commissioner, provided such micro-cultivator complies with the provisions of any regulations adopted under section 21a-420q concerning grow space. A micro-cultivator business shall meet physical security controls set forth and required by the commissioner.

(c) A micro-cultivator may apply for expansion of its grow space, in increments of five thousand square feet, on an annual basis, from the date of initial licensure, if such licensee is not subject to any pending or final administrative actions or judicial findings. If there are any pending or final administrative actions or judicial findings against the licensee, the department shall conduct a suitability review to determine whether such expansion shall be granted, which determination shall be final and appealable only to the Superior Court. The micro-cultivator may apply for an expansion of its business annually upon renewal of its credential until such licensee reaches a maximum of twenty-five thousand square feet of grow space. If a micro-cultivator desires to expand beyond twenty-five thousand square feet of grow space, the micro-cultivator licensee may apply for a cultivator license one year after its last expansion request. The micro-cultivator licensee shall not be required to apply through the lottery application process to convert its license to a

*Substitute House Bill No. 5150*

cultivator license. If a micro-cultivator maintains its license and meets all of the application and licensure requirements for a cultivator license, including payment of the cultivator license fee established under section 21a-420e, as amended by this act, the micro-cultivator licensee shall be granted a cultivator license.

(d) A micro-cultivator may label, manufacture, package and perform extractions on any cannabis cultivated, grown and propagated at its licensed establishment provided it meets all licensure and application requirements for a food and beverage manufacturer, product manufacturer or product packager, as applicable.

(e) A micro-cultivator may sell, transfer or transport its cannabis to a dispensary facility, hybrid retailer, retailer, delivery service, food and beverage manufacturer, product manufacturer, research program, cannabis testing laboratory or product packager, provided the cannabis is cultivated, grown and propagated at the micro-cultivator's licensed establishment and transported utilizing the micro-cultivator's own employees or a transporter. A micro-cultivator shall not gift or transfer cannabis or cannabis products at no cost to a consumer as part of a commercial transaction.

(f) **[**A**]** (1) Subject to the requirements of this subsection and subsection (b) of section 21a-420c, as amended by this act, a micro-cultivator may sell its own cannabis, including, but not limited to, its own cannabis seedlings, to consumers, excluding qualifying patients and caregivers, **[**either**]** through a delivery service. **[**or utilizing its own employees, subject to the requirements of subsection (b) of section 21a-420c. Any micro-cultivator that engages in the delivery of cannabis shall maintain a secure location, in a manner approved by the commissioner, at the micro-cultivator's premises where cannabis that is unable to be delivered may be returned to the micro-cultivator. Such secure cannabis return location shall meet specifications set forth by the commissioner and published on the department's Internet web site or included in

*Substitute House Bill No. 5150*

regulations adopted by the department. A micro-cultivator shall cease delivery of cannabis to consumers if it converts to being a cultivator.] No cannabis establishment other than a micro-cultivator shall sell cannabis seedlings to consumers, and no cannabis establishment other than a delivery service shall deliver cannabis seedlings sold by a micro-cultivator to consumers.

(2) No micro-cultivator shall sell a cannabis seedling to a consumer unless:

(A) The micro-cultivator cultivated the cannabis seedling in this state from seed or clone;

(B) The cannabis seedling (i) has a standing height of not more than six inches measured from the base of the stem to the tallest point of the plant, (ii) does not contain any bud or flower, and (iii) has been tested for pesticides and heavy metals in accordance with the laboratory testing standards established in the policies and procedures issued, and final regulations adopted, by the commissioner pursuant to section 21a-421j, as amended by this act; and

(C) A label or informational tag is affixed to the cannabis seedling disclosing the following in legible English, black lettering, Times New Roman font, flat regular typeface, on a contrasting background and in uniform size of not less than one-tenth of one inch, based on a capital letter "K":

(i) The name of the micro-cultivator;

(ii) A product description for the cannabis seedling;

(iii) One of the following chemotypes anticipated after flowering: (I) "High THC, Low CBD"; (II) "Low THC, High CBD"; or (III) "50/50 THC and CBD";

(iv) The results of the testing required under subparagraph (B)(iii) of this subdivision;

(v) Directions for optimal care of the cannabis seedling;

(vi) Unobscured symbols, in a size of not less than one-half inch by one-half inch and in a format approved by the commissioner, which symbols shall indicate that the cannabis seedling contains THC and is not legal or safe for individuals younger than twenty-one years of age; and

(vii) A unique identifier generated by a cannabis analytic tracking system maintained by the department and used to track cannabis under the policies and procedures issued, and final regulations adopted, by the commissioner pursuant to section 21a-421j, as amended by this act.

(3) Notwithstanding section 21a-421j, as amended by this act, no cannabis seedling shall be required to be sold in child-resistant packaging.

(4) No micro-cultivator shall knowingly sell more than three cannabis seedlings to a consumer in any six-month period.

(5) No micro-cultivator shall accept any returned cannabis seedling.

Sec. 15. Subsection (b) of section 21a-420u of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(b) Any equity joint venture created under this section shall be created for the development of a cannabis establishment, other than a cultivator, provided such equity joint venture is at least fifty per cent owned and controlled by an individual or individuals who meet, or the equity joint venture applicant is an individual who meets, the criteria established in subparagraphs (A) and (B) of subdivision **[**(50)**]** (51) of

*Substitute House Bill No. 5150*

section 21a-420, as amended by this act.

Sec. 16. Subsection (d) of section 21a-420w of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(d) A food and beverage manufacturer may sell, transfer or transport its own products to a cannabis establishment, cannabis testing laboratory or research program, or obtain cannabis from a cannabis establishment, cannabis testing laboratory or research program for manufacturing purposes, provided such transportation is performed by utilizing its own employees or a transporter. A food and beverage manufacturer may not deliver any cannabis, cannabis products or food or beverage incorporating cannabis to a consumer, directly or through a delivery service.

Sec. 17. Subsection (d) of section 21a-420x of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(d) A product manufacturer may sell, transfer or transport its own products to a cannabis establishment, cannabis testing laboratory or research program, or obtain cannabis from a cannabis establishment, cannabis testing laboratory or research program for manufacturing purposes, provided such transportation is performed by utilizing its own employees or a transporter. A product manufacturer may not deliver any cannabis to a consumer directly or through a delivery service.

Sec. 18. Section 21a-420y of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(a) On and after July 1, 2021, the department may issue or renew a license for a person to be a product packager. No person may act as a

*Substitute House Bill No. 5150*

product packager or represent that such person is a product packager unless such person has obtained a license from the department pursuant to this section.

(b) A product packager may obtain cannabis from a producer, cultivator, micro-cultivator, food and beverage manufacturer or a product manufacturer, provided the product packager utilizes its own employees or a transporter. The product packager may sell, transfer or transport cannabis to and from any cannabis establishment, cannabis testing laboratory or research program, provided the product packager only transports cannabis packaged at its licensed establishment and utilizing its own employees or a transporter.

(c) A product packager shall be responsible for ensuring that cannabis products are labeled and packaged in compliance with the provisions of RERACA and the policies and procedures issued by the commissioner to implement, and any regulations adopted pursuant to, RERACA.

(d) A product packager shall ensure all equipment utilized for processing and packaging cannabis is sanitary and inspected regularly to deter the adulteration of cannabis.

(e) (1) A product packager may expand the product packager's authorized activities to include the authorized activities of a product manufacturer if: (A) The product packager submits to the department (i) a completed license expansion application on a form and in a manner prescribed by the commissioner, and (ii) the fee prescribed in subparagraph (B) of subdivision (7) of subsection (c) of section 21a-420e, as amended by this act; and (B) the commissioner authorizes the product packager, in writing, to expand such product packager's authorized activities to include the authorized activities of a product manufacturer.

(2) A product packager that expands the product packager's

*Substitute House Bill No. 5150*

authorized activities to include the authorized activities of a product manufacturer under this subsection shall comply with all provisions of this chapter, and all regulations, policies and procedures prescribed pursuant to this chapter, concerning product manufacturers. In the event of a conflict between any provision of this chapter, or any regulation, policy or procedure prescribed pursuant to this chapter, concerning product packagers and any such provision, regulation, policy or procedure concerning product manufacturers, the provision, regulation, policy or procedure imposing the more stringent public health and safety standard shall prevail.

Sec. 19. Section 21a-421e of the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(a) As used in this section: **[**, "project labor agreement"**]**

(1) "Affiliated business entity" means a business entity that, either directly or indirectly through one or more intermediaries, is controlled by, or is under common control with, a cannabis establishment;

(2) "Control" means the power to direct, or cause the direction of, the management and policies of a business entity;

(3) "Covered project" means a project that is (A) for the construction or renovation of any facility for the operation of a cannabis establishment, (B) in an amount of at least five million dollars, and (C) performed by or on behalf of (i) a cannabis establishment, or (ii) an affiliated business entity;

(4) "Labor organization" (A) means any organization that exists and is constituted, in whole or in part, for the purpose of (i) collective bargaining, or (ii) dealing with employers concerning grievances, terms or conditions of employment or other mutual aid or protection, and (B) does not include a company union, as defined in section 31-101; and

*Substitute House Bill No. 5150*

(5) "Project labor agreement" means [an agreement between a subcontractor or contractor and a cannabis establishment that: (1) Binds all contractors and subcontractors on the covered project to the project labor] a prehire collective bargaining agreement that (A) is entered into by and between (i) a cannabis establishment or an affiliated business entity, (ii) one or more contractors or subcontractors at any tier, and (iii) one or more labor organizations, (B) establishes the terms and conditions of employment in connection with performance of a covered project, (C) binds each affiliated entity, contractor and subcontractor to adhere to the terms of such collective bargaining agreement through the inclusion of specifications in all relevant solicitation provisions and contract documents [; (2)] concerning performance of the covered project, (D) allows [all contractors and subcontractors] each contractor or subcontractor to compete for contracts and subcontracts on the covered project without regard to whether [they are] such contractor or subcontractor is otherwise [parties to] a party to a collective bargaining [agreements; (3)] agreement, (E) establishes uniform terms and conditions of employment for all construction labor employed [on the projects; (4)] in connection with performance of the covered project, (F) guarantees against strikes, lockouts and similar job disruptions [; (5)] in connection with performance of the covered project, (G) sets forth mutually binding procedures for resolving labor disputes arising during the [project labor] term of such collective bargaining agreement, [;] and [(6)] (H) includes any other provisions as negotiated by the parties to such collective bargaining agreement to promote successful [delivery] performance of the covered project. [; and "employee organization" means any lawful association, labor organization, federation or council having as a primary purpose the improvement of wages, hours and other conditions of employment for employees of cannabis establishments.]

(b) [A project for the construction or renovation of any facility for the operation of a cannabis establishment in an amount of five million

*Substitute House Bill No. 5150*

dollars or greater**]** Each covered project shall be the subject of a project labor agreement. **[**between the contractors and subcontractors of such project and the cannabis establishment.**]** A contractor, subcontractor or **[**employee**]** labor organization may enforce the provisions of this section, or seek remedies for noncompliance with a project labor agreement entered into under this section, by commencing a civil action in the Superior Court in the judicial district **[**where the cannabis establishment project is located**]** in which the covered project is to be performed or is performed. The court, after hearing, may order penalties of not more than ten thousand dollars per day for each violation of the project labor agreement by the cannabis establishment or affiliated business entity. A failure of a cannabis establishment or affiliated business entity to comply with the provisions of this section shall not be the basis for any administrative action by the Department of Consumer Protection.

Sec. 20. Subsection (b) of section 21a-421j of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(b) The commissioner shall adopt regulations in accordance with chapter 54 to implement the provisions of RERACA. Notwithstanding the requirements of sections 4-168 to 4-172, inclusive, in order to effectuate the purposes of RERACA and protect public health and safety, prior to adopting such regulations the commissioner shall issue policies and procedures to implement the provisions of RERACA that shall have the force and effect of law. The commissioner shall post all policies and procedures on the department's Internet web site and submit such policies and procedures to the Secretary of the State for posting on the eRegulations System, at least fifteen days prior to the effective date of any policy or procedure. The commissioner shall also provide such policies and procedures, in a manner prescribed by the commissioner, to each licensee. Any such policy or procedure shall no

*Substitute House Bill No. 5150*

longer be effective upon the earlier of either the adoption of the policy or procedure as a final regulation under section 4-172 or forty-eight months from June 22, 2021, if such regulations have not been submitted to the legislative regulation review committee for consideration under section 4-170. The commissioner shall issue policies and procedures and thereafter final regulations that include, but are not limited to, the following:

(1) Setting appropriate dosage, potency, concentration and serving size limits and delineation requirements for cannabis, provided a standardized serving of edible cannabis product or beverage, other than a medical marijuana product, shall contain not more than five milligrams of THC.

(2) Requiring that each single standardized serving of cannabis product in a multiple-serving edible product or beverage is physically demarked in a way that enables a reasonable person to determine how much of the product constitutes a single serving and a maximum amount of THC per multiple-serving edible cannabis product or beverage.

(3) Requiring that, if it is impracticable to clearly demark every standardized serving of cannabis product or to make each standardized serving easily separable in an edible cannabis product or beverage, the product, other than cannabis concentrate or medical marijuana product, shall contain not more than five milligrams of THC per unit of sale.

(4) Establishing, in consultation with the Department of Mental Health and Addiction Services, consumer health materials that shall be posted or distributed, as specified by the commissioner, by cannabis establishments to maximize dissemination to cannabis consumers. Consumer health materials may include pamphlets, packaging inserts, signage, online and printed advertisements and advisories and printed health materials.

*Substitute House Bill No. 5150*

(5) Imposing labeling and packaging requirements for cannabis sold by a cannabis establishment that include, but are not limited to, the following:

(A) Inclusion of universal symbols to indicate that cannabis, or a cannabis product, contains THC and is not legal or safe for individuals younger than twenty-one years of age, and prescribe how such product and product packaging shall utilize and exhibit such symbols.

(B) A disclosure concerning the length of time it typically takes for the cannabis to affect an individual, including that certain forms of cannabis take longer to have an effect.

(C) A notation of the amount of cannabis the cannabis product is considered the equivalent to.

(D) A list of ingredients and all additives for cannabis.

(E) **[**Child-resistant**]** <u>Except as provided in subdivision (3) of subsection (f) of section 21a-420p, as amended by this act, child-resistant</u>, tamper-resistant and light-resistant packaging. <u>**[**, including requiring that an edible product be individually wrapped.**]**</u> For the purposes of this subparagraph, packaging shall be deemed to be (i) child-resistant if the packaging satisfies the standard for special packaging established in 16 CFR 1700.1(b)(4), as amended from time to time, (ii) tamper-resistant if the packaging has at least one barrier to, or indicator of, entry that would preclude the contents of such packaging from being accessed or adulterated without indicating to a reasonable person that such packaging has been breached, and (iii) light-resistant if the packaging is entirely and uniformly opaque and protects the entirety of the contents of such packaging from the effects of light.

(F) **[**Packaging for**]** <u>Except as provided in subdivision (3) of subsection (f) of section 21a-420p, as amended by this act, (i) packaging for</u> cannabis intended for multiple servings to be resealable in such a

*Substitute House Bill No. 5150*

manner so as to render such packaging continuously child-resistant, as described in subparagraph (E)(i) of this subdivision, and preserve the integrity of the contents of such packaging, and (ii) if packaging for cannabis intended for multiple servings contains any edible cannabis product, for each single standardized serving to be easily discernible and (I) individually wrapped, or (II) physically demarked and delineated as required under this subsection.

(G) Impervious packaging that protects the contents of such packaging from contamination and exposure to any toxic or harmful substance, including, but not limited to, any glue or other adhesive or substance that is incorporated in such packaging.

(H) Product tracking information sufficient to determine where and when the cannabis was grown and manufactured such that a product recall could be effectuated.

(I) A net weight statement.

(J) A recommended use by or expiration date.

(K) Standard and uniform packaging and labeling, including, but not limited to, requirements (i) regarding branding or logos, (ii) that all packaging be opaque, and (iii) that amounts and concentrations of THC and cannabidiol, per serving and per package, be clearly marked on the packaging or label of any cannabis product sold.

(L) For any cannabis concentrate cannabis product that contains a total THC percentage greater than thirty per cent, a warning that such cannabis product is a high-potency product and may increase the risk of psychosis.

(M) Chemotypes, which shall be displayed as (i) "High THC, Low CBD" where the ratio of THC to CBD is greater than five to one and the total THC percentage is at least fifteen per cent, (ii) "Moderate THC,

*Substitute House Bill No. 5150*

Moderate CBD" where the ratio of THC to CBD is at least one to five but not greater than five to one and the total THC percentage is greater than five per cent but less than fifteen per cent, (iii) "Low THC, High CBD" where the ratio of THC to CBD is less than one to five and the total THC percentage is not greater than five per cent, or (iv) the chemotype described in clause (i), (ii) or (iii) of this subparagraph that most closely fits the cannabis or cannabis product, as determined by mathematical analysis of the ratio of THC to CBD, where such cannabis or cannabis product does not fit a chemotype described in clause (i), (ii) or (iii) of this subparagraph.

(N) A requirement that, prior to being sold and transferred to a consumer, qualifying patient or caregiver, cannabis packaging be clearly labeled, whether printed directly on such packaging or affixed by way of a separate label, other than an extended content label, with:

(i) A unique identifier generated by a cannabis analytic tracking system maintained by the department and used to track cannabis under the policies and procedures issued, and final regulations adopted, by the commissioner pursuant to this section; and

(ii) The following information concerning the cannabis contained in such packaging, which shall be in legible English, black lettering, Times New Roman font, flat regular typeface, on a contrasting background and in uniform size of not less than one-tenth of one inch, based on a capital letter "K", which information shall also be available on the Internet web site of the cannabis establishment that sells and transfers such cannabis:

(I) The name of such cannabis, as registered with the department under the policies and procedures issued, and final regulations adopted, by the commissioner pursuant to this section.

(II) The expiration date, which shall not account for any refrigeration

*Substitute House Bill No. 5150*

after such cannabis is sold and transferred to the consumer, qualifying patient or caregiver.

(III) The net weight or volume, expressed in metric and imperial units.

(IV) The standardized serving size, expressed in customary units, and the number of servings included in such packaging, if applicable.

(V) Directions for use and storage.

(VI) Each active ingredient comprising at least one per cent of such cannabis, including cannabinoids, isomers, esters, ethers and salts and salts of isomers, esters and ethers, and all quantities thereof expressed in metric units and as a percentage of volume.

(VII) A list of all known allergens, as identified by the federal Food and Drug Administration, contained in such cannabis, or the denotation "no known FDA identified allergens" if such cannabis does not contain any allergen identified by the federal Food and Drug Administration.

(VIII) The following warning statement within, and outlined by, a red box:

"This product is not FDA-approved, may be intoxicating, cause long-term physical and mental health problems, and have delayed side effects. It is illegal to operate a vehicle or machinery under the influence of cannabis. Keep away from children."

(IX) At least one of the following warning statements, rotated quarterly on an alternating basis:

"Warning: Frequent and prolonged use of cannabis can contribute to mental health problems over time, including anxiety, depression, stunted brain development and impaired memory."

*Substitute House Bill No. 5150*

"Warning: Consumption while pregnant or breastfeeding may be harmful."

"Warning: Cannabis has intoxicating effects and may be habit-forming and addictive."

"Warning: Consuming more than the recommended amount may result in adverse effects requiring medical attention.".

(X) All information necessary to comply with labeling requirements imposed under the laws of this state [or] and federal law, including, but not limited to, sections 21a-91 to 21a-120, inclusive, and 21a-151 to 21a-159, inclusive, the Federal Food, Drug and Cosmetic Act, 21 USC 301 et seq., as amended from time to time, and the federal Fair Packaging and Labeling Act, 15 USC 1451 et seq., as amended from time to time, for similar products that do not contain cannabis.

(XI) Such additional warning labels for certain cannabis products as the commissioner may require and post on the department's Internet web site.

(6) Establishing laboratory testing standards, consumer disclosures concerning mold and yeast in cannabis and permitted remediation practices.

(7) Restricting forms of cannabis products and cannabis product delivery systems to ensure consumer safety and deter public health concerns.

(8) Prohibiting certain manufacturing methods, or inclusion of additives to cannabis products, including, but not limited to, (A) added flavoring, terpenes or other additives unless approved by the department, or (B) any form of nicotine or other additive containing nicotine.

(9) Prohibiting cannabis product types that appeal to children.

(10) Establishing physical and cyber security requirements related to build out, monitoring and protocols for cannabis establishments as a requirement for licensure.

(11) Placing temporary limits on the sale of cannabis in the adult-use market, if deemed appropriate and necessary by the commissioner, in response to a shortage of cannabis for qualifying patients.

(12) Requiring retailers and hybrid retailers to make best efforts to provide access to (A) low-dose THC products, including products that have one milligram and two and a half milligrams of THC per dose, and (B) high-dose CBD products.

(13) Requiring producers, cultivators, micro-cultivators, product manufacturers and food and beverage manufacturers to register brand names for cannabis, in accordance with the policies and procedures and subject to the fee set forth in, regulations adopted under chapter 420f.

(14) Prohibiting a cannabis establishment from selling, other than the sale of medical marijuana products between cannabis establishments and the sale of cannabis to qualified patients and caregivers, (A) cannabis flower or other cannabis plant material with a total THC concentration greater than thirty per cent on a dry-weight basis, and (B) any cannabis product other than cannabis flower and cannabis plant material with a total THC concentration greater than sixty per cent on a dry-weight basis, except that the provisions of subparagraph (B) of this subdivision shall not apply to the sale of prefilled cartridges for use in an electronic cannabis delivery system, as defined in section 19a-342a and the department may adjust the percentages set forth in subparagraph (A) or (B) of this subdivision in regulations adopted pursuant to this section for purposes of public health or to address market access or shortage. As used in this subdivision, "cannabis plant

*Substitute House Bill No. 5150*

material" means material from the cannabis plant, as defined in section 21a-279a.

(15) Permitting the outdoor cultivation of cannabis.

(16) Prohibiting packaging that is (A) visually similar to any commercially similar product that does not contain cannabis, or (B) used for any good that is marketed to individuals reasonably expected to be younger than twenty-one years of age.

(17) Allowing packaging to include a picture of the cannabis product and contain a logo of one cannabis establishment, which logo may be comprised of not more than three colors and provided neither black nor white shall be considered one of such three colors.

(18) Requiring packaging to (A) be entirely and uniformly one color, and (B) not incorporate any information, print, embossing, debossing, graphic or hidden feature, other than any permitted or required label.

(19) Requiring that packaging and labeling for an edible cannabis product, excluding the warning labels required under this subsection and a picture of the cannabis product described in subdivision (17) of this subsection but including, but not limited to, the logo of the cannabis establishment, shall only be comprised of black and white or a combination thereof.

(20) (A) Except as provided in subparagraph (B) of this subdivision, requiring that delivery device cartridges be labeled, in a clearly legible manner and in as large a font as the size of the device reasonably allows, with only the following information (i) the name of the cannabis establishment where the cannabis is grown or manufactured, (ii) the cannabis brand, (iii) the total THC and total CBD content contained within the delivery device cartridge, (iv) the expiration date, and (v) the unique identifier generated by a cannabis analytic tracking system maintained by the department and used to track cannabis under the

*Substitute House Bill No. 5150*

policies and procedures issued, and final regulations adopted, by the commissioner pursuant to this section.

(B) A cannabis establishment may emboss, deboss or similarly print the name of the cannabis establishment's business entity, and one logo with not more than three colors, on a delivery device cartridge.

(21) Prescribing signage to be prominently displayed at dispensary facilities, retailers and hybrid retailers disclosing (A) possible health risks related to mold, and (B) the use and possible health risks related to the use of mold remediation techniques.

Sec. 21. Subsection (b) of section 21a-421*l* of the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(b) A cannabis establishment shall (1) store all cannabis in such a manner as to prevent diversion, theft or loss, (2) make cannabis accessible only to the minimum number of specifically authorized employees essential for efficient operation, and (3) return any cannabis to a secure location at the end of the scheduled business day. For the purposes of this subsection, a location shall be deemed to be secure if the location satisfies the requirements imposed in subsection (b) of section 21a-262-4 of the regulations of Connecticut state agencies for controlled substances listed in schedules III, IV and V of the Connecticut controlled substance scheduling regulations adopted pursuant to section 21a-243.

Sec. 22. Subsection (b) of section 21a-421bb of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(b) Except as provided in subsection (d) of this section, cannabis establishments shall not:

*Substitute House Bill No. 5150*

(1) Advertise, including, but not limited to, through a business name or logo, cannabis, cannabis paraphernalia or goods or services related to cannabis:

(A) In ways that target or are designed to appeal to individuals under twenty-one years of age, including, but not limited to, spokespersons or celebrities who appeal to individuals under the legal age to purchase cannabis or cannabis products, depictions of a person under twenty-five years of age consuming cannabis, or, the inclusion of objects, such as toys, characters or cartoon characters, suggesting the presence of a person under twenty-one years of age, or any other depiction designed in any manner to be appealing to a person under twenty-one years of age; or

(B) By using any image, or any other visual representation, of the cannabis plant or any part of the cannabis plant, including, but not limited to, the leaf of the cannabis plant;

(2) Engage in any advertising by means of any form of billboard within one thousand five hundred feet of an elementary or secondary school ground or a house of worship, recreation center or facility, child care center, playground, public park or library, or engage in any advertising by means of a billboard between the hours of six o'clock a.m. and eleven o'clock p.m.;

(3) Engage in advertising by means of any television, radio, Internet, mobile application, social media or other electronic communication, billboard or other outdoor signage, or print publication unless the cannabis establishment has reliable evidence that at least ninety per cent of the audience for the advertisement is reasonably expected to be twenty-one years of age or older;

(4) Engage in advertising or marketing directed toward location-based devices, including, but not limited to, cellular phones, unless the

*Substitute House Bill No. 5150*

marketing is a mobile device application installed on the device by the owner of the device who is twenty-one years of age or older and includes a permanent and easy opt-out feature and warnings that the use of cannabis is restricted to persons twenty-one years of age or older;

(5) Advertise cannabis or cannabis products in a manner claiming or implying, or permit any employee of the cannabis establishment to claim or imply, that such products have curative or therapeutic effects, or that any other medical claim is true, or allow any employee to promote cannabis for a wellness purpose unless such claims are substantiated as set forth in regulations adopted under chapter 420f or verbally conveyed by a licensed pharmacist or other licensed medical practitioner in the course of business in, or while representing, a hybrid retail or dispensary facility;

(6) Sponsor charitable, sports, musical, artistic, cultural, social or other similar events or advertising at, or in connection with, such an event unless the cannabis establishment has reliable evidence that (A) not more than ten per cent of the in-person audience at the event is reasonably expected to be under the legal age to purchase cannabis or cannabis products, and (B) not more than ten per cent of the audience that will watch, listen or participate in the event is expected to be under the legal age to purchase cannabis products;

(7) Advertise cannabis, cannabis products or cannabis paraphernalia in any physical form visible to the public within five hundred feet of an elementary or secondary school ground or a recreation center or facility, child care center, playground, public park or library;

(8) Cultivate cannabis or manufacture cannabis products for distribution outside of this state in violation of federal law, advertise in any way that encourages the transportation of cannabis across state lines or otherwise encourages illegal activity;

*Substitute House Bill No. 5150*

(9) Except for dispensary facilities and hybrid retailers, exhibit within or upon the outside of the facility used in the operation of a cannabis establishment, or include in any advertisement, the word "dispensary" or any variation of such term or any other words, displays or symbols indicating that such store, shop or place of business is a dispensary;

(10) Exhibit within or upon the outside of the premises subject to the cannabis establishment license, or include in any advertisement the words "drug store", "pharmacy", "apothecary", "drug", "drugs" or "medicine shop" or any combination of such terms or any other words, displays or symbols indicating that such store, shop or place of business is a pharmacy;

(11) Advertise on or in public or private vehicles or at bus stops, taxi stands, transportation waiting areas, train stations, airports or other similar transportation venues including, but not limited to, vinyl-wrapped vehicles or signs or logos on transportation vehicles not owned by a cannabis establishment;

(12) Display cannabis, cannabis products or any image, or any other visual representation, of the cannabis plant or any part of the cannabis plant, including, but not limited to, the leaf of the cannabis plant, so as to be clearly visible to a person from the exterior of the facility used in the operation of a cannabis establishment, or display signs or other printed material advertising any brand or any kind of cannabis or cannabis product, or including any image, or any other visual representation, of the cannabis plant or any part of the cannabis plant, including, but not limited to, the leaf of the cannabis plant, on the exterior of any facility used in the operation of a cannabis establishment;

(13) Utilize radio or loudspeaker, in a vehicle or in or outside of a facility used in the operation of a cannabis establishment, for the purposes of advertising the sale of cannabis or cannabis products; **[or]**

*Substitute House Bill No. 5150*

(14) Operate any web site advertising or depicting cannabis, cannabis products or cannabis paraphernalia unless such web site verifies that the entrants or users are twenty-one years of age or older; or

(15) Engage in advertising or marketing that includes a discounted price or other promotional offering as an inducement to purchase any cannabis or cannabis product that is not a medical marijuana product, except a discounted price or promotional offering may be offered, as an inducement to purchase cannabis, (A) within a dispensary facility, retailer or hybrid retailer, (B) through a delivery service, or (C) on an Internet web site maintained by or for a dispensary facility, retailer or hybrid retailer where cannabis or cannabis products may be lawfully ordered.

Sec. 23. Subdivision (30) of section 22-61*l* of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(30) "Manufacturer hemp product" (A) means a commodity manufactured from the hemp plant, for commercial or research purposes, that is intended for human ingestion, inhalation, absorption or other internal consumption, that contains a THC concentration of not more than 0.3 per cent on a dry weight basis or per volume or weight of such manufacturer hemp product, and (B) does not include an infused beverage, as defined in section 26 of this act;

Sec. 24. Section 22-61m of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(a) No person shall manufacture in the state without a license to manufacture issued by the Commissioner of Consumer Protection. Nothing in this section shall be construed to prohibit a person who is licensed in another state to manufacture, handle, store and market

*Substitute House Bill No. 5150*

manufacturer hemp products from applying for and obtaining a license in accordance with the provisions of this section.

(b) Each applicant for a manufacturer license shall submit an application on a form and in a manner prescribed by the Commissioner of Consumer Protection.

(c) The following fees shall apply for a license to manufacture:

(1) A nonrefundable license application fee of seventy-five dollars; and

(2) A nonrefundable licensing fee of three hundred seventy-five dollars for a license to manufacture hemp.

(d) A license to manufacture issued by the Commissioner of Consumer Protection pursuant to this section shall expire triennially on June thirtieth. Such licenses shall not be transferable.

(e) In accordance with a hearing held pursuant to chapter 54, the Commissioner of Consumer Protection may deny, suspend or revoke a manufacturer license, issue fines of not more than [two thousand five hundred] five thousand dollars per violation and place conditions upon a manufacturer licensee who violates the provisions of this section and any regulation adopted pursuant to this section.

(f) (1) Any individual who manufactures in this state without obtaining a license pursuant to this section or who manufactures in this state after such entity's license is suspended or revoked shall be fined [two hundred fifty] ten thousand dollars in accordance with the provisions of section 51-164n.

(2) Any entity who manufactures in this state without obtaining a license pursuant to this section, or who manufactures in this state after having a license suspended, shall be fined not more than [two thousand

*Substitute House Bill No. 5150*

five hundred**]** five thousand dollars per violation after a hearing conducted in accordance with the provisions of chapter 54.

(g) Nothing in this chapter or any regulations adopted pursuant to this chapter shall be construed to apply to persons licensed pursuant to section 21a-408i nor to require persons licensed pursuant to said section to obtain a license pursuant to this chapter.

(h) The Commissioner of Consumer Protection may inspect and shall have access to the buildings, equipment, supplies, vehicles, records, real property and other information of any manufacturer applicant or licensee that the commissioner deems necessary to carry out the commissioner's duties pursuant to this section.

(i) (1) Each manufacturer shall follow the protocol in this subsection for disposing of cannabis in the event that any hemp or hemp product is deemed to exceed the prescribed THC concentration, as determined by the Commissioner of Consumer Protection, or a manufacturer licensee in possession of hemp or hemp products who desires to dispose of obsolete, misbranded, excess or otherwise undesired product. Each manufacturer licensee shall be responsible for all costs of disposal of hemp samples and any hemp produced by such licensee that violates the provisions of this section or any regulation adopted pursuant to this section. Any cannabis that exceeds the prescribed THC concentration allowable in hemp or hemp products shall be immediately embargoed by such manufacturer and clearly labeled as adulterated by such licensee and such licensee shall immediately notify both the Department of Consumer Protection and the Department of Agriculture, in writing, of such adulterated product. Such adulterated product shall be destroyed and disposed of by the following method, as determined by the Commissioner of Consumer Protection:

(A) Surrender, without compensation, of such hemp or hemp product to the Commissioner of Consumer Protection who shall be responsible

*Substitute House Bill No. 5150*

for the destruction and disposal of such adulterated product; or

(B) By disposal in a manner prescribed by the Commissioner of Consumer Protection.

(2) Notwithstanding the provisions of subdivision (1) of this subsection, upon written request of a manufacturer, the Commissioner of Consumer Protection may permit such manufacturer to combine different batches of raw hemp plant material to achieve a THC concentration of 0.3 per cent on a dry weight basis, in lieu of embargo or destruction.

(j) The manufacturer or manufacturer's authorized designee disposing of the hemp or hemp products shall maintain and make available to the Commissioner of Consumer Protection a record of each such disposal or destruction of product indicating:

(1) The date, time and location of disposal or destruction;

(2) The manner of disposal or destruction;

(3) The batch or lot information and quantity of hemp or hemp product disposed of or destroyed; and

(4) The signatures of the persons disposing of the hemp or hemp products, the authorized representative of the Commissioner of Consumer Protection and any other persons present during the disposal.

(k) Any hemp intended to be manufactured by a manufacturer into a manufacturer hemp product shall be tested by an independent testing laboratory located in this state. A manufacturer licensee shall make available samples, in an amount and type determined by the Commissioner of Consumer Protection, of hemp for an independent testing laboratory employee to select random samples. The independent

testing laboratory shall test each sample in accordance with the laboratory testing standards established in policies, procedures and regulations adopted by the commissioner pursuant to section 21a-421j, as amended by this act.

(l) Once a batch of hemp, intended to be sold as a manufacturer hemp product, has been homogenized for sample testing and eventual packaging and sale, until the independent testing laboratory provides the results from its tests and analysis, the manufacturer shall segregate and withhold from use the entire batch of hemp that is intended for use as a manufacturer hemp product, except the samples that have been removed by the independent testing laboratory for testing. During this period of segregation, the manufacturer licensee shall maintain the hemp batch in a secure, cool and dry location, as prescribed by the Commissioner of Consumer Protection, so as to prevent the hemp from becoming adulterated. Such manufacturer shall not manufacture or sell a manufacturer hemp product prior to the time that the independent testing laboratory completes testing and analysis and provides such results, in writing, to the manufacturer licensee who initiated such testing.

(m) An independent testing laboratory shall immediately return or dispose of any hemp or manufacturer hemp product upon the completion of any testing, use or research. If an independent testing laboratory disposes of hemp or manufacturer hemp products, the laboratory shall dispose of such hemp in the following manner, as determined by the Commissioner of Consumer Protection:

(1) By surrender, without compensation, of such hemp or manufacturer hemp product to the Commissioner of Consumer Protection who shall be responsible for the destruction and disposal of such hemp or hemp product; or

(2) By disposal in a manner prescribed by the Commissioner of

*Substitute House Bill No. 5150*

Consumer Protection.

(n) If a sample does not pass the microbiological, mycotoxin, heavy metal or pesticide chemical residue test, based on the laboratory testing standards established in policies, procedures and regulations adopted by the Commissioner of Consumer Protection pursuant to section 21a-421j, as amended by this act, the manufacturer licensee who sent such batch for testing shall:

(1) Retest and reanalyze the hemp from which the sample was taken by having an employee from the same laboratory randomly select another sample from the same hemp batch. If the sample used to retest or reanalyze such hemp yields satisfactory results for all testing required under this section, an employee from a different laboratory shall randomly select a different sample from the same hemp batch for testing. If both samples yield satisfactory results for all testing required under this section, the hemp batch from which the samples were taken shall be released for manufacturing, processing and sale;

(2) If a remediation plan sufficient to ensure public health and safety is submitted to and approved by the commissioner, remediate the hemp batch from which the sample was taken and have a laboratory employee randomly select a sample from such remediated hemp batch for testing. If such randomly selected sample yields satisfactory results for any testing required under this section, an employee from a different laboratory shall randomly select a different sample from the same hemp batch for testing. If both samples yield satisfactory results for all testing required under this section, the hemp batch from which the samples were taken may be released for manufacturing, processing or sale; or

(3) If the manufacturer does not retest or remediate, or if any subsequent laboratory testing does not yield satisfactory results for any testing required under this section, dispose of the entire batch from which the sample was taken in accordance with procedures established

*Substitute House Bill No. 5150*

by the Commissioner of Consumer Protection pursuant to subdivision (1) of subsection (i) of this section.

(o) If a sample passes the microbiological, mycotoxin, heavy metal and pesticide chemical residue test, the independent testing laboratory shall release the entire batch for manufacturing, processing or sale.

(p) The independent testing laboratory shall file with the Department of Consumer Protection an electronic copy of each laboratory test result for any batch that does not pass the microbiological, mycotoxin, heavy metal or pesticide chemical residue test, at the same time that it transmits such results to the manufacturer licensee who requested such testing. Each independent testing laboratory shall maintain the test results of each tested batch for a period of three years and shall make such results available to the Department of Consumer Protection upon request.

(q) Manufacturers shall maintain records required by the federal act, this section, any regulation adopted pursuant to this section and the policies, procedures and regulations adopted by the Commissioner of Consumer Protection pursuant to section 21a-421j, as amended by this act. Each manufacturer shall make such records available to the Department of Consumer Protection immediately upon request and in electronic format, if available.

(r) The Commissioner of Consumer Protection may adopt regulations, in accordance with the provisions of chapter 54, to implement the provisions of this section including, but not limited to, establishing sampling and testing procedures to ensure compliance with this section, prescribing storage and disposal procedures for hemp, marijuana and manufacturer hemp products that fail to pass Department of Consumer Protection prescribed independent testing laboratory testing standards and establishing advertising and labeling requirements for manufacturer hemp products.

*Substitute House Bill No. 5150*

(s) Any claim of health impacts, medical effects or physical or mental benefits shall be prohibited on any advertising for, labeling of or marketing of manufacturer hemp products regardless of whether such manufacturer hemp products were manufactured in this state or another jurisdiction. Any violation of this subsection shall be deemed an unfair or deceptive trade practice under subsection (a) of section 42-110b.

(t) Not later than February 1, 2020, the Commissioners of Agriculture and Consumer Protection shall submit a report, in accordance with section 11-4a, to the joint standing committee of the general assembly having cognizance of matters relating to the environment on the status of the pilot program, the development of the state plan and any regulations for such pilot program or state plan. Such report shall also include any legislative recommendations, including, but not limited to, any recommendations for requiring the registration of any manufacturer hemp product offered for sale in this state.

(u) (1) Any person who sells manufacturer hemp products shall not be required to be licensed, provided such person only engages in: (A) The retail or wholesale sale of manufacturer hemp products in which no further manufacturing of hemp occurs, provided such manufacturer hemp products are acquired from a person authorized to manufacture the manufacturer hemp products under the laws of this state or another state, territory or possession of the United States or another sovereign entity; (B) the acquisition of manufacturer hemp products for the sole purpose of product distribution for resale; and (C) the retail sale of manufacturer hemp products that is authorized under federal or state law.

(2) The Commissioner of Consumer Protection or Commissioner of Revenue Services may, pursuant to section 4-182, summarily suspend any credential the Department of Consumer Protection or Department of Revenue Services, _respectively,_ issued to any person who [sells

*Substitute House Bill No. 5150*

manufacturer hemp products in violation of subdivision (1) of this subsection or subsections (v) to (y), inclusive, of this section] violates any provision of this section or chapter 214c, 228d, 420f or 420h.

(v) No manufacturer hemp product offered for sale in this state, or to a consumer in this state, shall contain any synthetic cannabinoid, as defined in section 21a-240, as amended by this act.

(w) No manufacturer hemp product offered for sale in this state, or to a consumer in this state, shall be packaged, presented or advertised in a manner that is likely to mislead a consumer by incorporating any statement, brand, design, representation, picture, illustration or other depiction that: (1) Bears a reasonable resemblance to trademarked or characteristic packaging of (A) cannabis offered for sale (i) in this state by a cannabis establishment licensed in this state, or (ii) on tribal land by a tribal-credentialed cannabis entity, or (B) a commercially available product other than a cannabis product, as defined in section 21a-420, as amended by this act; or (2) implies that the manufacturer hemp product (A) is a cannabis product, as defined in section 21a-420, as amended by this act, (B) contains a total THC concentration greater than three-tenths per cent on a dry-weight basis, or (C) is a high-THC hemp product, as defined in section 21a-240, as amended by this act.

(x) No manufacturer hemp product that is a food, beverage, oil or other product intended for human ingestion shall be distributed or sold in this state unless such product is contained within a package, or a label is affixed to such package, that includes:

(1) A scannable barcode, Internet web site address or quick response code that is linked to the certificate of analysis of the final form product batch by an independent testing laboratory and discloses:

(A) The name of such product;

(B) The name, address and telephone number of such product's

*Substitute House Bill No. 5150*

manufacturer, packer and distributor, as applicable;

(C) The batch number, which shall match the batch number on such package or label; and

(D) The concentration of cannabinoids present in such product, including, but not limited to, total THC and any cannabinoids or active ingredients comprising at least one per cent of such product;

(2) The expiration or best by date for such product, if applicable;

(3) A clear and conspicuous statement disclosing that:

(A) Children, or those who are pregnant or breastfeeding, should avoid using such product prior to consulting with a health care professional concerning such product's safety;

(B) Products containing cannabinoids should be kept out of reach of children; and

(C) The federal Food and Drug Administration has not evaluated such product for safety or efficacy; and

(4) If such product is intended to be inhaled, a clear and conspicuous warning statement disclosing that smoking or vaporizing is hazardous to human health.

(y) No manufacturer hemp product that is a topical, soap or cosmetic, as defined in section 21a-92, shall be distributed or sold in this state unless such product is contained within a package, or a label is affixed to such package, that includes:

(1) A scannable barcode, Internet web site address or quick response code that is linked to the certificate of analysis of the final form extract or final form product batch by an independent testing laboratory and discloses:

*Substitute House Bill No. 5150*

(A) The name of such product;

(B) The name, address and telephone number of such product's manufacturer, packer and distributor, as applicable;

(C) The batch number, which shall match the batch number on such package or label; and

(D) The concentration of cannabinoids present in such batch, including, but not limited to, total THC and any marketed cannabinoids;

(2) The expiration or best by date for such product, if applicable; and

(3) A clear and conspicuous statement disclosing the following:

"THE FDA HAS NOT EVALUATED THIS PRODUCT FOR SAFETY OR EFFICACY.".

**[**(z) Any violation of subsections (u) to (y), inclusive, of this section shall be deemed an unfair or deceptive trade practice under subsection (a) of section 42-110b.**]**

**[**(aa)**]** (z) Not later than October 31, 2023, and annually thereafter, the Department of Emergency Services and Public Protection shall, in consultation with the Department of Consumer Protection, publish a training bulletin to inform local law enforcement agencies and officers regarding the investigation and enforcement standards concerning cannabis and high-THC hemp products.

**[**(bb)**]** (aa) Notwithstanding any provision of the general statutes: (1) CBD that is found in manufacturer hemp products shall not be considered a controlled substance, as defined in section 21a-240, as amended by this act, or legend drug, as defined in section 20-571; and (2) CBD derived from hemp and contained in manufacturer hemp products shall not be considered a controlled substance or adulterant.

*Substitute House Bill No. 5150*

(bb) Nothing in this section shall be construed to prohibit the shipment or transportation through this state of any hemp that is lawfully produced under federal law.

Sec. 25. Subsection (c) of section 22-61n of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(c) Hemp or hemp products purchased by a producer, cultivator, micro-cultivator, [or] product manufacturer or food and beverage manufacturer from a third party shall be tracked as a separate batch throughout the manufacturing process in order to document the disposition of such hemp or hemp products. Once hemp or hemp products are received by a producer, cultivator, micro-cultivator, [or] product manufacturer or food and beverage manufacturer, such hemp or hemp products shall be deemed cannabis and shall comply with the requirements for cannabis contained in the applicable provisions of the general statutes and any regulations adopted pursuant to such provisions. A producer, cultivator, micro-cultivator, [and] product manufacturer and food and beverage manufacturer shall retain a copy of the certificate of analysis for purchased hemp or hemp products and invoice and transport documents that evidence the quantity purchased and date received.

Sec. 26. (NEW) (*Effective July 1, 2024*) For the purposes of this section and sections 27 and 28 of this act:

(1) "Cannabis" means marijuana, as defined in section 21a-240 of the general statutes, as amended by this act;

(2) "Cannabis establishment" has the same meaning as provided in section 21a-420 of the general statutes, as amended by this act;

(3) "Cannabis product" has the same meaning as provided in section 21a-420 of the general statutes, as amended by this act;

*Substitute House Bill No. 5150*

(4) "Cannabis testing laboratory" has the same meaning as provided in section 21a-408 of the general statutes, as amended by this act;

(5) "Commissioner" means the Commissioner of Consumer Protection;

(6) "Consumer" has the same meaning as provided in section 21a-420 of the general statutes, as amended by this act;

(7) "Container" (A) means an object that is offered, intended for sale or sold to a consumer and directly contains an infused beverage, and (B) does not include an object or packaging that indirectly contains, or contains in bulk for transportation purposes, an infused beverage;

(8) "Cultivator" has the same meaning as provided in section 21a-420 of the general statutes, as amended by this act;

(9) "Department" means the Department of Consumer Protection;

(10) "Dispensary facility" has the same meaning as provided in section 21a-420 of the general statutes, as amended by this act;

(11) "Food and beverage manufacturer" has the same meaning as provided in section 21a-420 of the general statutes, as amended by this act;

(12) "Hemp" has the same meaning as provided in section 22-61*l* of the general statutes, as amended by this act;

(13) "Hemp producer" means producer, as defined in section 22-61l of the general statutes, as amended by this act;

(14) "Hemp products" has the same meaning as provided in section 22-61*l* of the general statutes, as amended by this act;

(15) "Hybrid retailer" has the same meaning as provided in section

*Substitute House Bill No. 5150*

21a-420 of the general statutes, as amended by this act;

(16) "Infused beverage" means a beverage that (A) is not an alcoholic beverage, as defined in section 30-1 of the general statutes, (B) is intended for human consumption, and (C) contains, or is advertised, labeled or offered for sale as containing, total THC that is not greater than three milligrams per container;

(17) "Infused beverage manufacturer" means a person licensed by the Commissioner of Consumer Protection pursuant to section 27 of this act;

(18) "Legacy infused beverage" means a beverage that (A) is not an alcoholic beverage, as defined in section 30-1 of the general statutes, (B) is intended for human consumption, (C) contains, or is advertised, labeled or offered for sale as containing, THC, as defined in section 21a-240 of the general statutes, as amended by this act, and (D) as of June 30, 2024, is in compliance with (i) the provisions of RERACA, as defined in section 21a-420 of the general statutes, as amended by this act, and (ii) the policies and procedures issued by the Commissioner of Consumer Protection to implement, and any regulations adopted pursuant to, RERACA, as defined in section 21a-420 of the general statutes, as amended by this act;

(19) "Micro-cultivator" has the same meaning as provided in section 21a-420 of the general statutes, as amended by this act;

(20) "Manufacturer hemp product" has the same meaning as provided in section 22-61*l* of the general statutes, as amended by this act;

(21) "Producer" has the same meaning as provided in section 21a-420 of the general statutes, as amended by this act;

(22) "Product manufacturer" has the same meaning as provided in section 21a-420 of the general statutes, as amended by this act;

*Substitute House Bill No. 5150*

(23) "Retailer" has the same meaning as provided in section 21a-420 of the general statutes, as amended by this act; and

(24) "Total THC" has the same meaning as provided in section 21a-240 of the general statutes, as amended by this act.

Sec. 27. (NEW) (*Effective July 1, 2024*) (a) Notwithstanding the provisions of sections 22-61m of the general statutes, as amended by this act, and 22-61n of the general statutes, as amended by this act, and except as provided in subsection (c) of this section, no person shall, on or after October 1, 2024, manufacture any infused beverage that is intended to be sold or offered for sale in this state unless such person has received an infused beverage manufacturer license issued by the Commissioner of Consumer Protection pursuant to this section.

(b) A person seeking an infused beverage manufacturer license under this section shall submit to the Department of Consumer Protection, in a form and manner prescribed by the Commissioner of Consumer Protection, an application accompanied by an application fee in the amount of five thousand dollars. Each license issued pursuant to this section shall be valid for a period of one year, and shall be renewable for additional one-year periods upon submission of a renewal application in the manner, and payment of a renewal fee in the amount, set forth for an initial application under this subsection. All fees collected under this subsection shall be deposited in the consumer protection enforcement account established in section 21a-8a of the general statutes.

(c) (1) A cultivator, micro-cultivator, food and beverage manufacturer or product manufacturer, or a producer that has received expanded authorization to engage in the adult use cannabis market under the producer's license issued pursuant to section 21a-408i of the general statutes, may, beginning on October 1, 2024, manufacture infused beverages in this state that are intended to be sold or offered for sale in this state if such cultivator, micro-cultivator, food and beverage

*Substitute House Bill No. 5150*

manufacturer, product manufacturer or producer submits to the Department of Consumer Protection, in a form and manner prescribed by the Commissioner of Consumer Protection, a written request to manufacture such infused beverages, and the commissioner approves such written request.

(2) A cultivator, micro-cultivator, food and beverage manufacturer, product manufacturer or producer that receives approval from the Commissioner of Consumer Protection under subdivision (1) of this subsection shall be subject to all provisions of this section, and all regulations, policies and procedures adopted or issued pursuant to subsection (k) of this section, applicable to infused beverage manufacturers, except no such cultivator, micro-cultivator, food and beverage manufacturer, product manufacturer or producer shall be subject to the provisions of subsections (a) and (b) of this section.

(d) (1) Beginning on October 1, 2024, no infused beverage manufacturer shall obtain any hemp product for the purpose of manufacturing any infused beverage that is intended to be sold or offered for sale in this state unless such hemp product is in the form of hemp oil, and no such infused beverage manufacturer shall use any hemp product other than hemp oil to manufacture any such infused beverage.

(2) Beginning on October 1, 2024, no infused beverage manufacturer shall obtain any hemp oil for the purpose of manufacturing any infused beverage that is intended to be sold or offered for sale in this state unless such hemp oil:

(A) Is derived from hemp;

(B) (i) Was extracted from hemp grown by (I) a hemp producer, as evidenced by a certificate of authenticity issued by the hemp producer, or (II) a licensed hemp grower regulated by a state, territory or federally

*Substitute House Bill No. 5150*

recognized Indian tribe, and in accordance with a state or tribal plan approved by the United States Department of Agriculture, as evidenced by a certificate of authenticity issued by such licensed hemp grower, or (ii) was extracted (I) by a person who is actively credentialed by a state or federally recognized Indian tribe to extract hemp, and (II) in a facility that is credentialed by a state or federally recognized Indian tribe; and

(C) Was extracted from hemp by using (i) a Class 3 residual solvent within the meaning of the most recent United States Pharmacopeia, Chapter 467, as amended from time to time, (ii) a solvent generally recognized as safe pursuant to the Federal Food, Drug and Cosmetic Act, or (iii) a solvent approved by the Department of Consumer Protection and posted on the department's Internet web site.

(3) Beginning on October 1, 2024, each infused beverage manufacturer that manufactures any infused beverage that is intended to be sold or offered for sale in this state shall:

(A) Not manufacture any such infused beverage with total THC that exceeds three milligrams per container;

(B) Manufacture such infused beverage by using equipment that is exclusively used to manufacture an infused beverage or prepared in accordance with good manufacturing practices as set forth in 21 CFR Parts 110 and 111, as amended from time to time, as applicable; and

(C) Ensure that all hemp oil such infused beverage manufacturer possesses to manufacture such infused beverage is (i) stored in a secure, locked location separate from any cannabis, (ii) clearly and conspicuously labeled as hemp oil solely for use in manufacturing an infused beverage, and (iii) solely used for the purpose of manufacturing an infused beverage.

(e) (1) Beginning on October 1, 2024, no infused beverage that is sold or offered for sale in this state shall include (A) any additive that (i) is

*Substitute House Bill No. 5150*

psychotropic, or (ii) could increase the potency, toxicity or addictive properties of the infused beverage, including, but not limited to, caffeine other than caffeine naturally occurring in chocolate, or (B) total THC that exceeds three milligrams per container.

(2) (A) Beginning on October 1, 2024, each lot of an infused beverage in final form shall be tested by a cannabis testing laboratory. A statistically significant number of samples shall be collected from such lot and submitted to the cannabis testing laboratory for final product testing in a manner approved by the Department of Consumer Protection. Such sampling and final product testing shall be conducted by using a representative sample of such lot and by collecting a minimum number of sample increments relative to the size of such lot.

(B) Beginning on October 1, 2024, no infused beverage shall be sold or offered for sale in this state unless the infused beverage meets (i) the laboratory testing standards for cannabis established in, and any regulations, policies and procedures adopted or issued pursuant to, section 21a-421j of the general statutes, as amended by this act, or (ii) such other testing standards as may be approved by the Department of Consumer Protection and posted on the department's Internet web site.

(3) Beginning on October 1, 2024, no infused beverage sold or offered for sale in this state shall be packaged, labeled or advertised in any manner that is likely to mislead an individual by incorporating any statement, brand, design, representation, picture, illustration or other depiction that:

(A) Bears a reasonable resemblance to trademarked or characteristic packaging of (i) cannabis offered for sale (I) in this state by a cannabis establishment licensed in this state, or (II) on tribal land by a tribal-credentialed cannabis entity, or (ii) a commercially available product other than a cannabis product; or

*Substitute House Bill No. 5150*

(B) Appeals to individuals who are younger than twenty-one years of age by, among other things, (i) making use of any spokesperson or celebrity who appeals to such individuals, (ii) depicting any individual who is younger than twenty-five years of age consuming cannabis or an infused beverage, (iii) including any object, such as a toy, character or cartoon character, which suggests the presence of any individual who is younger than twenty-one years of age, or (iv) making use of any other method that is designed to appeal to any individual who is younger than twenty-one years of age.

(4) Beginning on October 1, 2024, each infused beverage container sold or offered for sale in this state shall prominently display a symbol, in a size of not less than one-half inch by one-half inch and in a format approved by the Commissioner of Consumer Protection, that indicates that such infused beverage is not legal or safe for individuals younger than twenty-one years of age.

(f) (1) Beginning on October 1, 2024, no infused beverage manufacturer shall sell an infused beverage to any person in this state other than (A) a dispensary facility, (B) a hybrid retailer, (C) a retailer, or (D) the holder of a wholesaler permit or a wholesaler permit for beer issued under section 30-17 of the general statutes.

(2) Beginning on October 1, 2024, a dispensary facility, hybrid retailer or retailer, before selling an infused beverage to a consumer in this state, or wholesaler permittee, before selling an infused beverage to a package store permittee under subsection (b) of section 30-20 of the general statutes, as amended by this act, shall, based on a representative sample of the infused beverage containers included in the shipment that includes such infused beverage, (A) verify that the infused beverages included in such shipment satisfy the requirements established in subdivision (3) of subsection (e) of this section and any regulations adopted, and policies and procedures issued, pursuant to subsection (k) of this section, and (B) for the purpose of preserving public health and

*Substitute House Bill No. 5150*

safety, verify that the infused beverages included in such shipment were manufactured in accordance with requirements that are substantially similar to the requirements established in subsections (d) and (e) of this section and any regulations adopted, and policies and procedures issued, pursuant to subsection (k) of this section if such infused beverages were manufactured (i) in a facility located in, and regulated by, another state, and (ii) by a person who is regulated as a food or nonalcoholic beverage manufacturer.

(g) Beginning on October 1, 2024, no cannabis establishment or infused beverage manufacturer, or agent or employee of a cannabis establishment or infused beverage manufacturer, shall gift or transfer any infused beverage to a consumer, at no cost to the consumer, as part of a commercial transaction.

(h) Beginning on October 1, 2024, the Commissioner of Consumer Protection may request that an infused beverage manufacturer submit to the Department of Consumer Protection, in a form and manner prescribed by the commissioner, documentation sufficient to demonstrate that the infused beverage manufacturer is in compliance with the provisions of this section. The infused beverage manufacturer shall promptly provide such documentation to the department.

(i) Beginning on October 1, 2024, each infused beverage manufacturer shall be subject to the investigation and enforcement provisions set forth in section 21a-421p of the general statutes.

(j) Beginning on October 1, 2024, if the Commissioner of Consumer Protection determines, after consulting with the Attorney General, that the Agriculture Improvement Act of 2018, P.L. 115-334, as amended from time to time, has been amended in a manner that conflicts with any provision of this section, the commissioner shall prepare and submit a report, in coordination with the Attorney General and in accordance with the provisions of section 11-4a of the general statutes, to the joint

standing committee of the General Assembly having cognizance of matters relating to consumer protection. Such report shall, at a minimum, set forth the scope of such conflict and recommendations to resolve such conflict. The commissioner shall submit such report: (1) Not later than thirty days after the United States Department of Agriculture announces such amendment, if the General Assembly is in session; or (2) not later than sixty days after the United States Department of Agriculture announces such amendment, if the General Assembly is not in session.

(k) The Commissioner of Consumer Protection may adopt regulations, in accordance with the provisions of chapter 54 of the general statutes, to implement the provisions of this section. Notwithstanding the requirements of sections 4-168 to 4-172, inclusive, of the general statutes, the commissioner shall, prior to adopting such regulations and in order to effectuate the provisions of this section, issue policies and procedures to implement the provisions of this section that shall have the force and effect of law. The commissioner shall post all policies and procedures on the Department of Consumer Protection's Internet web site, and submit such policies and procedures to the Secretary of the State for posting on the eRegulations System, at least fifteen days prior to the effective date of any policy or procedure. Any such policy or procedure shall no longer be effective upon the earlier of either the adoption of the policy or procedure as a final regulation under section 4-172 of the general statutes or forty-eight months from July 1, 2024, if such regulations have not been submitted to the legislative regulation review committee for consideration under section 4-170 of the general statutes.

(l) Beginning on October 1, 2024, and following a hearing conducted in accordance with chapter 54 of the general statutes, the Commissioner of Consumer Protection may impose an administrative civil penalty, not to exceed five thousand dollars per violation, and suspend, revoke or

*Substitute House Bill No. 5150*

place conditions upon any infused beverage manufacturer that violates any provision of this section or any regulation adopted pursuant to subsection (k) of this section. All administrative civil penalties collected under this subsection shall be deposited in the consumer protection enforcement account established in section 21a-8a of the general statutes.

(m) Beginning on October 1, 2024, the Commissioner of Consumer Protection may, pursuant to section 4-182 of the general statutes, summarily suspend any credential the commissioner or Department of Consumer Protection has issued to any person who violates any provision of this section.

(n) Any violation of the provisions of this section shall be deemed an unfair or deceptive trade practice under subsection (a) of section 42-110b of the general statutes.

Sec. 28. (NEW) (*Effective July 1, 2024*) (a) (1) Beginning on October 1, 2024, no infused beverage shall be sold, offered for sale or distributed in this state unless:

(A) The infused beverage is sold or offered for sale (i) on premises operating under a package store permit issued pursuant to subsection (b) of section 30-20 of the general statutes, as amended by this act, or (ii) at a dispensary facility, hybrid retailer or retailer;

(B) If the infused beverage is sold at a dispensary facility, hybrid retailer or retailer, the infused beverage is stored and displayed separately from any cannabis, in the same manner provided for manufacturer hemp products, in accordance with section 21a-409, 21a-420s or 21a-420r of the general statutes, respectively; and

(C) The infused beverage meets the standards set forth for manufacturer hemp products in subsections (v) and (x) of section 22-61m of the general statutes, as amended by this act.

*Substitute House Bill No. 5150*

(2) Beginning on July 1, 2024, no infused beverage shall be sold, or offered for sale, at retail to any individual in this state by way of any indirect means, including, but not limited to, by way of mail or any telephonic or other electronic means.

(b) No infused beverage shall be sold to any individual who is younger than twenty-one years of age. No owner, agent or employee of a package store permitted under subsection (b) of section 30-20 of the general statutes, as amended by this act, or of a dispensary facility, hybrid retailer or retailer, shall sell any infused beverage to an individual without first verifying the individual's age with a valid government-issued driver's license or identity card to establish that such individual is twenty-one years of age or older.

(c) Beginning on October 1, 2024, no person shall sell, or offer for sale, any infused beverage in any container containing less than twelve fluid ounces, or any packaging comprised of more than four containers.

(d) Notwithstanding the provisions of subsections (a) to (c), inclusive, of this section, a dispensary facility, hybrid retailer, retailer or package store that has received a waiver from the Commissioner of Consumer Protection under section 30 of this act may, during the period beginning on July 1, 2024, and ending on September 30, 2024, sell legacy infused beverages in accordance with such waiver and the requirements set forth in section 30 of this act.

(e) Any violation of the provisions of this section shall be deemed an unfair or deceptive trade practice under subsection (a) of section 42-110b of the general statutes.

Sec. 29. (NEW) (*Effective from passage*) (a) For the purposes of this section:

(1) "Business" means any individual or sole proprietorship, partnership, firm, corporation, trust, limited liability company, limited

*Substitute House Bill No. 5150*

liability partnership, joint stock company, joint venture, association or other legal entity through which business for profit or not-for-profit is conducted;

(2) "Commissioner" means the Commissioner of Consumer Protection;

(3) "Container" (A) means an object that is intended for sale to a consumer, as defined in section 21a-420 of the general statutes, as amended by this act, and directly contains an infused beverage or legacy infused beverage, and (B) does not include an object or packaging that indirectly contains, or contains in bulk for transportation purposes, an infused beverage or legacy infused beverage;

(4) "Dispensary facility" has the same meaning as provided in section 21a-420 of the general statutes, as amended by this act;

(5) "Hybrid retailer" has the same meaning as provided in section 21a-420 of the general statutes, as amended by this act;

(6) "Infused beverage" means a beverage that (A) is not an alcoholic beverage, as defined in section 30-1 of the general statutes, (B) is intended for human consumption, and (C) contains, or is advertised, labeled or offered for sale as containing, total THC, as defined in section 21a-240 of the general statutes, as amended by this act, that is not greater than three milligrams per container;

(7) "Legacy infused beverage" means a beverage that (A) is not an alcoholic beverage, as defined in section 30-1 of the general statutes, (B) is intended for human consumption, (C) contains, or is advertised, labeled or offered for sale as containing, THC, as defined in section 21a-240 of the general statutes, as amended by this act, and (D) as of the effective date of this section, is in compliance with (i) the provisions of RERACA, as defined in section 21a-420 of the general statutes, as amended by this act, and (ii) the policies and procedures issued by the

*Substitute House Bill No. 5150*

Commissioner of Consumer Protection to implement, and any regulations adopted pursuant to, RERACA, as defined in section 21a-420 of the general statutes, as amended by this act;

(8) "Package store" means premises operating under a permit issued under subsection (b) of section 30-20 of the general statutes, as amended by this act; and

(9) "Retailer" has the same meaning as provided in section 21a-420 of the general statutes, as amended by this act.

(b) (1) Beginning on May 15, 2024, no business, other than a dispensary facility, hybrid retailer, retailer or package store, shall sell any infused beverage or legacy infused beverage in this state unless such business has satisfied the requirements established in subdivision (1) of subsection (c) of this section.

(2) Beginning on October 1, 2024, no business, other than a dispensary facility, hybrid retailer, retailer or package store, shall sell, or possess with intent to sell, any infused beverage or legacy infused beverage in this state unless such business has satisfied the requirements established in subsection (c) of this section.

(c) (1) Not later than May 14, 2024, each business, other than a dispensary facility, hybrid retailer, retailer or package store, that owns and possesses any infused beverage or legacy infused beverage in this state on said date shall take an inventory of all containers such business owns and possesses in this state on said date.

(2) Not later than June 15, 2024, each business, other than a dispensary facility, hybrid retailer, retailer or package store, shall submit to the Department of Consumer Protection, in a form and manner prescribed by the Commissioner of Consumer Protection:

(A) A report disclosing the results of the inventory conducted

pursuant to subdivision (1) of this section; and

(B) A fee in the amount of one dollar per container included in such inventory.

(3) If any business, other than a dispensary facility, hybrid retailer, retailer or package store, fails to submit the report and pay the fee required under subdivision (2) of this subsection on or before June 15, 2024, the Commissioner of Consumer Protection shall:

(A) Make a good faith estimate, based on the information available to the commissioner, of the number of containers that such business owned, and were in such business's possession, in this state on May 14, 2024; and

(B) Invoice such business for a fee in the amount of one dollar per container described in subparagraph (A) of this subdivision.

(d) All fees received by the Department of Consumer Protection under this section shall be deposited in the consumer protection enforcement account established in section 21a-8a of the general statutes.

(e) If any business, other than a dispensary facility, hybrid retailer, retailer or package store, fails to submit the report and pay the fee required under subdivision (2) of subsection (c) of this section on or before June 15, 2024, the Commissioner of Consumer Protection may, subject to the provisions of chapter 54 of the general statutes, revoke, place conditions upon or suspend any certificate, license, permit, registration or other credential the Department of Consumer Protection has issued to or for such business.

Sec. 30. (NEW) (*Effective from passage*) (a) For the purposes of this section:

*Substitute House Bill No. 5150*

(1) "Dispensary facility" has the same meaning as provided in section 21a-420 of the general statutes, as amended by this act;

(2) "Hybrid retailer" has the same meaning as provided in section 21a-420 of the general statutes, as amended by this act;

(3) "Legacy infused beverage" means a beverage that (A) is not an alcoholic beverage, as defined in section 30-1 of the general statutes, (B) is intended for human consumption, (C) contains, or is advertised, labeled or offered for sale as containing, THC, as defined in section 21a-240 of the general statutes, as amended by this act, and (D) as of June 30, 2024, is in compliance with (i) the provisions of RERACA, and (ii) the policies and procedures issued by the Commissioner of Consumer Protection to implement, and any regulations adopted pursuant to, RERACA;

(4) "RERACA" has the same meaning as provided in section 21a-420 of the general statutes, as amended by this act; and

(5) "Retailer" has the same meaning as provided in section 21a-420 of the general statutes, as amended by this act.

(b) During the period beginning on the effective date of this section and ending on June 30, 2024, a dispensary facility, hybrid retailer or retailer, or the holder of a package store permit issued under subsection (b) of section 30-20 of the general statutes, as amended by this act, may submit to the Department of Consumer Protection, in a form and manner prescribed by the Commissioner of Consumer Protection, an application for a waiver to, during the period beginning on July 1, 2024, and ending on September 30, 2024, sell the legacy infused beverages that, on the effective date of this section, are in the possession, and included in the inventory, of such dispensary facility, hybrid retailer, retailer or package store.

(c) A waiver issued by the Commissioner of Consumer Protection

pursuant to subsection (b) of this section shall allow the dispensary facility, hybrid retailer, retailer or package store to, during the period beginning on July 1, 2024, and ending on September 30, 2024, sell the legacy infused beverages that, on the effective date of this section, are in the possession, and included in the inventory, of such dispensary facility, hybrid retailer, retailer or package store, provided all such sales are made (1) to individuals twenty-one years of age or older, and (2) in compliance with all applicable provisions of RERACA and the policies and procedures issued by the Commissioner of Consumer Protection to implement, and any regulations adopted pursuant to, RERACA.

(d) No dispensary facility, hybrid retailer, retailer or package store shall sell any legacy infused beverage during the period beginning on July 1, 2024, and ending on September 30, 2024, unless the Commissioner of Consumer Protection has issued a waiver, pursuant to subsection (b) of this section, to the dispensary facility, hybrid retailer or retailer or the holder of the package store permit issued under subsection (b) of section 30-20 of the general statutes, as amended by this act.

Sec. 31. (NEW) (*Effective January 1, 2025*) (a) As used in this section:

(1) "Cannabis establishment" has the same meaning as provided in section 21a-420 of the general statutes, as amended by this act;

(2) "Consumer" has the same meaning as provided in section 21a-420 of the general statutes, as amended by this act;

(3) "Container" (A) means an object that is offered, intended for sale or sold to a consumer and directly contains (i) a manufacturer hemp product, or (ii) a moderate-THC hemp product, and (B) does not include an object or packaging that indirectly contains, or contains in bulk for transportation purposes, (i) a manufacturer hemp product, or (ii) a moderate-THC hemp product;

*Substitute House Bill No. 5150*

(4) "Manufacturer hemp product" has the same meaning as provided in section 22-61*l* of the general statutes, as amended by this act;

(5) "Moderate-THC hemp product" (A) means a manufacturer hemp product that has total THC, as defined in section 21a-240 of the general statutes, as amended by this act, of not less than one-half of one milligram, and not more than five milligrams, on a per-container basis, and (B) does not include (i) an infused beverage, as defined in section 26 of this act, or (ii) a legacy infused beverage, as defined in section 26 of this act; and

(6) "Moderate-THC hemp product vendor" means a person that (A) holds a certificate of registration issued by the Commissioner of Consumer Protection pursuant to this section, and (B) is not a cannabis establishment.

(b) Beginning on January 1, 2025, no person shall sell any moderate-THC hemp product in the state unless such person is a cannabis establishment or holds a certificate of registration issued by the Commissioner of Consumer Protection pursuant to this section.

(c) (1) (A) Beginning on January 1, 2025, a person seeking a certificate of registration as a moderate-THC hemp product vendor shall submit to the Commissioner of Consumer Protection, in a form and manner prescribed by the commissioner, an application accompanied by a nonrefundable application fee in the amount of two thousand dollars. Such application shall, at a minimum, disclose:

(i) The location in the state where such person currently sells or proposes to sell, at retail, moderate-THC hemp products to consumers; and

(ii) Except as provided in subparagraph (C) of this subdivision, information sufficient for the commissioner to determine that:

*Substitute House Bill No. 5150*

(I) During the preceding year, at least eighty-five per cent of the average monthly gross revenue generated at such existing retail location was derived from sales, at retail, of moderate-THC hemp products to consumers; or

(II) It is reasonably likely that at least eighty-five per cent of the average monthly gross revenue to be generated at such proposed retail location will be derived from sales, at retail, of moderate-THC hemp products to consumers.

(B) Except as provided in subparagraph (C) of this subdivision, the commissioner shall not issue a certificate of registration as a moderate-THC hemp product vendor unless the commissioner has determined that the applicant satisfies, or is reasonably likely to satisfy, the minimum sales threshold established in subparagraph (A) of this subdivision. Each such certificate shall expire annually, and shall allow the moderate-THC hemp product vendor to sell, at retail, moderate-THC hemp products to consumers at such location.

(C) No person seeking a certificate of registration as a moderate-THC hemp product vendor shall be required to disclose information sufficient for the Commissioner of Consumer Protection to determine that such person satisfies, or is reasonably likely to satisfy, the minimum sales threshold established in subparagraph (A) of this subdivision if such person manufactures moderate-THC hemp products at the location in the state where such person sells or proposes to sell, at retail, moderate-THC hemp products to consumers. The commissioner may issue a certificate of registration as a moderate-THC hemp product vendor to a person that satisfies the criteria set forth in this subparagraph even if such person does not satisfy the minimum sales threshold established in subparagraph (A) of this subdivision.

(2) (A) Each certificate issued pursuant to this section shall be renewable for additional one-year periods. Each moderate-THC hemp

*Substitute House Bill No. 5150*

product vendor seeking renewal shall submit to the Commissioner of Consumer Protection, in a form and manner prescribed by the commissioner, a renewal application accompanied by a nonrefundable renewal application fee in the amount of two thousand dollars. Such application shall, at a minimum and except as provided in subparagraph (B) of this subdivision, disclose information sufficient for the commissioner to determine that, during the preceding registration year, at least eighty-five per cent of the average monthly gross revenue generated at the moderate-THC hemp product vendor's registered retail location was derived from sales, at retail, of moderate-THC hemp products to consumers. Except as provided in subparagraph (B) of this subdivision, the commissioner shall not issue a renewal to a moderate-THC hemp product vendor unless the commissioner has determined that the moderate-THC hemp product vendor satisfied such minimum sales threshold.

(B) No moderate-THC hemp product vendor seeking renewal of a certificate issued pursuant to this section shall be required to disclose information sufficient for the Commissioner of Consumer Protection to determine that such moderate-THC hemp product vendor satisfied the minimum sales threshold established in subparagraph (A) of this subdivision if such moderate-THC hemp product vendor manufactures moderate-THC hemp products at such moderate-THC hemp product vendor's registered retail location. The commissioner may issue a renewal to a moderate-THC hemp product vendor that satisfies the criteria set forth in this subparagraph even if the moderate-THC hemp product vendor did not satisfy the minimum sales threshold established in subparagraph (A) of this subdivision.

(3) All fees collected by the department under this section shall be deposited in the consumer protection enforcement account established in section 21a-8a of the general statutes.

(d) No person may act as a moderate-THC hemp product vendor, or

*Substitute House Bill No. 5150*

represent that such person is a moderate-THC hemp product vendor, unless such person has obtained and actively holds a certificate of registration as a moderate-THC hemp product vendor issued by the Commissioner of Consumer Protection pursuant to this section.

(e) No cannabis establishment or moderate-THC hemp product vendor, or agent or employee of a cannabis establishment or moderate-THC hemp product vendor, shall sell a moderate-THC hemp product to any individual who is younger than twenty-one years of age. Prior to selling any moderate-THC hemp product to an individual, the cannabis establishment, moderate-THC hemp product vendor, agent or employee shall first verify the individual's age with a valid government-issued driver's license or identity card to establish that such individual is twenty-one years of age or older.

(f) No person shall sell any moderate-THC hemp product intended for human ingestion in packaging that includes more than two containers.

(g) All moderate-THC hemp products shall meet the standards set forth for manufacturer hemp products in subsections (v), (w) and (x) of section 22-61m of the general statutes, as amended by this act.

(h) All moderate-THC hemp products shall meet (1) the testing standards for manufacturer hemp products established in, and any regulations adopted pursuant to, section 22-61m of the general statutes, as amended by this act, or (2) such other testing standards for manufacturer hemp products as the Commissioner of Consumer Protection, in the commissioner's discretion, may designate.

(i) Each moderate-THC hemp product container shall prominently display a symbol, in a size of not less than one-half inch by one-half inch and in a format approved by the Commissioner of Consumer Protection, that indicates that such moderate-THC hemp product is not legal or safe

*Substitute House Bill No. 5150*

for individuals younger than twenty-one years of age.

(j) No cannabis establishment or moderate-THC hemp product vendor, or agent or employee of a cannabis establishment or moderate-THC hemp product vendor, shall gift or transfer any moderate-THC hemp product at no cost to a consumer as part of a commercial transaction.

(k) Each moderate-THC hemp product vendor shall be subject to the investigation and enforcement provisions set forth in section 21a-421p of the general statutes.

(l) The Commissioner of Consumer Protection shall adopt regulations, in accordance with the provisions of chapter 54 of the general statutes, to implement the provisions of this section. Notwithstanding the requirements of sections 4-168 to 4-172, inclusive, of the general statutes, the commissioner shall, prior to adopting such regulations and in order to effectuate the provisions of this section, issue policies and procedures to implement the provisions of this section that shall have the force and effect of law. The commissioner shall post all policies and procedures on the Department of Consumer Protection's Internet web site, and submit such policies and procedures to the Secretary of the State for posting on the eRegulations System, at least fifteen days prior to the effective date of any policy or procedure. Any such policy or procedure shall no longer be effective upon the earlier of either the adoption of the policy or procedure as a final regulation under section 4-172 of the general statutes or forty-eight months from July 1, 2024, if such regulations have not been submitted to the legislative regulation review committee for consideration under section 4-170 of the general statutes.

(m) Following a hearing conducted in accordance with chapter 54 of the general statutes, the Commissioner of Consumer Protection may impose an administrative civil penalty, not to exceed five thousand

*Substitute House Bill No. 5150*

dollars per violation, and suspend, revoke or place conditions upon any moderate-THC hemp product vendor that violates any provision of this section or any regulation adopted pursuant to subsection (l) of this section. Any administrative civil penalty collected under this subsection shall be deposited in the consumer protection enforcement account established in section 21a-8a of the general statutes.

Sec. 32. Section 21a-93 of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective January 1, 2025*):

The following acts and the causing thereof shall be prohibited: (1) The sale in intrastate commerce of any food, drug, device or cosmetic that is adulterated or misbranded; (2) the adulteration or misbranding of any food, drug, device or cosmetic in intrastate commerce; (3) the receipt in intrastate commerce of any food, drug, device or cosmetic that is adulterated or misbranded, and the sale thereof in such commerce for pay or otherwise; (4) the introduction or delivery for introduction into intrastate commerce of (A) any food in violation of section 21a-103 or (B) any new drug in violation of section 21a-110; (5) the dissemination within this state, in any manner or by any means or through any medium, of any false advertisement; (6) the refusal to permit (A) entry and the taking of a sample or specimen or the making of an investigation as authorized by section 21a-116, or (B) access to or copying of any record as authorized by section 21a-117; (7) the refusal to permit entry or inspection as authorized by section 21a-118; (8) the giving of a guaranty or undertaking in intrastate commerce, referred to in subsection (c) of section 21a-95, that is false; (9) the forging, counterfeiting, simulating or falsely representing, or, without proper authority, using, any mark, stamp, tag, label or other identification device authorized or required by regulations promulgated under the provisions of this chapter or of the federal act; (10) the alteration, mutilation, destruction, obliteration or removal of the whole or any part

*Substitute House Bill No. 5150*

of the labeling of a food, drug, device or cosmetic, or the doing of any other act with respect to a food, drug, device or cosmetic, or the labeling or advertisement thereof, which results in a violation of this chapter; (11) the using in interstate commerce, in the labeling or advertisement of any drug, of any representation or suggestion that an application with respect to such drug is effective under Section 355 of the federal act or under section 21a-110, or that such drug complies with the provisions of either such section; (12) the violation of any provision of section 21a-108; (13) in the case of a prescription drug distributed or offered for sale in this state, the failure of the manufacturer, packer or distributor thereof to maintain for transmittal, or to transmit, to any practitioner licensed by applicable state law to administer such drug who makes written request for information as to such drug, true and correct copies of all printed matter which is required to be included in any package in which that drug is distributed or sold, or such other printed matter as is approved by the commissioner or under the federal act. Nothing in this subdivision shall be construed to exempt any person from any labeling requirement imposed by or under other provisions of this chapter unless specifically exempted under the federal act, as effective on April 26, 1974; (14) the using by any person to his own advantage, or revealing, other than to the commissioner or his duly authorized agents or to the courts when relevant in any judicial proceeding under this chapter, of any information acquired under authority of this chapter concerning any method, process, substance or any other subject which as a trade secret is entitled to protection; (15) (A) placing or causing to be placed upon any drug or device or upon the container of any drug or device, with intent to defraud, the trademark, trade name or other identifying mark, imprint or device of another or any likeness thereof; or (B) selling, dispensing, disposing of or causing to be sold, dispensed or disposed of or concealing or keeping in possession, control or custody, with intent to sell, dispense or dispose of, any drug, device or any container thereof transported, received or held for transportation in commerce, with knowledge that the trademark, trade name or other

*Substitute House Bill No. 5150*

identifying mark, imprint or device of another or any likeness thereof has been placed thereon in a manner prohibited by subparagraph (A) of this subdivision; or (C) making, selling, disposing of or causing to be made, sold or disposed of or keeping in possession, control or custody, or concealing, with intent to defraud, any punch, die, plate, stone or other thing designed to print, imprint or reproduce the trademark, trade name or other identifying mark, imprint or device of another or any likeness thereof upon any drug, device or container thereof; (16) failing to demonstrate adherence to applicable provisions of United States Pharmacopeia, Chapter 797, Pharmaceutical Compounding - Sterile Preparations, as amended from time to time, concerning compounding or preparation of sterile drugs; **[**or**]** (17) failing to demonstrate adherence to applicable provisions of United States Pharmacopeia, Chapter 795, Pharmaceutical Compounding – Nonsterile Preparations, as amended from time to time, concerning compounding or preparation of nonsterile drug<u>s; or (18) selling any moderate-THC hemp product, as defined in section 31 of this act, without first obtaining a license as a cannabis establishment, as defined in section 21a-420, as amended by this act, or registering as a moderate-THC hemp product vendor pursuant to section 31 of this act</u>.

Sec. 33. Subsection (b) of section 30-20 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(b) (1) A package store permit shall allow the retail sale of alcoholic liquor in sealed bottles or containers not to be consumed on the permit premises. The holder of a package store permit may, in accordance with regulations adopted by the Department of Consumer Protection pursuant to the provisions of chapter 54, (A) offer free samples of alcoholic liquor for tasting on the permit premises, (B) conduct fee-based wine education and tasting classes and demonstrations, and (C) conduct tastings or demonstrations provided by a permittee or backer

*Substitute House Bill No. 5150*

of the package store for a nominal charge to charitable nonprofit organizations. Any offering, tasting, wine education and tasting class or demonstration held on permit premises shall be conducted only during the hours the package store may sell alcoholic liquor under section 30-91. No tasting of wine on the permit premises shall be offered from more than ten uncorked bottles at any one time.

(2) No store operating under a package store permit shall sell any commodity other than alcoholic liquor except, notwithstanding any other provision of law, such store may sell (A) cigarettes and cigars, (B) publications, (C) bar utensils, including, but not limited to, corkscrews, beverage strainers, stirrers or other similar items used to consume, or related to the consumption of, alcoholic liquor, (D) gift packages of alcoholic liquor shipped into the state by a manufacturer or out-of-state shipper, which gift packages may include nonalcoholic items, other than food or tobacco products, if the dollar value of the nonalcoholic items in such gift package does not exceed the dollar value of the alcoholic items in such gift package, (E) complementary fresh fruits used in the preparation of mixed alcoholic beverages, (F) cheese, crackers or both, (G) olives, (H) nonalcoholic beverages, (I) concentrates used in the preparation of mixed alcoholic beverages, (J) beer and wine-making kits and products related to such kits, (K) ice in any form, (L) articles of clothing imprinted with advertising related to the alcoholic liquor industry, (M) gift baskets or other containers of alcoholic liquor, (N) multiple packages of alcoholic liquors, provided in all such cases the minimum retail selling price for such alcoholic liquor shall apply, (O) lottery tickets authorized by the Department of Consumer Protection, if licensed as an agent to sell such tickets by the department, (P) devices and related accessories designed primarily for accessing and extracting a beverage containing alcohol from prepackaged containers, including, but not limited to, pods, pouches or similar containers, but excluding devices, including, but not limited to, household blenders, that are not designed primarily for such purposes, (Q) alcohol-infused confections

*Substitute House Bill No. 5150*

containing not more than one-half of one per cent of alcohol by weight and which the commissioner has approved for sale under section 21a-101, **[and]** (R) gift baskets containing only containers of alcoholic liquor and commodities authorized for sale under subparagraphs (A) to (Q), inclusive, of this subdivision, (S) infused beverages, as defined in section 26 of this act, provided (i) the package store permittee (I) paid to the department the annual fee for an infused beverage endorsement pursuant to this subdivision, and (II) purchased such infused beverages from the holder of a wholesaler permit or a wholesaler permit for beer issued under section 30-17, and (ii) such sales are made in accordance with the provisions of section 28 of this act, and (T) legacy infused beverages, as defined in section 30 of this act, provided all such sales shall be made (i) during the period beginning on July 1, 2024, and ending September 30, 2024, and (ii) in accordance with (I) a waiver issued pursuant to section 30 of this act, and (II) the requirements set forth in section 30 of this act. A package store permit shall also allow the taking and transmitting of orders for delivery of such merchandise in other states. Notwithstanding any other provision of law, a package store permit shall allow the participation in any lottery ticket promotion or giveaway sponsored by the department. The annual fee for a package store permit shall be five hundred thirty-five dollars. The annual fee for an infused beverage endorsement to a package store permit shall be five hundred dollars, and shall be deposited by the department in the consumer protection enforcement account established in section 21a-8a.

Sec. 34. Section 30-63 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective July 1, 2024*):

(a) No holder of any manufacturer, wholesaler or out-of-state shipper's permit shall ship, transport or deliver within this state, or sell or offer for sale, any alcoholic liquors, except for beer manufactured by a permittee in this state and sold for consumption only on the permittee's premises, unless the name of the brand, trade name or other

*Substitute House Bill No. 5150*

distinctive characteristic by which such alcoholic liquors are bought and sold, the name and address of the manufacturer thereof and the name and address of each wholesaler permittee who is authorized by the manufacturer or his authorized representative to sell such alcoholic liquors are registered with the Department of Consumer Protection and until such brand, trade name or other distinctive characteristic has been approved by the department. Such registration shall be valid for a period of three years. The fee for such registration, or renewal thereof, shall be two hundred dollars for out-of-state shippers and fifteen dollars for Connecticut manufacturers for each brand so registered, payable by the manufacturer or such manufacturer's authorized representative when such liquors are manufactured in the United States and by the importer or such importer's authorized representative when such liquors are imported into the United States. The department shall not approve the brand registration of any fortified wine, as defined in section 12-433, which is labeled, packaged or canned so as to appear to be a wine or liquor cooler, as defined in section 12-433.

(b) No manufacturer, wholesaler or out-of-state shipper permittee shall discriminate in any manner in price discounts between one permittee and another on sales or purchases of alcoholic liquors bearing the same brand or trade name and of like age, size and quality, nor shall such manufacturer, wholesaler or out-of-state shipper permittee allow in any form any discount, rebate, free goods, allowance or other inducement for the purpose of making sales or purchases. Nothing in this subsection shall be construed to prohibit beer manufacturers, beer wholesalers or beer out-of-state shipper permittees from differentiating in the manner in which their products are packaged on the basis of on-site or off-site consumption.

(c) For alcoholic liquor other than beer, each manufacturer, wholesaler and out-of-state shipper permittee shall post with the department, on a monthly basis, the bottle, can and case price of any

*Substitute House Bill No. 5150*

brand of goods offered for sale in Connecticut, which price when so posted shall be the controlling price for such manufacturer, wholesaler or out-of-state permittee for the month following such posting. On and after July 1, 2005, for beer, each manufacturer, wholesaler and out-of-state shipper permittee shall post with the department, on a monthly basis, the bottle, can and case price, and the price per keg or barrel or fractional unit thereof for any brand of goods offered for sale in Connecticut which price when so posted shall be the controlling price for such brand of goods offered for sale in this state for the month following such posting. Such manufacturer, wholesaler and out-of-state shipper permittee may also post additional prices for such bottle, can, case, keg or barrel or fractional unit thereof for a specified portion of the following month which prices when so posted shall be the controlling prices for such bottle, can, case, keg or barrel or fractional unit thereof for such specified portion of the following month. Notice of all manufacturer, wholesaler and out-of-state shipper permittee prices shall be given to permittee purchasers by direct mail, Internet web site or advertising in a trade publication having circulation among the retail permittees except a wholesaler permittee may give such notice by hand delivery. Price postings with the department setting forth wholesale prices to retailers shall be available for inspection during regular business hours at the offices of the department by manufacturers and wholesalers until three o'clock p.m. of the first business day after the last day for posting prices. A manufacturer or wholesaler may amend such manufacturer's or wholesaler's posted price for any month to meet a lower price posted by another manufacturer or wholesaler with respect to alcoholic liquor bearing the same brand or trade name and of like age, vintage, quality and unit container size; provided that any such amended price posting shall be filed before three o'clock p.m. of the fourth business day after the last day for posting prices; and provided further such amended posting shall not set forth prices lower than those being met. Any manufacturer or wholesaler posting an amended price shall, at the time of posting, identify in writing the specific posting being

*Substitute House Bill No. 5150*

met. On and after July 1, 2005, all wholesaler postings, other than for beer, for the following month shall be provided to retail permittees not later than the twenty-seventh day of the month prior to such posting. All wholesaler postings for beer shall be provided to retail permittees not later than the twentieth day of the month prior to such posting.

(d) Monthly price schedules on a family brand case shall contain the bottle price for each item contained in the family brand case, the unit price and the case price. The bottle price posted for a family brand case shall be equal to the bottle price posted for the same month in a case containing the one class and specific brand of alcoholic liquor. For purposes of this subsection, "family brand" means a group of different products belonging to a single brand that are marketed under a parent brand. Family brand cases shall be assembled and packaged by the supplier or by a third party, on behalf of the supplier, and shall not be assembled by the wholesaler.

(e) The provisions of this section shall not apply to the sale or distribution of infused beverages or legacy infused beverages, as such terms are defined in section 26 of this act.

Sec. 35. (NEW) (*Effective July 1, 2024*) (a) For the purposes of this section:

(1) "Container" has the same meaning as provided in section 26 of this act; and

(2) "Infused beverage" has the same meaning as provided in section 26 of this act.

(b) A fee of one dollar shall be assessed by the holder of a wholesaler permit or a wholesaler permit for beer issued under section 30-17 of the general statutes on each infused beverage container sold to the holder of a package store permit issued under subsection (b) of section 30-20 of the general statutes, as amended by this act. Such fee shall not be subject

*Substitute House Bill No. 5150*

to any sales tax or treated as income pursuant to any provision of the general statutes.

(c) On January 2, 2025, and every six months thereafter, each holder of a wholesaler permit or a wholesaler permit for beer issued under section 30-17 of the general statutes shall remit payment to the department for each infused beverage container sold during the preceding six-month period. The funds received by the department from infused beverage sales shall be deposited in the consumer protection enforcement account established in section 21a-8a of the general statutes for the purposes of (1) protecting public health and safety, (2) educating consumers and licensees, and (3) ensuring compliance with cannabis and liquor control laws.

Sec. 36. (NEW) (*Effective July 1, 2024*) Notwithstanding the provisions of section 21a-8a of the general statutes, the Commissioner of Consumer Protection shall, upon request by the Attorney General, execute an agreement with the Attorney General pursuant to which the Department of Consumer Protection shall provide to the Office of the Attorney General, from such funds as may be available in the consumer protection enforcement account established in said section, such funds as the commissioner and Attorney General may agree are necessary to pay for any personal services and other enforcement expenses incurred by said office in enforcing the provisions of section 21a-420c of the general statutes, as amended by this act.

Approved May 11, 2024

**EXHIBIT 2**



*Senate Bill No. 200*

# Public Act No. 24-95

*AN ACT CONCERNING SOCIAL EQUITY APPLICANTS, INFUSED BEVERAGES AND MODERATE-THC HEMP PRODUCTS.*

Be it enacted by the Senate and House of Representatives in General Assembly convened:

Section 1. (*Effective from passage*) (a) There is established a task force to study the effect of allowing social equity applicants described in section 21a-420o of the general statutes and eligible for cannabis cultivation licenses to (1) enter into business agreements to cultivate cannabis on the lots, and in the facilities, of hemp cultivators, which lots and facilities may be located outside of disproportionately impacted areas, as defined in section 21a-420 of the general statutes, and (2) form other business arrangements to facilitate market entry for, and the commercial viability of, their prospective businesses. Such study may include, but need not be limited to, an examination of (A) land and facility use agreements, and (B) forms of partnerships or other forms of joint business participation.

(b) The task force shall consist of the following members:

(1) One appointed by the speaker of the House of Representatives, who shall be a member of the House of Representatives and the joint standing committee of the General Assembly having cognizance of matters relating to consumer protection, and whose district shall

*Senate Bill No. 200*

include a disproportionately impacted area, as defined in section 21a-420 of the general statutes;

(2) One appointed by the president pro tempore of the Senate, who shall be a member of the Senate and the joint standing committee of the General Assembly having cognizance of matters relating to consumer protection, and whose district shall include a disproportionately impacted area, as defined in section 21a-420 of the general statutes;

(3) One appointed by the majority leader of the House of Representatives, who shall be a social equity applicant described in section 21a-420o of the general statutes seeking a license to cultivate cannabis outdoors;

(4) One appointed by the majority leader of the Senate, who shall be a member of the Social Equity Council who has been appointed to said council (A) pursuant to subdivision (4) of subsection (b) of section 21a-420d of the general statutes, or (B) by any other member of the General Assembly;

(5) One appointed by the minority leader of the House of Representatives, who shall be a producer, as defined in section 22-61*l* of the general statutes, who (A) has been continually licensed under section 22-61*l* of the general statutes since January 1, 2023, and (B) is located outside of a disproportionately impacted area, as defined in section 21a-420 of the general statutes;

(6) One appointed by the minority leader of the Senate, who shall be a member of the Social Equity Council who has been appointed to said council (A) pursuant to subdivision (6) of subsection (b) of section 21a-420d of the general statutes, or (B) by any other member of the General Assembly;

(7) One appointed by the chairperson of the Black and Puerto Rican Caucus of the General Assembly, who shall be a member of the House

*Senate Bill No. 200*

of Representatives;

(8) One appointed by the chairperson of the Black and Puerto Rican Caucus of the General Assembly, who shall be a member of the Senate; and

(9) The Commissioner of Consumer Protection or said commissioner's designee, provided such designee shall (A) be employed by the Department of Consumer Protection, and (B) have been a resident of a disproportionately impacted area, as defined in section 21a-420 of the general statutes.

(c) All initial appointments to the task force shall be made not later than thirty days after the effective date of this section. Any vacancy shall be filled by the appointing authority.

(d) The speaker of the House of Representatives and the president pro tempore of the Senate shall select the chairpersons of the task force from among the members of the task force. Such chairpersons shall schedule the first meeting of the task force, which shall be held not later than sixty days after the effective date of this section.

(e) The administrative staff of the joint standing committee of the General Assembly having cognizance of matters relating to consumer protection shall serve as administrative staff of the task force.

(f) Not later than January 1, 2025, the task force shall submit a report on its findings and recommendations to the joint standing committee of the General Assembly having cognizance of matters relating to consumer protection, in accordance with the provisions of section 11-4a of the general statutes. The task force shall terminate on the date that it submits such report or January 1, 2025, whichever is later.

Sec. 2. Section 29 of public act 24-76 is repealed and the following is substituted in lieu thereof (*Effective from passage*):

*Senate Bill No. 200*

(a) For the purposes of this section:

(1) "Business" means any individual or sole proprietorship, partnership, firm, corporation, trust, limited liability company, limited liability partnership, joint stock company, joint venture, association or other legal entity through which business for profit or not-for-profit is conducted;

(2) "Commissioner" means the Commissioner of Consumer Protection;

(3) "Container" (A) means an object that is intended for sale to a consumer, as defined in section 21a-420 of the general statutes, as amended by **[**this act**]** section 4 of public act 24-76, and directly contains an infused beverage or legacy infused beverage, and (B) does not include an object or packaging that indirectly contains, or contains in bulk for transportation purposes, an infused beverage or legacy infused beverage;

(4) "Dispensary facility" has the same meaning as provided in section 21a-420 of the general statutes, as amended by **[**this act**]** section 4 of public act 24-76;

(5) "Hybrid retailer" has the same meaning as provided in section 21a-420 of the general statutes, as amended by **[**this act**]** section 4 of public act 24-76;

(6) "Infused beverage" means a beverage that (A) is not an alcoholic beverage, as defined in section 30-1 of the general statutes, (B) is intended for human consumption, and (C) contains, or is advertised, labeled or offered for sale as containing, total THC, as defined in section 21a-240 of the general statutes, as amended by **[**this act**]** section 1 of public act 24-76, that is not greater than three milligrams per container;

(7) "Legacy infused beverage" means a beverage that (A) is not an

*Public Act No. 24-95* *4 of 15*

*Senate Bill No. 200*

alcoholic beverage, as defined in section 30-1 of the general statutes, (B) is intended for human consumption, (C) contains, or is advertised, labeled or offered for sale as containing, THC, as defined in section 21a-240 of the general statutes, as amended by **[**this act**]** section 1 of public act 24-76, and (D) as of the effective date of this section, is in compliance with (i) the provisions of RERACA, as defined in section 21a-420 of the general statutes, as amended by **[**this act**]** section 4 of public act 24-76, and (ii) the policies and procedures issued by the Commissioner of Consumer Protection to implement, and any regulations adopted pursuant to, RERACA, as defined in section 21a-420 of the general statutes, as amended by **[**this act**]** section 4 of public act 24-76;

(8) "Package store" means premises operating under a permit issued under subsection (b) of section 30-20 of the general statutes, as amended by **[**this act**]** section 33 of public act 24-76; and

(9) "Retailer" has the same meaning as provided in section 21a-420 of the general statutes, as amended by **[**this act**]** section 4 of public act 24-76.

(b) **[**(1)**]** Beginning on May 15, 2024, no business **[**, other than a dispensary facility, hybrid retailer, retailer or package store,**]** shall sell, at retail, any infused beverage or legacy infused beverage in this state unless such business has satisfied the requirements established in **[**subdivision (1) of**]** subsection (c) of this section. No business, other than a dispensary facility, hybrid retailer, retailer or package store authorized pursuant to section 30 of public act 24-76, as amended by this act, shall sell, at retail, any infused beverage or legacy infused beverage in this state on or after July 1, 2024.

**[**(2) Beginning on October 1, 2024, no business, other than a dispensary facility, hybrid retailer, retailer or package store, shall sell, or possess with intent to sell, any infused beverage or legacy infused beverage in this state unless such business has satisfied the

*Senate Bill No. 200*

requirements established in subsection (c) of this section.**]**

(c) (1) Not later than May 14, 2024, each business **[**, other than a dispensary facility, hybrid retailer, retailer or package store,**]** that owns and possesses any infused beverage or legacy infused beverage in this state on said date shall take an inventory of all containers such business owns and possesses in this state on said date.

(2) Not later than June 15, 2024, each business **[**, other than a dispensary facility, hybrid retailer, retailer or package store,**]** that is in possession of infused beverages or legacy infused beverages for sale, at retail, shall submit to the Department of Consumer Protection, in a form and manner prescribed by the Commissioner of Consumer Protection:

(A) A report disclosing the results of the inventory conducted pursuant to subdivision (1) of this **[**section**]** subsection; and

(B) A fee in the amount of one dollar per container included in such inventory.

(3) If any business **[**, other than a dispensary facility, hybrid retailer, retailer or package store,**]** fails to submit the report and pay the fee required under subdivision (2) of this subsection on or before June 15, 2024, the Commissioner of Consumer Protection shall:

(A) Make a good faith estimate, based on the information available to the commissioner, of the number of containers that such business owned, and were in such business's possession, in this state on May 14, 2024; and

(B) Invoice such business for a fee in the amount of one dollar per container described in subparagraph (A) of this subdivision.

(d) All fees received by the Department of Consumer Protection under this section shall be deposited in the consumer protection

*Senate Bill No. 200*

enforcement account established in section 21a-8a of the general statutes.

(e) If any business **[**, other than a dispensary facility, hybrid retailer, retailer or package store,**]** fails to submit the report and pay the fee required under subdivision (2) of subsection (c) of this section on or before June 15, 2024, the Commissioner of Consumer Protection may, subject to the provisions of chapter 54 of the general statutes, revoke, place conditions upon or suspend any certificate, license, permit, registration or other credential the Department of Consumer Protection has issued to or for such business.

Sec. 3. Section 30 of public act 24-76 is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) For the purposes of this section:

(1) "Dispensary facility" has the same meaning as provided in section 21a-420 of the general statutes, as amended by **[**this act**]** section 4 of public act 24-76;

(2) "Hybrid retailer" has the same meaning as provided in section 21a-420 of the general statutes, as amended by **[**this act**]** section 4 of public act 24-76;

(3) "Legacy infused beverage" means a beverage that (A) is not an alcoholic beverage, as defined in section 30-1 of the general statutes, (B) is intended for human consumption, (C) contains, or is advertised, labeled or offered for sale as containing, THC, as defined in section 21a-240 of the general statutes, as amended by **[**this act**]** section 1 of public act 24-76, and (D) as of June 30, 2024, is in compliance with (i) the provisions of RERACA, and (ii) the policies and procedures issued by the Commissioner of Consumer Protection to implement, and any regulations adopted pursuant to, RERACA;

*Senate Bill No. 200*

(4) "RERACA" has the same meaning as provided in section 21a-420 of the general statutes, as amended by **[**this act**]** <u>section 4 of public act 24-76</u>; and

(5) "Retailer" has the same meaning as provided in section 21a-420 of the general statutes, as amended by **[**this act**]** <u>section 4 of public act 24-76</u>.

(b) During the period beginning on the effective date of this section and ending on June 30, 2024, a dispensary facility, hybrid retailer or retailer, or the holder of a package store permit issued under subsection (b) of section 30-20 of the general statutes, as amended by **[**this act**]** <u>section 33 of public act 24-76</u>, may submit to the Department of Consumer Protection, in a form and manner prescribed by the Commissioner of Consumer Protection, an application for a waiver to, during the period beginning on July 1, 2024, and ending on September 30, 2024, sell the legacy infused beverages that, on **[**the effective date of this section**]** <u>May 14, 2024</u>, are in the possession, and included in the inventory, of such dispensary facility, hybrid retailer, retailer or package store.

(c) A waiver issued by the Commissioner of Consumer Protection pursuant to subsection (b) of this section shall allow the dispensary facility, hybrid retailer, retailer or package store to, during the period beginning on July 1, 2024, and ending on September 30, 2024, sell the legacy infused beverages that, on **[**the effective date of this section**]** <u>May 14, 2024</u>, are in the possession, and included in the inventory, of such dispensary facility, hybrid retailer, retailer or package store, provided all such sales are made (1) to individuals twenty-one years of age or older, and (2) in compliance with all applicable provisions of RERACA and the policies and procedures issued by the Commissioner of Consumer Protection to implement, and any regulations adopted pursuant to, RERACA.

*Senate Bill No. 200*

(d) No dispensary facility, hybrid retailer, retailer or package store shall sell any legacy infused beverage during the period beginning on July 1, 2024, and ending on September 30, 2024, unless the Commissioner of Consumer Protection has issued a waiver, pursuant to subsection (b) of this section, to the dispensary facility, hybrid retailer or retailer or the holder of the package store permit issued under subsection (b) of section 30-20 of the general statutes, as amended by [this act] section 33 of public act 24-76.

Sec. 4. Section 31 of public act 24-76 is repealed and the following is substituted in lieu thereof (*Effective January 1, 2025*):

(a) As used in this section:

(1) "Cannabis establishment" has the same meaning as provided in section 21a-420 of the general statutes, as amended by [this act] section 4 of public act 24-76;

(2) "Consumer" has the same meaning as provided in section 21a-420 of the general statutes, as amended by [this act] section 4 of public act 24-76;

(3) "Container" (A) means an object that is offered, intended for sale or sold to a consumer and directly contains (i) a manufacturer hemp product, or (ii) a moderate-THC hemp product, and (B) does not include an object or packaging that indirectly contains, or contains in bulk for transportation purposes, (i) a manufacturer hemp product, or (ii) a moderate-THC hemp product;

(4) "Manufacturer" has the same meaning as provided in section 22-61*l* of the general statutes, as amended by section 23 of public act 24-76;

[(4)] (5) "Manufacturer hemp product" has the same meaning as provided in section 22-61*l* of the general statutes, as amended by [this act] section 23 of public act 24-76;

**Senate Bill No. 200**

**[**(5)**]** (6) "Moderate-THC hemp product" (A) means a manufacturer hemp product that has total THC, as defined in section 21a-240 of the general statutes, as amended by **[**this act**]** section 1 of public act 24-76, of not less than one-half of one milligram, and not more than five milligrams, on a per-container basis, and (B) does not include (i) an infused beverage, as defined in section 26 of **[**this act**]** public act 24-76, or (ii) a legacy infused beverage, as defined in section 26 of **[**this act**]** public act 24-76; and

**[**(6)**]** (7) "Moderate-THC hemp product vendor" means a person that (A) holds a certificate of registration issued by the Commissioner of Consumer Protection pursuant to this section, and (B) is not a cannabis establishment.

(b) Beginning on January 1, 2025, no person shall sell or offer to sell, at retail, any moderate-THC hemp product in the state to consumers unless such person is a cannabis establishment or holds a certificate of registration issued by the Commissioner of Consumer Protection pursuant to this section. The provisions of this section shall not apply to the wholesale or commercial distribution of moderate-THC hemp products for resale.

(c) (1) (A) Beginning on January 1, 2025, a person seeking a certificate of registration as a moderate-THC hemp product vendor shall submit to the Commissioner of Consumer Protection, in a form and manner prescribed by the commissioner, an application accompanied by a nonrefundable application fee in the amount of two thousand dollars or, if the applicant actively holds a manufacturer license, in the amount of one thousand dollars. Such application shall, at a minimum, disclose:

(i) The location in the state where such person currently sells or offers to sell, or proposes to sell or offer to sell, at retail, moderate-THC hemp products to consumers; and

*Senate Bill No. 200*

(ii) Except as provided in subparagraph (C) of this subdivision, information sufficient for the commissioner to determine that:

(I) During the preceding year, at least eighty-five per cent of the average monthly gross revenue generated at such existing retail location was derived from sales, at retail, of moderate-THC hemp products to consumers; or

(II) It is reasonably likely that at least eighty-five per cent of the average monthly gross revenue to be generated at such proposed retail location will be derived from sales, at retail, of moderate-THC hemp products to consumers.

(B) Except as provided in subparagraph (C) of this subdivision, the commissioner shall not issue a certificate of registration as a moderate-THC hemp product vendor unless the commissioner has determined that the applicant satisfies, or is reasonably likely to satisfy, the minimum sales threshold established in subparagraph (A) of this subdivision. Each such certificate shall expire annually, and shall allow the moderate-THC hemp product vendor to sell <u>and offer to sell</u>, at retail, moderate-THC hemp products to consumers at such location.

(C) <u>(i)</u> No person seeking a certificate of registration as a moderate-THC hemp product vendor shall be required to disclose information sufficient for the Commissioner of Consumer Protection to determine that such person satisfies, or is reasonably likely to satisfy, the minimum sales threshold established in subparagraph (A) of this subdivision if such person <u>(I)</u> manufactures moderate-THC hemp products at the location in the state where such person sells <u>or offers to sell,</u> or proposes to sell <u>or offer to sell</u>, at retail, moderate-THC hemp products to consumers<u>, or (II) is actively licensed as a manufacturer and sells or offers to sell, or proposes to sell or offer to sell, at retail, to consumers moderate-THC hemp products manufactured by such manufacturer</u>.

*Senate Bill No. 200*

(ii) The commissioner may issue a certificate of registration as a moderate-THC hemp product vendor to a person that satisfies the criteria set forth in **[**this**]** subparagraph (C)(i) of this subdivision even if such person does not satisfy the minimum sales threshold established in subparagraph (A) of this subdivision.

(2) (A) Each certificate issued pursuant to this section shall be renewable for additional one-year periods. Each moderate-THC hemp product vendor seeking renewal shall submit to the Commissioner of Consumer Protection, in a form and manner prescribed by the commissioner, a renewal application accompanied by a nonrefundable renewal application fee in the amount of two thousand dollars or, if the moderate-THC hemp product vendor actively holds a manufacturer license, in the amount of one thousand dollars. Such application shall, at a minimum and except as provided in subparagraph (B) of this subdivision, disclose information sufficient for the commissioner to determine that, during the preceding registration year, at least eighty-five per cent of the average monthly gross revenue generated at the moderate-THC hemp product vendor's registered retail location was derived from sales, at retail, of moderate-THC hemp products to consumers. Except as provided in subparagraph (B) of this subdivision, the commissioner shall not issue a renewal to a moderate-THC hemp product vendor unless the commissioner has determined that the moderate-THC hemp product vendor satisfied such minimum sales threshold.

(B) (i) No moderate-THC hemp product vendor seeking renewal of a certificate issued pursuant to this section shall be required to disclose information sufficient for the Commissioner of Consumer Protection to determine that such moderate-THC hemp product vendor satisfied the minimum sales threshold established in subparagraph (A) of this subdivision if (I) such moderate-THC hemp product vendor manufactures moderate-THC hemp products at such moderate-THC

*Senate Bill No. 200*

hemp product vendor's registered retail location<u>, or (II) is actively licensed as a manufacturer and sells or offers to sell, at retail, to consumers moderate-THC hemp products manufactured by such manufacturer</u>.

<u>(ii)</u> The commissioner may issue a renewal to a moderate-THC hemp product vendor that satisfies the criteria set forth in **[**this**]** subparagraph <u>(B)(i) of this subdivision</u> even if the moderate-THC hemp product vendor did not satisfy the minimum sales threshold established in subparagraph (A) of this subdivision.

(3) All fees collected by the department under this section shall be deposited in the consumer protection enforcement account established in section 21a-8a of the general statutes.

(d) No person may act as a moderate-THC hemp product vendor, or represent that such person is a moderate-THC hemp product vendor, unless such person has obtained and actively holds a certificate of registration as a moderate-THC hemp product vendor issued by the Commissioner of Consumer Protection pursuant to this section.

(e) No cannabis establishment or moderate-THC hemp product vendor, or agent or employee of a cannabis establishment or moderate-THC hemp product vendor, shall sell a moderate-THC hemp product to any individual who is younger than twenty-one years of age. Prior to selling any moderate-THC hemp product to an individual, the cannabis establishment, moderate-THC hemp product vendor, agent or employee shall first verify the individual's age with a valid government-issued driver's license or identity card to establish that such individual is twenty-one years of age or older.

(f) No person shall sell any moderate-THC hemp product intended for human ingestion in packaging that includes more than two containers.

*Senate Bill No. 200*

(g) All moderate-THC hemp products shall meet the standards set forth for manufacturer hemp products in subsections (v), (w) and (x) of section 22-61m of the general statutes, as amended by **[**this act**]** section 24 of public act 24-76.

(h) All moderate-THC hemp products shall meet (1) the testing standards for manufacturer hemp products established in, and any regulations adopted pursuant to, section 22-61m of the general statutes, as amended by **[**this act**]** section 24 of public act 24-76, or (2) such other testing standards for manufacturer hemp products as the Commissioner of Consumer Protection, in the commissioner's discretion, may designate.

(i) Each moderate-THC hemp product container shall prominently display a symbol, in a size of not less than one-half inch by one-half inch and in a format approved by the Commissioner of Consumer Protection, that indicates that such moderate-THC hemp product is not legal or safe for individuals younger than twenty-one years of age.

(j) No cannabis establishment or moderate-THC hemp product vendor, or agent or employee of a cannabis establishment or moderate-THC hemp product vendor, shall gift or transfer any moderate-THC hemp product at no cost to a consumer as part of a commercial transaction.

(k) Each moderate-THC hemp product vendor shall be subject to the investigation and enforcement provisions set forth in section 21a-421p of the general statutes.

(l) The Commissioner of Consumer Protection shall adopt regulations, in accordance with the provisions of chapter 54 of the general statutes, to implement the provisions of this section. Notwithstanding the requirements of sections 4-168 to 4-172, inclusive, of the general statutes, the commissioner shall, prior to adopting such

*Senate Bill No. 200*

regulations and in order to effectuate the provisions of this section, issue policies and procedures to implement the provisions of this section that shall have the force and effect of law. The commissioner shall post all policies and procedures on the Department of Consumer Protection's Internet web site, and submit such policies and procedures to the Secretary of the State for posting on the eRegulations System, at least fifteen days prior to the effective date of any policy or procedure. Any such policy or procedure shall no longer be effective upon the earlier of either the adoption of the policy or procedure as a final regulation under section 4-172 of the general statutes or forty-eight months from July 1, 2024, if such regulations have not been submitted to the legislative regulation review committee for consideration under section 4-170 of the general statutes.

(m) Following a hearing conducted in accordance with chapter 54 of the general statutes, the Commissioner of Consumer Protection may impose an administrative civil penalty, not to exceed five thousand dollars per violation, and suspend, revoke or place conditions upon any moderate-THC hemp product vendor that violates any provision of this section or any regulation adopted pursuant to subsection (l) of this section. Any administrative civil penalty collected under this subsection shall be deposited in the consumer protection enforcement account established in section 21a-8a of the general statutes.

Approved May 11, 2024

**EXHIBIT 3**



*Substitute House Bill No. 5235*

## *Public Act No. 24-115*

### *AN ACT CONCERNING THE DEPARTMENT OF CONSUMER PROTECTION'S RECOMMENDATIONS REGARDING CANNABIS REGULATION.*

Be it enacted by the Senate and House of Representatives in General Assembly convened:

Section 1. Section 21a-240 of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

The following words and phrases, as used in this chapter, shall have the following meanings, unless the context otherwise requires:

(1) "Abuse of drugs" means the use of controlled substances solely for their stimulant, depressant or hallucinogenic effect upon the higher functions of the central nervous system and not as a therapeutic agent prescribed in the course of medical treatment or in a program of research operated under the direction of a physician or pharmacologist.

(2) "Administer" means the direct application of a controlled substance, whether by injection, inhalation, ingestion or any other means, to the body of a patient or research subject by: (A) A practitioner, or, in the practitioner's presence, by the practitioner's authorized agent**;** **[**, or**]** (B) the patient or research subject at the direction and in the presence of the practitioner**;** **[**,**]** or (C) a nurse or intern under the

*Substitute House Bill No. 5235*

direction and supervision of a practitioner.

(3) "Agent" means an authorized person who acts on behalf of or at the direction of a manufacturer, distributor, dispenser or prescribing practitioner, but does not include a common or contract carrier, public warehouseman **[,]** or employee of the carrier or warehouseman.

(4) "Amphetamine-type substances" include amphetamine, optical isomers thereof, salts of amphetamine and its isomers, and chemical compounds which are similar thereto in chemical structure or which are similar thereto in physiological effect, and which show a like potential for abuse, which are controlled substances under this chapter unless modified.

(5) "Barbiturate-type drugs" include barbituric acid and its salts, derivatives thereof and chemical compounds which are similar thereto in chemical structure or which are similar thereto in physiological effect, and which show a like potential for abuse, which are controlled substances under this chapter unless modified.

(6) "Bureau" means the Bureau of Narcotics and Dangerous Drugs, United States Department of Justice, or its successor agency.

(7) "Cannabis-type substances" include all parts of any plant, or species of the genus cannabis or any infra specific taxon thereof whether growing or not; **[**the seeds thereof;**]** the resin extracted from any part of such a plant; and every compound, manufacture, salt, derivative, mixture or preparation of such plant, **[**its seeds**]** or <u>its</u> resin; but shall not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture or preparation of such mature stalks, except the resin extracted therefrom, fiber, oil or cake, the **[**sterilized**]** seed of such plant<u>,</u> **[**which is incapable of germination,**]** or hemp, as defined in 7 USC 1639o, as amended from time to time.

*Substitute House Bill No. 5235*

Included are cannabinon, cannabinol, cannabidiol and chemical compounds which are similar to cannabinon, cannabinol or cannabidiol in chemical structure or which are similar thereto in physiological effect, and which show a like potential for abuse, which are controlled substances under this chapter unless derived from hemp, as defined in section 22-61*l*.

(8) "Controlled drugs" are those drugs which contain any quantity of a substance which has been designated as subject to the federal Controlled Substances Act, or which has been designated as a depressant or stimulant drug pursuant to federal food and drug laws, or which has been designated by the Commissioner of Consumer Protection pursuant to section 21a-243, as amended by this act, as having a stimulant, depressant or hallucinogenic effect upon the higher functions of the central nervous system and as having a tendency to promote abuse or psychological or physiological dependence, or both. Such controlled drugs are classifiable as amphetamine-type, barbiturate-type, cannabis-type, cocaine-type, hallucinogenic, morphine-type and other stimulant and depressant drugs. Specifically excluded from controlled drugs and controlled substances are alcohol, nicotine and caffeine.

(9) "Controlled substance" means a drug, substance **[,]** or immediate precursor in schedules I to V, inclusive, of the Connecticut controlled substance scheduling regulations adopted pursuant to section 21a-243, as amended by this act.

(10) "Counterfeit substance" means a controlled substance which, or the container or labeling of which, without authorization, bears the trademark, trade name or other identifying mark, imprint, number or device, or any likeness thereof, of a manufacturer, distributor or dispenser other than the person who in fact manufactured, distributed or dispensed the substance.

**Public Act No. 24-115**                                                      **3** *of 42*

*Substitute House Bill No. 5235*

(11) "Deliver or delivery" means the actual, constructive or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship.

(12) "Dentist" means a person authorized by law to practice dentistry in this state.

(13) "Dispense" means to deliver a controlled substance to an ultimate user or research subject by or pursuant to the lawful order of a practitioner, including the prescribing, administering, packaging, labeling or compounding necessary to prepare the substance for the delivery.

(14) "Dispenser" means a practitioner who dispenses.

(15) "Distribute" means to deliver other than by administering or dispensing a controlled substance.

(16) "Distributor" means a person who distributes and includes a wholesaler who is a person supplying or distributing controlled drugs which the person personally has not produced or prepared to hospitals, clinics, practitioners, pharmacies, other wholesalers, manufacturers and federal, state and municipal agencies.

(17) "Drug" means: (A) **[**substances**]** <u>Substances</u> recognized as drugs in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; (B) substances intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man or animals; (C) substances, other than food, intended to affect the structure or any function of the body of man or animals; and (D) substances intended for use as a component of any article specified in subparagraph (A), (B) or (C) of this subdivision. **[**It**]** <u>"Drug"</u> does not include devices or their components, parts or accessories.

*Substitute House Bill No. 5235*

(18) "Drug dependence" means a psychoactive substance dependence on drugs as that condition is defined in the most recent edition of the "Diagnostic and Statistical Manual of Mental Disorders" of the American Psychiatric Association.

(19) "Drug-dependent person" means a person who has a psychoactive substance dependence on drugs as that condition is defined in the most recent edition of the "Diagnostic and Statistical Manual of Mental Disorders" of the American Psychiatric Association.

(20) (A) "Drug paraphernalia" means equipment, products and materials of any kind that are used, intended for use or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing or concealing, or ingesting, inhaling or otherwise introducing into the human body, any controlled substance contrary to the provisions of this chapter, including, but not limited to: (i) Kits intended for use or designed for use in planting, propagating, cultivating, growing or harvesting of any species of plant that is a controlled substance or from which a controlled substance can be derived; (ii) kits used, intended for use or designed for use in manufacturing, compounding, converting, producing, processing or preparing controlled substances; (iii) isomerization devices used or intended for use in increasing the potency of any species of plant that is a controlled substance; (iv) testing equipment used, intended for use or designed for use in identifying or analyzing the strength, effectiveness or purity of controlled substances; (v) dilutents and adulterants, including, but not limited to, quinine hydrochloride, mannitol, mannite, dextrose and lactose used, intended for use or designed for use in cutting controlled substances; (vi) separation gins and sifters used, intended for use or designed for use in removing twigs and seeds from, or in otherwise cleaning or refining, marijuana; (vii) capsules and other

containers used, intended for use or designed for use in packaging small quantities of controlled substances; (viii) containers and other objects used, intended for use or designed for use in storing or concealing controlled substances; and (ix) objects used, intended for use or designed for use in ingesting, inhaling, or otherwise introducing marijuana, cocaine, hashish **[,]** or hashish oil into the human body, including, but not limited to, wooden, acrylic, glass, stone, plastic or ceramic pipes with screens, permanent screens, hashish heads or punctured metal bowls; water pipes; carburetion tubes and devices; smoking and carburetion masks; roach clips; miniature cocaine spoons and cocaine vials; chamber pipes; carburetor pipes; electric pipes; air-driven pipes; chillums; bongs; ice pipes and chillers. "Drug paraphernalia" does not include a product used by a manufacturer licensed pursuant to this chapter for the activities permitted under the license or by an individual to test any substance prior to injection, inhalation or ingestion of the substance to prevent accidental overdose by injection, inhalation or ingestion of the substance, provided the licensed manufacturer or individual is not using the product to engage in the unlicensed manufacturing or distribution of controlled substances. As used in this subdivision, "roach clip" means an object used to hold burning material, including, but not limited to, a marijuana cigarette, that has become too small or too short to be held between the fingers.

(B) "Factory" means any place used for the manufacturing, mixing, compounding, refining, processing, packaging, distributing, storing, keeping, holding, administering or assembling illegal substances contrary to the provisions of this chapter, or any building, rooms or location which contains equipment or paraphernalia used for this purpose.

(21) "Federal Controlled Substances Act, 21 USC 801 et seq." means Public Law 91-513, the Comprehensive Drug Abuse Prevention and

*Substitute House Bill No. 5235*

Control Act of 1970.

(22) "Federal food and drug laws" means the federal Food, Drug and Cosmetic Act, as amended, Title 21 USC 301 et seq.

(23) "Hallucinogenic substances" are psychodysleptic substances, other than cannabis-type substances, which assert a confusional or disorganizing effect upon mental processes or behavior and mimic acute psychotic disturbances. Exemplary of such drugs are mescaline, peyote, psilocyn and d-lysergic acid diethylamide, which are controlled substances under this chapter unless modified.

(24) "Hospital", as used in sections 21a-243 to 21a-283, inclusive, <u>as amended by this act,</u> means an institution for the care and treatment of the sick and injured, approved by the Department of Public Health or the Department of Mental Health and Addiction Services as proper to be entrusted with the custody of controlled drugs and substances and professional use of controlled drugs and substances under the direction of a licensed practitioner.

(25) "Intern" means a person who holds a degree of doctor of medicine or doctor of dental surgery or medicine and whose period of service has been recorded with the Department of Public Health and who has been accepted and is participating in training by a hospital or institution in this state. Doctors meeting the foregoing requirements and commonly designated as "residents" and "fellows" shall be regarded as interns for purposes of this chapter.

(26) "Immediate precursor" means a substance which the Commissioner of Consumer Protection has found to be, and by regulation designates as being, the principal compound commonly used or produced primarily for use, and which is an immediate chemical intermediary used or likely to be used, in the manufacture of a controlled substance, the control of which is necessary to prevent, curtail

*Substitute House Bill No. 5235*

or limit manufacture.

(27) "Laboratory" means a laboratory approved by the Department of Consumer Protection as proper to be entrusted with the custody of controlled substances and the use of controlled substances for scientific and medical purposes and for purposes of instruction, research or analysis.

(28) "Manufacture" means the production, preparation, cultivation, growing, propagation, compounding, conversion or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container, except that this term does not include the preparation or compounding of a controlled substance by an individual for the individual's own use or the preparation, compounding, packaging or labeling of a controlled substance: (A) By a practitioner as an incident to the practitioner administering or dispensing of a controlled substance in the course of such practitioner's professional practice; **[,]** or (B) by a practitioner, or by the practitioner's authorized agent under such practitioner's supervision, for the purpose of, or as an incident to, research, teaching or chemical analysis and not for sale.

(29) "Marijuana" means all parts of any plant, or species of the genus cannabis or any infra specific taxon thereof, whether growing or not; **[**the seeds thereof;**]** the resin extracted from any part of the plant; every compound, manufacture, salt, derivative, mixture **[,]** or preparation of such plant, *or* its **[**seeds or**]** resin; **[,]** any high-THC hemp product; manufactured cannabinoids; **[**, synthetic cannabinoids, except as provided in subparagraph (E) of this subdivision;**]** or cannabinon, cannabinol or cannabidiol and chemical compounds which are similar to cannabinon, cannabinol or cannabidiol in chemical structure or which are similar thereto in physiological effect, which are controlled

*Substitute House Bill No. 5235*

substances under this chapter, except cannabidiol derived from hemp, as defined in section 22-61*l*, that is not a high-THC hemp product. "Marijuana" does not include: (A) The mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture or preparation of such mature stalks, except the resin extracted from such mature stalks or fiber, oil or cake; (B) the **[**sterilized**]** seed of such plant; **[**which is incapable of germination;**]** (C) hemp, as defined in section 22-61*l*, (i) with a total THC concentration of not more than three-tenths per cent on a dry-weight basis, and (ii) that is not a high-THC hemp product; or (D) any substance approved by the federal Food and Drug Administration or successor agency as a drug and reclassified in any schedule of controlled substances or unscheduled by the federal Drug Enforcement Administration or successor agency which is included in the same schedule designated by the federal Drug Enforcement Administration or successor agency. **[**; or (E) synthetic cannabinoids which are controlled substances that are designated by the Commissioner of Consumer Protection, by whatever official, common, usual, chemical or trade name designation, as controlled substances and are classified in the appropriate schedule in accordance with subsections (i) and (j) of section 21a-243.**]**

(30) "Narcotic substance" means any of the following, whether produced directly or indirectly by extraction from a substance of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis: (A) Morphine-type: (i) Opium or opiate, or any salt, compound, derivative, or preparation of opium or opiate which is similar to any such substance in chemical structure or which is similar to any such substance in physiological effect and which shows a like potential for abuse, which is a controlled substance under this chapter unless modified; (ii) any salt, compound, isomer, derivative, or preparation of any such substance which is chemically equivalent or identical to any substance

*Substitute House Bill No. 5235*

referred to in clause (i) of this [subdivision] subparagraph, but not including the isoquinoline alkaloids of opium; (iii) opium poppy or poppy straw; or (iv) (I) fentanyl or any salt, compound, derivative or preparation of fentanyl which is similar to any such substance in chemical structure or which is similar to any such substance in physiological effect and which shows a like potential for abuse, which is a controlled substance under this chapter unless modified, or (II) any salt, compound, isomer, derivative or preparation of any such substance which is chemically equivalent or identical to any substance referred to in subclause (I) of this clause; or (B) cocaine-type; coca leaves or any salt, compound, derivative or preparation of coca leaves, or any salt, compound, isomer, derivatives or preparation of any such substance which is chemically equivalent or identical to any such substance or which is similar to any such substance in physiological effect and which shows a like potential for abuse, but not including decocainized coca leaves or extractions of coca leaves which do not contain cocaine or ecgonine.

(31) "Nurse" means a person performing nursing as defined in section 20-87a.

(32) "Official written order" means an order for controlled substances written on a form provided by the bureau for that purpose under the federal Controlled Substances Act.

(33) "Opiate" means any substance having an addiction-forming or addiction-sustaining liability similar to morphine or being capable of conversion into a drug having addiction-forming or addiction-sustaining liability; it does not include, unless specifically designated as controlled under this chapter, the dextrorotatory isomer of 3-methoxy-n-methylmorthinan and its salts (dextro-methorphan) but shall include its racemic and levorotatory forms.

(34) "Opium poppy" means the plant of the species papaver

*Substitute House Bill No. 5235*

somniferum l., except its seed.

(35) Repealed by P.A. 99-102, S. 51.

(36) "Other stimulant and depressant drugs" means controlled substances other than amphetamine-type, barbiturate-type, cannabis-type, cocaine-type, hallucinogenics and morphine-type which are found to exert a stimulant and depressant effect upon the higher functions of the central nervous system and which are found to have a potential for abuse and are controlled substances under this chapter.

(37) "Person" includes any corporation, limited liability company, association or partnership, or one or more individuals, government or governmental subdivisions or agency, business trust, estate, trust, or any other legal entity. Words importing the plural number may include the singular; words importing the masculine gender may be applied to females.

(38) "Pharmacist" means a person authorized by law to practice pharmacy pursuant to section 20-590, 20-591, 20-592 or 20-593.

(39) "Pharmacy" means an establishment licensed pursuant to section 20-594.

(40) "Physician" means a person authorized by law to practice medicine in this state pursuant to section 20-9.

(41) "Podiatrist" means a person authorized by law to practice podiatry in this state.

(42) "Poppy straw" means all parts, except the seeds, of the opium poppy, after mowing.

(43) "Practitioner" means: (A) A physician, dentist, veterinarian, podiatrist, scientific investigator or other person licensed, registered or otherwise permitted to distribute, dispense, conduct research with

*Substitute House Bill No. 5235*

respect to or to administer a controlled substance in the course of professional practice or research in this state; and (B) a pharmacy, hospital or other institution licensed, registered or otherwise permitted to distribute, dispense, conduct research with respect to or to administer a controlled substance in the course of professional practice or research in this state.

(44) "Prescribe" means order or designate a remedy or any preparation containing controlled substances.

(45) "Prescription" means a written, oral or electronic order for any controlled substance or preparation from a licensed practitioner to a pharmacist for a patient.

(46) "Production" includes the manufacture, planting, cultivation, growing or harvesting of a controlled substance.

(47) "Registrant" means any person licensed by this state and assigned a current federal Bureau of Narcotics and Dangerous Drug Registry Number as provided under the federal Controlled Substances Act.

(48) "Registry number" means the alphabetical or numerical designation of identification assigned to a person by the federal Drug Enforcement Administration, or other federal agency, which is commonly known as the federal registry number.

(49) "Restricted drugs or substances" are the following substances without limitation and for all purposes: Datura stramonium; hyoscyamus niger; atropa belladonna, or the alkaloids atropine; hyoscyamine; belladonnine; apatropine; or any mixture of these alkaloids such as daturine, or the synthetic homatropine or any salts of these alkaloids, except that any drug or preparation containing any of the above-mentioned substances which is permitted by federal food and drug laws to be sold or dispensed without a prescription or written

*Substitute House Bill No. 5235*

order shall not be a controlled substance; amyl nitrite; the following volatile substances to the extent that said chemical substances or compounds containing said chemical substances are sold, prescribed, dispensed, compounded, possessed or controlled or delivered or administered to another person with the purpose that said chemical substances shall be breathed, inhaled, sniffed or drunk to induce a stimulant, depressant or hallucinogenic effect upon the higher functions of the central nervous system: Acetone; benzene; butyl alcohol; butyl nitrate and its salts, isomers, esters, ethers or their salts; cyclohexanone; dichlorodifluoromethane; ether; ethyl acetate; formaldehyde; hexane; isopropanol; methanol; methyl cellosolve acetate; methyl ethyl ketone; methyl isobutyl ketone; nitrous oxide; pentochlorophenol; toluene; toluol; trichloroethane; trichloroethylene; 1,4 butanediol.

(50) "Sale" is any form of delivery which includes barter, exchange or gift, or offer therefor, and each such transaction made by any person whether as principal, proprietor, agent, servant or employee.

(51) "State", when applied to a part of the United States, includes any state, district, commonwealth, territory or insular possession thereof, and any area subject to the legal authority of the United States of America.

(52) "State food, drug and cosmetic laws" means the Uniform Food, Drug and Cosmetic Act, section 21a-91 et seq.

(53) "Ultimate user" means a person who lawfully possesses a controlled substance for the person's own use or for the use of a member of such person's household or for administering to an animal owned by such person or by a member of such person's household.

(54) "Veterinarian" means a person authorized by law to practice veterinary medicine in this state.

(55) "Wholesaler" means a distributor or a person who supplies

controlled substances that the person personally has not produced or prepared to registrants.

(56) "Reasonable times" means the time or times any office, care-giving institution, pharmacy, clinic, wholesaler, manufacturer, laboratory, warehouse, establishment, store or place of business, vehicle or other place is open for the normal affairs or business or the practice activities usually conducted by the registrant.

(57) "Unit dose drug distribution system" means a drug distribution system used in a hospital or chronic and convalescent nursing home in which drugs are supplied in individually labeled unit of use packages, each patient's supply of drugs is exchanged between the hospital pharmacy and the drug administration area or, in the case of a chronic and convalescent nursing home between a pharmacy and the drug administration area, at least once each twenty-four hours and each patient's medication supply for this period is stored within a patient-specific container, all of which is conducted under the direction of a pharmacist licensed in Connecticut and, in the case of a hospital, directly involved in the provision and supervision of pharmaceutical services at such hospital at least thirty-five hours each week.

(58) "Cocaine in a free-base form" means any substance which contains cocaine, or any compound, isomer, derivative or preparation thereof, in a nonsalt form.

(59) "THC" means tetrahydrocannabinol, including, but not limited to, delta-7, delta-8-tetrahydrocannabinol, delta-9-tetrahydrocannabinol and delta-10-tetrahydrocannabinol, and any material, compound, mixture or preparation which contain their salts, isomers and salts of isomers, whenever the existence of such salts, isomers and salts of isomers is possible within the specific chemical designation, regardless of the source, except: (A) Dronabinol substituted in sesame oil and encapsulated in a soft gelatin capsule in a federal Food and Drug

Administration or successor agency approved product; **[**,**]** or (B) any tetrahydrocannabinol product that has been approved by the federal Food and Drug Administration or successor agency to have a medical use and reclassified in any schedule of controlled substances or unscheduled by the federal Drug Enforcement Administration or successor agency.

(60) "Total THC" means the sum of the percentage by weight of tetrahydrocannabinolic acid, multiplied by eight hundred seventy-seven-thousandths, plus the percentage of weight of THC.

(61) "Manufactured cannabinoid" means cannabinoids **[**naturally occurring from a source other than marijuana that are similar in chemical structure or physiological effect to cannabinoids derived from marijuana, as defined in section 21a-243, but are derived by a chemical or biological process**]** created by directly converting one cannabinoid to a different cannabinoid through: (A) Application of light or heat; (B) decarboxylation of naturally occurring acidic forms of cannabinoids; or (C) an alternate extraction or conversion process approved by the Department of Consumer Protection and published on the department's Internet web site.

(62) "Synthetic cannabinoid" (A) means any **[**material, compound, mixture or preparation which contains any quantity of a substance having a psychotropic response primarily by agonist activity at cannabinoid-specific receptors affecting the central nervous system that is produced artificially and not derived from an organic source naturally containing cannabinoids, unless listed in another schedule pursuant to section 21a-243**]** substance converted, by a chemical process, to create a cannabinoid or cannabinoid-like substance that (i) has structural features which allow interaction with at least one of the known cannabinoid-specific receptors, or (ii) has any physiological or psychotropic response on at least one cannabinoid-specific receptor, (B) includes, but is not limited to, hexahydrocannabinol (HHC and HXC)

and hydrox4phc (PHC), and (C) does not include any manufactured cannabinoid.

(63) "High-THC hemp product" means a manufacturer hemp product, as defined in section 22-61*l*, that has, or is advertised, labeled or offered for sale as having, total THC that exceeds: (A) **[**for**]** For a hemp edible, hemp topical or hemp transdermal patch (i) one milligram on a per-serving basis, or (ii) five milligrams on a per-container basis; **[,]** (B) for a hemp tincture, including, but not limited to, oil intended for ingestion by swallowing, buccal administration or sublingual absorption, (i) one milligram on a per-serving basis, or (ii) twenty-five milligrams on a per-container basis; **[,]** (C) for a hemp concentrate or extract, including, but not limited to, a vape oil, wax or shatter, twenty-five milligrams on a per-container basis; **[,]** or (D) for a manufacturer hemp product not described in subparagraph (A), (B) or (C) of this subdivision, (i) one milligram on a per-serving basis, (ii) five milligrams on a per-container basis, or (iii) three-tenths per cent on a dry-weight basis for cannabis flower or cannabis trim.

Sec. 2. Subsection (j) of section 21a-243 of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(j) Notwithstanding the provisions of subsection (c) of this section, the Commissioner of Consumer Protection shall designate the following substances, by whatever official, common, usual, chemical or trade name designation, as controlled substances in schedule I of the controlled substances scheduling regulations:

(1) Mephedrone (4-methylmethcathinone); **[**and**]**

(2) Synthetic cannabinoids; and

**[**(2)**]** (3) MDPV (3,4-methyenedioxypyrovalerone).

*Substitute House Bill No. 5235*

Sec. 3. Section 21a-408 of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective October 1, 2024*):

As used in this section, sections 21a-408a to 21a-408o, inclusive, **[**and**]** sections 21a-408r to 21a-408v, inclusive, unless the context otherwise requires:

(1) "Advanced practice registered nurse" means an advanced practice registered nurse licensed pursuant to chapter 378;

(2) "Cannabis establishment" has the same meaning as provided in section 21a-420;

(3) "Cannabis testing laboratory" means a person who (A) is located in this state, (B) is licensed by the department to analyze marijuana, and (C) meets the licensure requirements established in section 21a-408r and the regulations adopted pursuant to subsection (d) of section 21a-408r;

(4) "Cannabis testing laboratory employee" means a person who is (A) employed at a cannabis testing laboratory, and (B) registered pursuant to section 21a-408r and the regulations adopted pursuant to subsection (d) of section 21a-408r;

(5) "Caregiver" means a person, other than the qualifying patient and the qualifying patient's physician, physician assistant or advanced practice registered nurse, who is eighteen years of age or older and has agreed to undertake responsibility for managing the well-being of the qualifying patient with respect to the palliative use of marijuana, provided (A) in the case of a qualifying patient (i) under eighteen years of age and not an emancipated minor, or (ii) otherwise lacking legal capacity, such person shall be a parent, guardian or person having legal custody of such qualifying patient, and (B) in the case of a qualifying patient eighteen years of age or older or an emancipated minor, the need for such person shall be evaluated by the qualifying patient's physician,

*Substitute House Bill No. 5235*

physician assistant or advanced practice registered nurse and such need shall be documented in the written certification;

(6) "Cultivation" includes planting, propagating, cultivating, growing and harvesting;

(7) "Debilitating medical condition" means (A) cancer, glaucoma, positive status for human immunodeficiency virus or acquired immune deficiency syndrome, Parkinson's disease, multiple sclerosis, damage to the nervous tissue of the spinal cord with objective neurological indication of intractable spasticity, epilepsy or uncontrolled intractable seizure disorder, cachexia, wasting syndrome, Crohn's disease, posttraumatic stress disorder, irreversible spinal cord injury with objective neurological indication of intractable spasticity, cerebral palsy, cystic fibrosis or terminal illness requiring end-of-life care, except, if the qualifying patient is under eighteen years of age, "debilitating medical condition" means terminal illness requiring end-of-life care, irreversible spinal cord injury with objective neurological indication of intractable spasticity, cerebral palsy, cystic fibrosis, severe epilepsy or uncontrolled intractable seizure disorder, or (B) any medical condition, medical treatment or disease approved for qualifying patients by the Department of Consumer Protection and posted online pursuant to section 21a-408*l*;

(8) "Dispensary facility" means a place of business where marijuana may be dispensed, sold or distributed in accordance with this chapter and any regulations adopted thereunder to qualifying patients and caregivers and for which the department has issued a dispensary facility license pursuant to this chapter;

(9) "Employee" has the same meaning as provided in section 21a-420;

(10) "Institutional animal care and use committee" means a committee that oversees an organization's animal program, facilities and

*Substitute House Bill No. 5235*

procedures to ensure compliance with federal policies, guidelines and principles related to the care and use of animals in research;

(11) "Institutional review board" means a specifically constituted review body established or designated by an organization to protect the rights and welfare of persons recruited to participate in biomedical, behavioral or social science research;

(12) "Licensed dispensary" or "dispensary" means an individual who is a licensed pharmacist employed by a dispensary facility or hybrid retailer;

(13) "Marijuana" **[**means marijuana, as defined**]** has the same meaning as provided in section 21a-240, as amended by this act;

(14) "Nurse" means a person who is licensed as a nurse under chapter 378;

(15) "Palliative use" means the acquisition, distribution, transfer, possession, use or transportation of marijuana or paraphernalia relating to marijuana, including the transfer of marijuana and paraphernalia relating to marijuana from the patient's caregiver to the qualifying patient, to alleviate a qualifying patient's symptoms of a debilitating medical condition or the effects of such symptoms, but does not include any such use of marijuana by any person other than the qualifying patient;

(16) "Paraphernalia" means drug paraphernalia, as defined in section 21a-240, as amended by this act;

(17) "Physician" means a person who is licensed as a physician under chapter 370;

(18) "Physician assistant" means a person who is licensed as a physician assistant under chapter 370;

*Substitute House Bill No. 5235*

(19) "Producer" means a person who is licensed as a producer pursuant to section 21a-408i;

(20) "Qualifying patient" means a person who **[:]** (A) **[Is]** is a resident of Connecticut, (B) has been diagnosed by a physician, physician assistant or advanced practice registered nurse as having a debilitating medical condition, and (C) (i) is eighteen years of age or older, (ii) is an emancipated minor, or (iii) has written consent from a custodial parent, guardian or other person having legal custody of such person that indicates that such person has permission from such parent, guardian or other person for the palliative use of marijuana for a debilitating medical condition and that such parent, guardian or other person will (I) serve as a caregiver for the qualifying patient, and (II) control the acquisition and possession of marijuana and any related paraphernalia for palliative use on behalf of such person. "Qualifying patient" does not include an inmate confined in a correctional institution or facility under the supervision of the Department of Correction;

(21) "Research program" means a study approved by the Department of Consumer Protection in accordance with this chapter and undertaken to increase information or knowledge regarding the growth or processing of marijuana, or the medical attributes, dosage forms, administration or use of marijuana to treat or alleviate symptoms of any medical conditions or the effects of such symptoms;

(22) "Research program employee" means a person who (A) is registered as a research program employee under section 21a-408t, or (B) holds a temporary certificate of registration issued pursuant to section 21a-408t;

(23) "Research program subject" means a person registered as a research program subject pursuant to section 21a-408v;

(24) "Usable marijuana" means the dried leaves and flowers of the

marijuana plant, and any mixtures or preparations of such leaves and flowers, that are appropriate for the palliative use of marijuana, but does not include the seeds, stalks and roots of the marijuana plant; and

(25) "Written certification" means a written certification issued by a physician, physician assistant or advanced practice registered nurse pursuant to section 21a-408c.

Sec. 4. Subsection (d) of section 21a-420n of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(d) A cultivator may sell, transfer or transport its cannabis to a **[**dispensary facility, hybrid retailer, retailer, food and beverage manufacturer, product manufacturer**]** cannabis establishment, research program **[**,**]** or cannabis testing laboratory **[**or product packager**]** utilizing its own employees or a transporter. A cultivator shall not sell, transfer or deliver to consumers, qualifying patients or caregivers, directly or through a delivery service.

Sec. 5. Subsection (b) of section 21a-421j of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(b) The commissioner shall adopt regulations in accordance with chapter 54 to implement the provisions of RERACA. Notwithstanding the requirements of sections 4-168 to 4-172, inclusive, in order to effectuate the purposes of RERACA and protect public health and safety, prior to adopting such regulations the commissioner shall issue policies and procedures to implement the provisions of RERACA that shall have the force and effect of law. The commissioner shall post all policies and procedures on the department's Internet web site and submit such policies and procedures to the Secretary of the State for posting on the eRegulations System, at least fifteen days prior to the

*Substitute House Bill No. 5235*

effective date of any policy or procedure. The commissioner shall also provide such policies and procedures, in a manner prescribed by the commissioner, to each licensee. Any such policy or procedure shall no longer be effective upon the earlier of either the adoption of the policy or procedure as a final regulation under section 4-172 or forty-eight months from June 22, 2021, if such regulations have not been submitted to the legislative regulation review committee for consideration under section 4-170. The commissioner shall issue policies and procedures and thereafter final regulations that include, but are not limited to, the following:

(1) Setting appropriate dosage, potency, concentration and serving size limits and delineation requirements for cannabis, provided a standardized serving of edible cannabis product or beverage, other than a medical marijuana product, shall contain not more than five milligrams of THC.

(2) Requiring that each single standardized serving of cannabis product in a multiple-serving edible product or beverage is physically demarked in a way that enables a reasonable person to determine how much of the product constitutes a single serving and a maximum amount of THC per multiple-serving edible cannabis product or beverage.

(3) Requiring that, if it is impracticable to clearly demark every standardized serving of cannabis product or to make each standardized serving easily separable in an edible cannabis product or beverage, the product, other than cannabis concentrate or medical marijuana product, shall contain not more than five milligrams of THC per unit of sale.

(4) Establishing, in consultation with the Department of Mental Health and Addiction Services, consumer health materials that shall be posted or distributed, as specified by the commissioner, by cannabis establishments to maximize dissemination to cannabis consumers.

*Substitute House Bill No. 5235*

Consumer health materials may include pamphlets, packaging inserts, signage, online and printed advertisements and advisories and printed health materials.

(5) Imposing labeling and packaging requirements for cannabis sold by a cannabis establishment that include, but are not limited to, the following:

(A) Inclusion of universal symbols to indicate that cannabis, or a cannabis product, contains THC and is not legal or safe for individuals younger than twenty-one years of age, and prescribe how such product and product packaging shall utilize and exhibit such symbols.

(B) A disclosure concerning the length of time it typically takes for the cannabis to affect an individual, including that certain forms of cannabis take longer to have an effect.

(C) A notation of the amount of cannabis the cannabis product is considered the equivalent to.

(D) A list of ingredients and all additives for cannabis.

(E) Child-resistant, tamper-resistant and light-resistant packaging. **[**, including requiring that an edible product be individually wrapped.**]** For the purposes of this subparagraph, packaging shall be deemed to be (i) child-resistant if the packaging satisfies the standard for special packaging established in 16 CFR 1700.1(b)(4), as amended from time to time, (ii) tamper-resistant if the packaging has at least one barrier to, or indicator of, entry that would preclude the contents of such packaging from being accessed or adulterated without indicating to a reasonable person that such packaging has been breached, and (iii) light-resistant if the packaging is entirely and uniformly opaque and protects the entirety of the contents of such packaging from the effects of light.

(F) <u>(i)</u> Packaging for cannabis intended for multiple servings to be

*Substitute House Bill No. 5235*

resealable in such a manner so as to render such packaging continuously child-resistant, as described in subparagraph (E)(i) of this subdivision, and preserve the integrity of the contents of such packaging, and (ii) if packaging for cannabis intended for multiple servings contains any edible cannabis product, for each single standardized serving to be easily discernible and (I) individually wrapped, or (II) physically demarked and delineated as required under this subsection.

(G) Impervious packaging that protects the contents of such packaging from contamination and exposure to any toxic or harmful substance, including, but not limited to, any glue or other adhesive or substance that is incorporated in such packaging.

(H) Product tracking information sufficient to determine where and when the cannabis was grown and manufactured such that a product recall could be effectuated.

(I) A net weight statement.

(J) A recommended use by or expiration date.

(K) Standard and uniform packaging and labeling, including, but not limited to, requirements (i) regarding branding or logos, (ii) that all packaging be opaque, and (iii) that amounts and concentrations of THC and cannabidiol, per serving and per package, be clearly marked on the packaging or label of any cannabis product sold.

(L) For any cannabis concentrate cannabis product that contains a total THC percentage greater than thirty per cent, a warning that such cannabis product is a high-potency product and may increase the risk of psychosis.

(M) Chemotypes, which shall be displayed as (i) "High THC, Low CBD" where the ratio of THC to CBD is greater than five to one and the total THC percentage is at least fifteen per cent, (ii) "Moderate THC,

*Substitute House Bill No. 5235*

Moderate CBD" where the ratio of THC to CBD is at least one to five but not greater than five to one and the total THC percentage is greater than five per cent but less than fifteen per cent, (iii) "Low THC, High CBD" where the ratio of THC to CBD is less than one to five and the total THC percentage is not greater than five per cent, or (iv) the chemotype described in clause (i), (ii) or (iii) of this subparagraph that most closely fits the cannabis or cannabis product, as determined by mathematical analysis of the ratio of THC to CBD, where such cannabis or cannabis product does not fit a chemotype described in clause (i), (ii) or (iii) of this subparagraph.

(N) A requirement that, prior to being sold and transferred to a consumer, qualifying patient or caregiver, cannabis packaging be clearly labeled, whether printed directly on such packaging or affixed by way of a separate label, other than an extended content label, with:

(i) A unique identifier generated by a cannabis analytic tracking system maintained by the department and used to track cannabis under the policies and procedures issued, and final regulations adopted, by the commissioner pursuant to this section; and

(ii) The following information concerning the cannabis contained in such packaging, which shall be in legible English, black lettering, Times New Roman font, flat regular typeface, on a contrasting background and in uniform size of not less than one-tenth of one inch, based on a capital letter "K", which information shall also be available on the Internet web site of the cannabis establishment that sells and transfers such cannabis:

(I) The name of such cannabis, as registered with the department under the policies and procedures issued, and final regulations adopted, by the commissioner pursuant to this section.

(II) The expiration date, which shall not account for any refrigeration

*Substitute House Bill No. 5235*

after such cannabis is sold and transferred to the consumer, qualifying patient or caregiver.

(III) The net weight or volume, expressed in metric and imperial units.

(IV) The standardized serving size, expressed in customary units, and the number of servings included in such packaging, if applicable.

(V) Directions for use and storage.

(VI) Each active ingredient comprising at least one per cent of such cannabis, including cannabinoids, isomers, esters, ethers and salts and salts of isomers, esters and ethers, and all quantities thereof expressed in metric units and as a percentage of volume.

(VII) A list of all known allergens, as identified by the federal Food and Drug Administration, contained in such cannabis, or the denotation "no known FDA identified allergens" if such cannabis does not contain any allergen identified by the federal Food and Drug Administration.

(VIII) The following warning statement within, and outlined by, a red box:

"This product is not FDA-approved, may be intoxicating, cause long-term physical and mental health problems, and have delayed side effects. It is illegal to operate a vehicle or machinery under the influence of cannabis. Keep away from children."

(IX) At least one of the following warning statements, rotated quarterly on an alternating basis:

"Warning: Frequent and prolonged use of cannabis can contribute to mental health problems over time, including anxiety, depression, stunted brain development and impaired memory."

*Substitute House Bill No. 5235*

"Warning: Consumption while pregnant or breastfeeding may be harmful."

"Warning: Cannabis has intoxicating effects and may be habit-forming and addictive."

"Warning: Consuming more than the recommended amount may result in adverse effects requiring medical attention.".

(X) All information necessary to comply with labeling requirements imposed under the laws of this state **[**or**]** <u>and</u> federal law, including, but not limited to, sections 21a-91 to 21a-120, inclusive, and 21a-151 to 21a-159, inclusive, the Federal Food, Drug and Cosmetic Act, 21 USC 301 et seq., as amended from time to time, and the federal Fair Packaging and Labeling Act, 15 USC 1451 et seq., as amended from time to time, for similar products that do not contain cannabis.

(XI) Such additional warning labels for certain cannabis products as the commissioner may require and post on the department's Internet web site.

(6) Establishing laboratory testing standards.

(7) Restricting forms of cannabis products and cannabis product delivery systems to ensure consumer safety and deter public health concerns.

(8) Prohibiting certain manufacturing methods, or inclusion of additives to cannabis products, including, but not limited to, (A) added flavoring, terpenes or other additives unless approved by the department, or (B) any form of nicotine or other additive containing nicotine.

(9) Prohibiting cannabis product types that appeal to children.

(10) Establishing physical and cyber security requirements related to

*Substitute House Bill No. 5235*

build out, monitoring and protocols for cannabis establishments as a requirement for licensure.

(11) Placing temporary limits on the sale of cannabis in the adult-use market, if deemed appropriate and necessary by the commissioner, in response to a shortage of cannabis for qualifying patients.

(12) Requiring retailers and hybrid retailers to make best efforts to provide access to (A) low-dose THC products, including products that have one milligram and two and a half milligrams of THC per dose, and (B) high-dose CBD products.

(13) Requiring producers, cultivators, micro-cultivators, product manufacturers and food and beverage manufacturers to register brand names for cannabis, in accordance with the policies and procedures and subject to the fee set forth in, regulations adopted under chapter 420f.

(14) Prohibiting a cannabis establishment from selling, other than the sale of medical marijuana products between cannabis establishments and the sale of cannabis to qualified patients and caregivers, (A) cannabis flower or other cannabis plant material with a total THC concentration greater than thirty per cent on a dry-weight basis, and (B) any cannabis product other than cannabis flower and cannabis plant material with a total THC concentration greater than sixty per cent on a dry-weight basis, except that the provisions of subparagraph (B) of this subdivision shall not apply to the sale of prefilled cartridges for use in an electronic cannabis delivery system, as defined in section 19a-342a and the department may adjust the percentages set forth in subparagraph (A) or (B) of this subdivision in regulations adopted pursuant to this section for purposes of public health or to address market access or shortage. As used in this subdivision, "cannabis plant material" means material from the cannabis plant, as defined in section 21a-279a.

*Substitute House Bill No. 5235*

(15) Permitting the outdoor cultivation of cannabis.

(16) Prohibiting packaging that is (A) visually similar to any commercially similar product that does not contain cannabis, or (B) used for any good that is marketed to individuals reasonably expected to be younger than twenty-one years of age.

(17) Allowing packaging to include a picture of the cannabis product and contain a logo of one cannabis establishment, which logo may be comprised of not more than three colors and provided neither black nor white shall be considered one of such three colors.

(18) Requiring packaging to (A) be entirely and uniformly one color, and (B) not incorporate any information, print, embossing, debossing, graphic or hidden feature, other than any permitted or required label.

(19) Requiring that packaging and labeling for an edible cannabis product, excluding the warning labels required under this subsection and a picture of the cannabis product described in subdivision (17) of this subsection but including, but not limited to, the logo of the cannabis establishment, shall only be comprised of black and white or a combination thereof.

(20) (A) Except as provided in subparagraph (B) of this subdivision, requiring that delivery device cartridges be labeled, in a clearly legible manner and in as large a font as the size of the device reasonably allows, with only the following information (i) the name of the cannabis establishment where the cannabis is grown or manufactured, (ii) the cannabis brand, (iii) the total THC and total CBD content contained within the delivery device cartridge, (iv) the expiration date, and (v) the unique identifier generated by a cannabis analytic tracking system maintained by the department and used to track cannabis under the policies and procedures issued, and final regulations adopted, by the commissioner pursuant to this section.

*Substitute House Bill No. 5235*

(B) A cannabis establishment may emboss, deboss or similarly print the name of the cannabis establishment's business entity, and one logo with not more than three colors, on a delivery device cartridge.

Sec. 6. Section 21a-421aa of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) No cannabis retailer or hybrid retailer shall accept payment or other form of compensation directly or indirectly from a cultivator, micro-cultivator, producer, food and beverage manufacturer, product manufacturer or product packager to carry a cannabis product or for placement or promotion of such product in a retailer or hybrid retailer's establishment or through other promotional initiatives. No retailer or hybrid retailer shall enter into a contract with a cultivator, micro-cultivator, producer, food and beverage manufacturer, product manufacturer or product packager that requires or permits preferential treatment, exclusivity or near exclusivity or limits a retailer or hybrid retailer from purchasing from other cultivators, micro-cultivators, producers, food and beverage manufacturers or product manufacturers in any way.

(b) No cannabis establishment shall produce, manufacture or sell cannabis that is intended for use or consumption by animals.

(c) A retailer or hybrid retailer shall not knowingly sell to a consumer more than one ounce of cannabis or the equivalent amount of cannabis products or combination of cannabis and cannabis products, as set forth in subsection (i) of section 21a-279a, per day, except that a hybrid retailer or dispensary facility may sell up to five ounces of cannabis or the equivalent amount of cannabis products or combination of cannabis and cannabis products to a qualifying patient or caregiver per day. Notwithstanding the requirements of sections 4-168 to 4-172, inclusive, to avoid cannabis supply shortages or address a public health and safety concern, the commissioner may set temporary lower per-transaction

limits, which shall be published on the department's Internet web site. Such limits shall become ineffective upon the commissioner's determination that a supply shortage or public health and safety concern no longer exists.

(d) No cannabis establishment, except a producer, cultivator or micro-cultivator, may acquire or possess a live cannabis plant.

(e) No person issued a license or registration pursuant to RERACA shall (1) assign or transfer such license or registration without the commissioner's prior approval, or (2) sell, transfer or transport cannabis to, or obtain cannabis from, a location outside of this state if such activity would be in violation of federal law.

(f) Synthetic cannabinoids, as defined in section 21a-240, as amended by this act, are prohibited in cannabis, and no synthetic cannabinoid may be sold at any cannabis establishment.

Sec. 7. Subsection (a) of section 21a-421dd of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) No member of the Social Equity Council and no employee of the Social Equity Council or department who carries out the licensing, inspection, investigation, enforcement or policy decisions authorized by [RERACA] this chapter, and any regulations enacted pursuant thereto, may, directly or indirectly, have any management or financial interest in the cultivation, manufacture, sale, transportation, delivery or testing of cannabis in this state, nor receive any commission or profit from nor have any financial interest in purchases or sales made by [persons] cannabis establishments that are licensed pursuant to this chapter and authorized to make such purchases or sales pursuant to [RERACA] such license. No provision of this section shall prevent any such member or employee from purchasing and keeping in his or her possession, for his

*Substitute House Bill No. 5235*

or her personal use or the use of such member's or employee's family or guests, any cannabis which may be purchased or kept by any person by virtue of **[**RERACA**]** this chapter.

Sec. 8. Section 22-61m of the 2024 supplement to the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) No person shall manufacture in the state without a license to manufacture issued by the Commissioner of Consumer Protection.

(b) Each applicant for a manufacturer license shall submit an application on a form and in a manner prescribed by the Commissioner of Consumer Protection.

(c) The following fees shall apply for a license to manufacture:

(1) A nonrefundable license application fee of seventy-five dollars; and

(2) A nonrefundable licensing fee of three hundred seventy-five dollars for a license to manufacture hemp.

(d) A license to manufacture issued by the Commissioner of Consumer Protection pursuant to this section shall expire triennially on June thirtieth. Such licenses shall not be transferable.

(e) In accordance with a hearing held pursuant to chapter 54, the Commissioner of Consumer Protection may deny, suspend or revoke a manufacturer license, issue fines of not more than two thousand five hundred dollars per violation and place conditions upon a manufacturer licensee who violates the provisions of this section and any regulation adopted pursuant to this section.

(f) (1) Any individual who manufactures in this state without obtaining a license pursuant to this section or who manufactures in this

*Substitute House Bill No. 5235*

state after such entity's license is suspended or revoked shall be fined two hundred fifty dollars in accordance with the provisions of section 51-164n.

(2) Any entity who manufactures in this state without obtaining a license pursuant to this section, or who manufactures in this state after having a license suspended, shall be fined not more than two thousand five hundred dollars per violation after a hearing conducted in accordance with the provisions of chapter 54.

(g) Nothing in this chapter or any regulations adopted pursuant to this chapter shall be construed to apply to persons licensed pursuant to section 21a-408i nor to require persons licensed pursuant to said section to obtain a license pursuant to this chapter.

(h) The Commissioner of Consumer Protection may inspect and shall have access to the buildings, equipment, supplies, vehicles, records, real property and other information of any manufacturer applicant or licensee that the commissioner deems necessary to carry out the commissioner's duties pursuant to this section.

(i) (1) Each manufacturer shall follow the protocol in this subsection for disposing of cannabis in the event that any hemp or hemp product is deemed to exceed the prescribed THC concentration, as determined by the Commissioner of Consumer Protection, or a manufacturer licensee in possession of hemp or hemp products who desires to dispose of obsolete, misbranded, excess or otherwise undesired product. Each manufacturer licensee shall be responsible for all costs of disposal of hemp samples and any hemp produced by such licensee that violates the provisions of this section or any regulation adopted pursuant to this section. Any cannabis that exceeds the prescribed THC concentration allowable in hemp or hemp products shall be immediately embargoed by such manufacturer and clearly labeled as adulterated by such licensee and such licensee shall immediately notify both the Department

*Substitute House Bill No. 5235*

of Consumer Protection and the Department of Agriculture, in writing, of such adulterated product. Such adulterated product shall be destroyed and disposed of by the following method, as determined by the Commissioner of Consumer Protection:

(A) Surrender, without compensation, of such hemp or hemp product to the Commissioner of Consumer Protection who shall be responsible for the destruction and disposal of such adulterated product; or

(B) By disposal in a manner prescribed by the Commissioner of Consumer Protection.

(2) Notwithstanding the provisions of subdivision (1) of this subsection, upon written request of a manufacturer, the Commissioner of Consumer Protection may permit such manufacturer to combine different batches of raw hemp plant material to achieve a THC concentration of 0.3 per cent on a dry weight basis, in lieu of embargo or destruction.

(j) The manufacturer or manufacturer's authorized designee disposing of the hemp or hemp products shall maintain and make available to the Commissioner of Consumer Protection a record of each such disposal or destruction of product indicating:

(1) The date, time and location of disposal or destruction;

(2) The manner of disposal or destruction;

(3) The batch or lot information and quantity of hemp or hemp product disposed of or destroyed; and

(4) The signatures of the persons disposing of the hemp or hemp products, the authorized representative of the Commissioner of Consumer Protection and any other persons present during the disposal.

*Substitute House Bill No. 5235*

(k) Any hemp intended to be manufactured by a manufacturer into a manufacturer hemp product shall be tested by an independent testing laboratory located in this state. A manufacturer licensee shall make available samples, in an amount and type determined by the Commissioner of Consumer Protection, of hemp for an independent testing laboratory employee to select random samples. The independent testing laboratory shall test each sample in accordance with the laboratory testing standards established in policies, procedures and regulations adopted by the commissioner pursuant to section 21a-421j, as amended by this act.

(l) Once a batch of hemp, intended to be sold as a manufacturer hemp product, has been homogenized for sample testing and eventual packaging and sale, until the independent testing laboratory provides the results from its tests and analysis, the manufacturer shall segregate and withhold from use the entire batch of hemp that is intended for use as a manufacturer hemp product, except the samples that have been removed by the independent testing laboratory for testing. During this period of segregation, the manufacturer licensee shall maintain the hemp batch in a secure, cool and dry location, as prescribed by the Commissioner of Consumer Protection, so as to prevent the hemp from becoming adulterated. Such manufacturer shall not manufacture or sell a manufacturer hemp product prior to the time that the independent testing laboratory completes testing and analysis and provides such results, in writing, to the manufacturer licensee who initiated such testing.

(m) An independent testing laboratory shall immediately return or dispose of any hemp or manufacturer hemp product upon the completion of any testing, use or research. If an independent testing laboratory disposes of hemp or manufacturer hemp products, the laboratory shall dispose of such hemp in the following manner, as determined by the Commissioner of Consumer Protection:

*Substitute House Bill No. 5235*

(1) By surrender, without compensation, of such hemp or manufacturer hemp product to the Commissioner of Consumer Protection who shall be responsible for the destruction and disposal of such hemp or hemp product; or

(2) By disposal in a manner prescribed by the Commissioner of Consumer Protection.

(n) If a sample does not pass the microbiological, mycotoxin, heavy metal or pesticide chemical residue test, based on the laboratory testing standards established in policies, procedures and regulations adopted by the Commissioner of Consumer Protection pursuant to section 21a-421j, as amended by this act, the manufacturer licensee who sent such batch for testing shall:

(1) Retest and reanalyze the hemp from which the sample was taken by having an employee from the same laboratory randomly select another sample from the same hemp batch. If the sample used to retest or reanalyze such hemp yields satisfactory results for all testing required under this section, an employee from a different laboratory shall randomly select a different sample from the same hemp batch for testing. If both samples yield satisfactory results for all testing required under this section, the hemp batch from which the samples were taken shall be released for manufacturing, processing and sale;

(2) If a remediation plan sufficient to ensure public health and safety is submitted to and approved by the commissioner, remediate the hemp batch from which the sample was taken and have a laboratory employee randomly select a sample from such remediated hemp batch for testing. If such randomly selected sample yields satisfactory results for any testing required under this section, an employee from a different laboratory shall randomly select a different sample from the same hemp batch for testing. If both samples yield satisfactory results for all testing required under this section, the hemp batch from which the samples

*Substitute House Bill No. 5235*

were taken may be released for manufacturing, processing or sale; or

(3) If the manufacturer does not retest or remediate, or if any subsequent laboratory testing does not yield satisfactory results for any testing required under this section, dispose of the entire batch from which the sample was taken in accordance with procedures established by the Commissioner of Consumer Protection pursuant to subdivision (1) of subsection (i) of this section.

(o) If a sample passes the microbiological, mycotoxin, heavy metal and pesticide chemical residue test, the independent testing laboratory shall release the entire batch for manufacturing, processing or sale.

(p) The independent testing laboratory shall file with the Department of Consumer Protection an electronic copy of each laboratory test result for any batch that does not pass the microbiological, mycotoxin, heavy metal or pesticide chemical residue test, at the same time that it transmits such results to the manufacturer licensee who requested such testing. Each independent testing laboratory shall maintain the test results of each tested batch for a period of three years and shall make such results available to the Department of Consumer Protection upon request.

(q) Manufacturers shall maintain records required by the federal act, this section, any regulation adopted pursuant to this section and the policies, procedures and regulations adopted by the Commissioner of Consumer Protection pursuant to section 21a-421j, as amended by this act. Each manufacturer shall make such records available to the Department of Consumer Protection immediately upon request and in electronic format, if available.

(r) The Commissioner of Consumer Protection may adopt regulations, in accordance with the provisions of chapter 54, to implement the provisions of this section including, but not limited to,

establishing sampling and testing procedures to ensure compliance with this section, prescribing storage and disposal procedures for hemp, marijuana and manufacturer hemp products that fail to pass Department of Consumer Protection prescribed independent testing laboratory testing standards and establishing advertising and labeling requirements for manufacturer hemp products.

(s) Any claim of health impacts, medical effects or physical or mental benefits shall be prohibited on any advertising for, labeling of or marketing of manufacturer hemp products regardless of whether such manufacturer hemp products were manufactured in this state or another jurisdiction. Any violation of this subsection shall be deemed an unfair or deceptive trade practice under subsection (a) of section 42-110b.

(t) Not later than February 1, 2020, the Commissioners of Agriculture and Consumer Protection shall submit a report, in accordance with section 11-4a, to the joint standing committee of the general assembly having cognizance of matters relating to the environment on the status of the pilot program, the development of the state plan and any regulations for such pilot program or state plan. Such report shall also include any legislative recommendations, including, but not limited to, any recommendations for requiring the registration of any manufacturer hemp product offered for sale in this state.

(u) (1) Any person who sells manufacturer hemp products shall not be required to be licensed, provided such person only engages in: (A) The retail or wholesale sale of manufacturer hemp products in which no further manufacturing of hemp occurs, provided such manufacturer hemp products are acquired from a person authorized to manufacture the manufacturer hemp products under the laws of this state or another state, territory or possession of the United States or another sovereign entity; (B) the acquisition of manufacturer hemp products for the sole purpose of product distribution for resale; and (C) the retail sale of

*Substitute House Bill No. 5235*

manufacturer hemp products that is authorized under federal or state law.

(2) The Commissioner of Consumer Protection or Commissioner of Revenue Services may, pursuant to section 4-182, summarily suspend any credential the Department of Consumer Protection or Department of Revenue Services issued to any person who sells manufacturer hemp products in violation of subdivision (1) of this subsection or subsections (v) to (y), inclusive, of this section.

(v) No manufacturer hemp product offered for sale in this state, or to a consumer in this state, shall contain any synthetic cannabinoid, as defined in section 21a-240, as amended by this act.

(w) No manufacturer hemp product offered for sale in this state, or to a consumer in this state, shall be packaged, presented or advertised in a manner that is likely to mislead a consumer by incorporating any statement, brand, design, representation, picture, illustration or other depiction that: (1) Bears a reasonable resemblance to trademarked or characteristic packaging of (A) cannabis offered for sale (i) in this state by a cannabis establishment licensed in this state, or (ii) on tribal land by a tribal-credentialed cannabis entity, or (B) a commercially available product other than a cannabis product, as defined in section 21a-420; or (2) implies that the manufacturer hemp product (A) is a cannabis product, as defined in section 21a-420, (B) contains a total THC concentration greater than three-tenths per cent on a dry-weight basis, or (C) is a high-THC hemp product, as defined in section 21a-240, as amended by this act.

(x) No manufacturer hemp product that is a food, beverage, oil or other product intended for human ingestion shall be distributed or sold in this state unless such product is contained within a package, or a label is affixed to such package, that includes:

**Public Act No. 24-115**                                    **39** *of 42*

*Substitute House Bill No. 5235*

(1) A scannable barcode, Internet web site address or quick response code that is linked to the certificate of analysis of the final form product batch by an independent testing laboratory and discloses:

(A) The name of such product;

(B) The name, address and telephone number of such product's manufacturer, packer and distributor, as applicable;

(C) The batch number, which shall match the batch number on such package or label; and

(D) The concentration of cannabinoids present in such product, including, but not limited to, total THC and any cannabinoids or active ingredients comprising at least one per cent of such product;

(2) The expiration or best by date for such product, if applicable;

(3) A clear and conspicuous statement disclosing that:

(A) Children, or those who are pregnant or breastfeeding, should avoid using such product prior to consulting with a health care professional concerning such product's safety;

(B) Products containing cannabinoids should be kept out of reach of children; and

(C) The federal Food and Drug Administration has not evaluated such product for safety or efficacy; and

(4) If such product is intended to be inhaled, a clear and conspicuous warning statement disclosing that smoking or vaporizing is hazardous to human health.

(y) No manufacturer hemp product that is a topical, soap or cosmetic, as defined in section 21a-92, shall be distributed or sold in this state

*Substitute House Bill No. 5235*

unless such product is contained within a package, or a label is affixed to such package, that includes:

(1) A scannable barcode, Internet web site address or quick response code that is linked to the certificate of analysis of the final form extract or final form product batch by an independent testing laboratory and discloses:

(A) The name of such product;

(B) The name, address and telephone number of such product's manufacturer, packer and distributor, as applicable;

(C) The batch number, which shall match the batch number on such package or label; and

(D) The concentration of cannabinoids present in such batch, including, but not limited to, total THC and any marketed cannabinoids;

(2) The expiration or best by date for such product, if applicable; and

(3) A clear and conspicuous statement disclosing the following:

"THE FDA HAS NOT EVALUATED THIS PRODUCT FOR SAFETY OR EFFICACY.".

(z) Any violation of subsections (u) to (y), inclusive, of this section shall be deemed an unfair or deceptive trade practice under subsection (a) of section 42-110b.

(aa) Not later than October 31, 2023, the Department of Emergency Services and Public Protection shall, in consultation with the Department of Consumer Protection, publish a training bulletin to inform local law enforcement agencies and officers regarding the investigation and enforcement standards concerning cannabis and high-THC hemp products.

**Public Act No. 24-115**                                          **41** *of 42*

*Substitute House Bill No. 5235*

(bb) Notwithstanding any provision of the general statutes: (1) CBD that is found in manufacturer hemp products shall not be considered a controlled substance, as defined in section 21a-240, as amended by this act, or legend drug, as defined in section 20-571; and (2) CBD derived from hemp and contained in manufacturer hemp products shall not be considered a controlled substance or adulterant.

(cc) Nothing in this section shall be construed to prohibit the shipment or transportation through this state of any hemp that is lawfully produced under federal law.

Approved June 4, 2024

**EXHIBIT 4**

## IV. Notice of Hearing Under 21 CFR Part 15

The Commissioner of Food and Drugs is announcing that the public hearing will be held in accordance with part 15 (21 CFR part 15). The hearing will be conducted by a presiding officer, who will be accompanied by FDA senior management from the Office of the Commissioner, the Center for Devices and Radiological Health, the Center for Drug Evaluation and Research, and the Office of the Chief Counsel. Under § 15.30(f) (21 CFR 15.30(f)), the hearing is informal, and the rules of evidence do not apply. No participant may interrupt the presentation of another participant. Public hearings under part 15 are subject to FDA's policy and procedures for electronic media coverage of FDA's public administrative proceedings (21 CFR part 10, subpart C). Under 21 CFR 10.205, representatives of the media may be permitted, subject to certain limitations, to videotape, film, or otherwise record FDA's public administrative proceedings, including presentations by participants. Persons attending FDA's hearings are advised that the Agency is not responsible for providing access to electrical outlets. The hearing will be transcribed as stipulated in § 15.30(b) (see *Transcripts*). To the extent that the conditions for the hearing, as described in this notification, conflict with any provisions set out in part 15, this notification acts as a waiver of those provisions as specified in § 15.30(h).

Dated: March 28, 2019.

**Lowell J. Schiller,**

*Acting Associate Commissioner for Policy.*

[FR Doc. 2019–06438 Filed 4–2–19; 8:45 am]

**BILLING CODE 4164–01–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Food and Drug Administration

### 21 CFR Part 15

**[Docket No. FDA–2019–N–1482]**

### Scientific Data and Information About Products Containing Cannabis or Cannabis-Derived Compounds; Public Hearing; Request for Comments

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice of public hearing; request for comments.

**SUMMARY:** The Food and Drug Administration (FDA, the Agency, or we) is announcing a public hearing to obtain scientific data and information about the safety, manufacturing, product quality, marketing, labeling, and sale of products containing cannabis or cannabis-derived compounds.

**DATES:** The public hearing will be held on May 31, 2019, from 8 a.m. to 6 p.m. Submit requests to make oral presentations and comments at the public hearing by May 10, 2019. Electronic or written comments will be accepted until July 2, 2019. See the **SUPPLEMENTARY INFORMATION** section for registration and information.

**ADDRESSES:** The public hearing will be held at FDA White Oak Campus, 10903 New Hampshire Ave., Building 31 Conference Center, the Great Room (Rm. 1503), Silver Spring, MD 20993. Entrance for the public hearing participants (non-FDA employees) is through Building 1, where routine security check procedures will be performed. For parking and security information, please refer to *https:// www.fda.gov/AboutFDA/ WorkingatFDA/BuildingsandFacilities/ WhiteOakCampusInformation/ ucm241740.htm*.

FDA is establishing a docket for public comment on this hearing. The docket number is FDA–2019–N–1482. The docket will close on July 2, 2019. Submit either electronic or written comments on this public hearing by July 2, 2019. Please note that late, untimely filed comments will not be considered. Electronic comments must be submitted on or before July 2, 2019. The *https:// www.regulations.gov* electronic filing system will accept comments until 11:59 p.m. Eastern Time at the end of July 2, 2019. Comments received by mail/hand delivery/courier (for written/ paper submissions) will be considered timely if they are postmarked or the delivery service acceptance receipt is on or before that date.

*Electronic Submissions*

Submit electronic comments in the following way:

• *Federal eRulemaking Portal: https://www.regulations.gov.* Follow the instructions for submitting comments. Comments submitted electronically, including attachments, to *https:// www.regulations.gov* will be posted to the docket unchanged. Because your comment will be made public, you are solely responsible for ensuring that your comment does not include any confidential information that you or a third party may not wish to be posted, such as medical information, your or anyone else's Social Security number, or confidential business information, such as a manufacturing process. Please note that if you include your name, contact information, or other information that identifies you in the body of your comments, that information will be posted on *https://www.regulations.gov*.

• If you want to submit a comment with confidential information that you do not wish to be made available to the public, submit the comment as a written/paper submission and in the manner detailed (see "Written/Paper Submissions" and "Instructions").

*Written/Paper Submissions*

Submit written/paper submissions as follows:

• *Mail/Hand delivery/Courier (for written/paper submissions):* Dockets Management Staff (HFA–305), Food and Drug Administration, 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852.

• For written/paper comments submitted to the Dockets Management Staff, FDA will post your comment, as well as any attachments, except for information submitted, marked and identified, as confidential, if submitted as detailed in "Instructions."

*Instructions:* All submissions received must include the Docket No. FDA– 2019–N–1482 for "Scientific Data and Information about Products Containing Cannabis or Cannabis-Derived Compounds; Public Hearing; Request for Comments." Received comments, those filed in a timely manner (see **ADDRESSES**), will be placed in the docket and, except for those submitted as "Confidential Submissions," publicly viewable at *https://www.regulations.gov* or at the Dockets Management Staff between 9 a.m. and 4 p.m., Monday through Friday.

• Confidential Submissions—To submit a comment with confidential information that you do not wish to be made publicly available, submit your comments only as a written/paper submission. You should submit two copies total. One copy will include the information you claim to be confidential with a heading or cover note that states "THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION." The Agency will review this copy, including the claimed confidential information, in our consideration of comments. The second copy, which will have the claimed confidential information redacted/blacked out, will be available for public viewing and posted on *https://www.regulations.gov*. Submit both copies to the Dockets Management Staff. If you do not wish your name and contact information to be made publicly available, you can provide this information on the cover sheet and not in the body of your comments and you must identify this information as "confidential." Any information marked

as "confidential" will not be disclosed except in accordance with 21 CFR 10.20 and other applicable disclosure law. For more information about FDA's posting of comments to public dockets, see 80 FR 56469, September 18, 2015, or access the information at: *https://www.gpo.gov/ fdsys/pkg/FR-2015-09-18/pdf/2015- 23389.pdf*.

*Docket:* For access to the docket to read background documents or the electronic and written/paper comments received, go to *https:// www.regulations.gov* and insert the docket number, found in brackets in the heading of this document, into the "Search" box and follow the prompts and/or go to the Dockets Management Staff, 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852.

**FOR FURTHER INFORMATION CONTACT:** Beth F. Fritsch, Food and Drug Administration, 10903 New Hampshire Ave. Bldg. 32, Rm. 5308, Silver Spring, MD 20993, 301–796–8451, *StakeholderEngagement@fda.hhs.gov*.

**SUPPLEMENTARY INFORMATION:**

## I. Background and Purpose of Hearing

Cannabis is a plant of the Cannabaceae family and contains more than 80 biologically active chemical compounds. The most commonly known compounds are delta-9-tetrahydrocannabinol (THC) and cannabidiol (CBD). Parts of the *Cannabis sativa* plant have been controlled under the Federal Controlled Substances Act (CSA) since 1970 under the drug class "Marihuana" (21 U.S.C. 802(16).[1] "Marihuana" is listed in Schedule I of the CSA due to its high potential for abuse, which is attributable in large part to the psychoactive effects of THC, and the absence of a currently accepted medical use for marijuana in the United States. Cannabis and cannabis-derived products have been the subject of increasing interest by consumers, industry, researchers, the public, and regulators. Regulatory oversight of products containing cannabis or cannabis-derived compounds is complex and involves multiple Federal and State agencies.

The legality of cannabis has been changing over time at both the State and Federal levels. Currently, 33 States and Washington, DC, allow "medical" use of marijuana under State law and 14 additional States have State law "medical" programs that are limited to CBD products. In addition, 10 States and Washington, DC, have legalized marijuana for recreational use under State law, and 13 additional States have decriminalized recreational marijuana possession under State law in some form.

At the Federal level, the Agriculture Improvement Act of 2018, Public Law 115–334 (the 2018 Farm Bill), was signed into law on December 20, 2018. Among other things, this new law changes certain Federal authorities relating to the production and marketing of hemp, defined as the plant *Cannabis sativa L.* and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis. These changes include removing hemp from the CSA, which means that cannabis plants and derivatives that contain no more than 0.3 percent THC on a dry weight basis are no longer controlled substances under Federal law.

The 2018 Farm Bill explicitly preserved FDA's authority to regulate products containing cannabis or cannabis-derived compounds under the Federal Food, Drug, and Cosmetic Act (FD&C Act) and section 351 of the Public Health Service Act.[2] In doing so, Congress recognized FDA's important public health role with respect to all the products it regulates. Therefore, because the 2018 Farm Bill did not change FDA's authorities, cannabis and cannabis-derived products are subject to the same authorities and requirements as FDA-regulated products containing any other substance, regardless of whether the products fall within the definition of "hemp" under the 2018 Farm Bill.

FDA is aware that some companies are marketing products containing cannabis and cannabis-derived compounds in ways that violate the FD&C Act. FDA has taken action against companies illegally selling cannabis and cannabis-derived products that put the health and safety of consumers at risk. For example, FDA has issued warning

letters[3] to companies illegally selling CBD products that were intended to prevent, diagnose, mitigate, treat, or cure serious diseases, such as cancer, and that had not obtained new drug approvals. Selling unapproved drug products with unsubstantiated therapeutic claims is not only a violation of the law, but also can put patients at risk as the marketing of unproven treatments raises significant public health concerns. Patients and other consumers may be influenced not to use approved therapies to treat serious and even fatal diseases.

FDA's warning letters also cited food products to which CBD had been added and CBD products marketed as dietary supplements. As discussed below, under current law, such products violate the FD&C Act because CBD is an active ingredient in an approved drug and has been the subject of substantial clinical investigations. Allowing drug ingredients in foods can undermine the drug approval process and diminish commercial incentives for further clinical study of the relevant drug substance. It also raises questions about the safety to consumers of exposure from broader consumption of such ingredients.

While the use of cannabis and cannabis-derived products, including hemp and hemp-derived products, has increased dramatically in recent years, questions remain regarding the safety considerations raised by the widespread use of these products. These questions could impact the approaches we consider taking in regulating the development and marketing of products. For example, a 2017 report by the National Academies of Sciences, Engineering, and Medicine[4] reviewed the scientific literature published since 1999 about what is known about the health impacts of cannabis and cannabis-derived products and identified the need for additional research. In addition, during its review of the marketing application for EPIDIOLEX, a CBD oral solution indicated for the treatment of seizures associated with Lennox-Gastaut syndrome and Dravet syndrome in patients 2 years of age and older that was approved in 2018, FDA identified certain safety concerns (see FDA's drug approval package at: *https:// www.accessdata.fda.gov/drugsatfda_ docs/nda/2018/210365Orig1s000 TOC.cfm*). Specifically, at doses of 20

---

[1] Under the CSA, the term "marihuana" means all parts of the plant *Cannabis sativa L.*, whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin. Such a term does not include hemp or the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

[2] For a discussion of FDA's legal authorities, see section IV of this notice.

[3] *https://www.fda.gov/NewsEvents/PublicHealth Focus/ucm484109.htm*.

[4] *http://www.nationalacademies.org/hmd/ Reports/2017/health-effects-of-cannabis-and- cannabinoids.aspx*.

milligrams per kilogram of body weight per day (mg/kg/day) of EPIDIOLEX in clinical trials, there was a potential for liver injury, evidenced by elevated transaminase levels. This is a potentially serious risk that can be managed when the product is taken under medical supervision in accordance with the FDA approved labeling for the product, but it is less clear how this risk might be managed if this substance is used far more widely, without medical supervision, and not in accordance with FDA-approved labeling. Other serious treatment-emergent adverse events reported in clinical studies of EPIDIOLEX included somnolence and lethargy; and hypersensitivity reactions. Common adverse reactions included decreased appetite, diarrhea, and sleep disorders.

Given the substantial interest in this topic and Congressional interest in fostering the development of appropriate hemp products under the 2018 Farm Bill, while also preserving FDA's ability to protect the public health, FDA is holding a public hearing. The goal of the hearing is to obtain additional scientific data and other information related to cannabis and cannabis-derived compounds, both from botanical and synthetic sources, to inform our regulatory oversight of these products. FDA does not intend for this hearing to produce any decisions or new positions on specific regulatory questions, but this hearing is expected to be an important step in our continued evaluation of cannabis and cannabis-derived compounds in FDA-regulated products.

## II. Participating in the Public Hearing

*Registration:* To register to attend the public hearing, either in person or by webcast, on "Scientific Data and Information about Products Containing Cannabis or Cannabis-Derived Compounds" please register at *https://www.fda.gov/NewsEvents/Meetings ConferencesWorkshops/ ucm634550.htm.* Please provide complete contact information for each attendee, including name, title, affiliation, address, email, and telephone and whether you want to attend in person or by webcast.

*Request for Presentations:* During online registration, you may indicate if you wish to make a formal presentation (with accompanying slide deck) or present oral comments during the public hearing session (with no slide deck) and which topic(s) you would like to address. FDA will do its best to accommodate requests to make public presentations. We are seeking to have a broad representation of ideas and issues

presented at the meeting. Individuals and organizations with common interests are urged to consolidate or coordinate their presentations. Following the close of registration, FDA will determine the amount of time allotted to each presenter and the approximate time each presentation is to begin and will select and notify participants by May 21, 2019. All requests to make presentations must be received by the close of registration on May 10, 2019, Eastern Time.

If selected for a formal oral presentation (with a slide deck), each presenter must submit an electronic copy of their presentation (PowerPoint or PDF) to *Stakeholderengagement@ fda.hhs.gov* with the subject line "Scientific Data and Information about Products Containing Cannabis or Cannabis-Derived Compounds" on or before May 28, 2019. No commercial or promotional material will be permitted to be presented or distributed at the public hearing.

Persons notified that they will be presenters are encouraged to arrive at the hearing room early and check in at the onsite registration table to confirm their designated presentation time. Actual presentation times may vary based on how the meeting progresses in real time. An agenda for the hearing and any other background materials will be made available 5 days before the hearing at *https://www.fda.gov/NewsEvents/ MeetingsConferencesWorkshops/ ucm634550.htm.*

Those without internet or email access can register and/or request to participate by contacting Beth F. Fritsch by the above dates (see **FOR FURTHER INFORMATION CONTACT**).

*Streaming Webcast of the Public Hearing:* For those unable to attend in person, FDA will provide a live webcast of the hearing. To join the hearing via the webcast, please go to *https:// collaboration.fda.gov/cannabispart15.*

*Transcripts:* Please be advised that as soon as a transcript is available, it will be accessible at *https://www.fda.gov/ NewsEvents/MeetingsConferences Workshops/ucm634550.htm.* It may be viewed at the Dockets Management Staff (see **ADDRESSES**) and also will be available at *https:// www.regulations.gov.*

## III. Issues for Consideration and Request for Data and Information

We encourage public comments and presentations at the public hearing. In submitting comments, data, and information to the docket, please identify available references for the data and information, as well as the general

category area and specific question number listed below.

### A. Health and Safety Risks

As noted above, there are many unanswered questions about the safety of cannabis and cannabis-derived products. To inform FDA's regulatory oversight of these products, especially as we consider whether it is appropriate to exercise our authority to allow the use of CBD in dietary supplements and other foods, we are interested in obtaining information, including data and studies, on, among other things:

1. Based on what is known about the safety of products containing cannabis and cannabis-derived compounds, are there particular safety concerns that FDA should consider regarding its regulatory oversight and monitoring of these products? For example:

• What levels of cannabis and cannabis-derived compounds cause safety concerns?

• How does the mode of delivery (*e.g.,* ingestion, absorption, inhalation) affect the safety and exposure to cannabis and cannabis-derived compounds?

• How do cannabis and cannabis-derived compounds interact with other substances (*e.g.,* drug ingredients)?

2. Are there special human populations (*e.g.,* children, adolescents, pregnant and lactating women) or animal populations (*e.g.* species, breed, or class) that should be considered when assessing the safety of products containing cannabis and cannabis-derived compounds?

3. What are the characteristics of a successful system to collect representative safety information at the national or State level about products containing cannabis and cannabis-derived compounds?

• Are there systems that currently exist for the collection of this information (other than FDA's systems)?

• Are there particular safety concerns related to the overlap of therapeutic dose levels from approved drug products, with potential exposure from other uses (*e.g.,* from food, dietary supplements, cosmetics)? Please identify any safety concerns and include relevant data or studies.

4. What endpoints or outcomes would define a maximal acceptable daily intake from all products?

• What margin of exposure would represent an appropriate and safe level from anticipated cumulative exposure? Does that margin of exposure vary based on the form of consumption (*e.g.,* from ingestion, absorption, inhalation)? Please explain your reasoning and include relevant data or studies.

• What mechanisms would be available to help ensure that this margin of exposure was maintained at a level sufficiently protective of public health?

5. Are there any data known that would support the safe use of cannabis and cannabis-related compounds in general food use (including dietary supplements), including data regarding exposure levels to cannabis and cannabis-related compounds in foods (including dietary supplements) that would be acceptable from a food safety perspective?

• What data are available about residues of cannabis-derived compounds in human foods (*e.g.,* meat, milk, or eggs) that come from animals that consume cannabis or cannabis-derived compounds? Are there residue levels that should be tolerated in these foods? Please provide data or other information to support your reasoning.

6. How does the existing commercial availability of food products containing cannabis-derived compounds such as CBD (which may in some cases be lawful at the State level but not the Federal level) affect the incentives for, and the feasibility of, drug-development programs involving such compounds?

• How would the incentives for, and the feasibility of, drug development be affected if food products containing cannabis-derived compounds, such as CBD, were to become widely commercially available? How would this change if FDA established thresholds on acceptable levels of cannabinoids, including CBD, in the non-drug products it regulates? What else could FDA do to support drug development from cannabinoids?

*B. Manufacturing and Product Quality*

Please provide data and information on how products containing cannabis or cannabis-derived compounds (other than those marketed as drugs in compliance with the FD&C Act) are currently manufactured, including information about methods for ensuring product quality and consistency. More specifically, we are interested in obtaining information on, among other things:

1. Are there particular standards needed to address any safety issues related to the manufacturing, processing, and holding of products containing cannabis and cannabis-derived compounds (*e.g.,* genotoxic impurities, degradation of active compounds)? Please identify or describe those standards.

2. Are there particular standards or processes needed to ensure manufacturing quality and consistency of products containing cannabis or cannabis-derived compounds, including standards applied to evaluate product quality? Please identify or describe those standards.

3. What validated analytical testing is needed to support the manufacturing of safe and consistent products?

4. Are there any currently used standardized definitions for the ingredients in cannabis products (*e.g.,* "hemp oil")? If standardized definitions would be helpful, what terms should be defined and what should the definition(s) be?

5. What are the functional purposes of adding cannabis-derived compounds, such as CBD, to foods (*e.g.,* nutritive value, technical effect), both in terms of manufacturer intent and consumer perceptions and/or expectations? To the extent a compound is added to food to achieve a particular functional purpose, what evidentiary support is available to demonstrate that the addition of such compound has the intended or perceived effect?

*C. Marketing/Labeling/Sales*

FDA is interested in information about how products containing cannabis or cannabis-derived compounds, other than drug products approved by FDA for human or animal use, are marketed, labeled, and sold. More specifically, we seek information on, among other things:

1. How should consumers be informed about the risks associated with such products (*e.g.,* directions for use, warnings)? What specific risks should consumers be informed about? Are there any subpopulations for which additional warnings or restrictions are appropriate? Please explain your reasoning.

2. What conditions, restrictions, or other limitations on the manufacturing and distribution of these products have been put in place under State or local law, particularly with respect to food products containing cannabis-derived compounds such as CBD (which may, in some cases, be lawful at the State level but not the Federal level)? What other conditions, restrictions, or other limitations might be appropriate to ensure adequate consumer information and to protect the public health?

3. What statutory or regulatory restrictions are in place under State or local law to warn about the use of these products by certain vulnerable human populations (*e.g.,* children, adolescents, pregnant and lactating women) or animal populations (*e.g.* species, breed, or class)? Are there other steps that should be taken to warn about use by vulnerable populations? Please identify such steps and how they would apply to a particular subpopulation.

4. What other information should FDA consider in the labeling of specific product categories of cannabis and cannabis-derived products?

**IV. FDA Legal Authorities**

There are FD&C Act provisions that are relevant to the legality of cannabis or cannabis-derived products. To help in understanding the context of the public hearing and current FDA actions, a synopsis of FDA legal authorities is provided below.

*A. Human Drugs*

A drug is an article intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals (section 201(g) of the FD&C Act (21 U.S.C. 321(g)). A drug is also defined as an article (other than food) intended to affect the structure or any function of the body of man or other animals. Thus, the determination of whether a product is a drug turns in part on the "intended use" of the product.

By statute, it is a prohibited act to introduce a new drug into interstate commerce unless it has an approved marketing application (New Drug Application (NDA) or Abbreviated New Drug Application (ANDA)) (section 301(d) of the FD&C Act (21 U.S.C. 331(d)). FDA reviews the data submitted in a marketing application to evaluate whether a drug product meets the statutory standards for approval. To conduct clinical research that can lead to an approved new drug, including research using materials from plants such as cannabis, researchers submit an Investigational New Drug (IND) application to FDA, as described in 21 CFR part 312.

FDA has approved several drug products that contain compounds found in cannabis. Most recently, FDA has approved EPIDIOLEX,[5] which contains the purified drug substance CBD for the treatment of seizures associated with Lennox-Gastaut syndrome or Dravet syndrome in patients 2 years of age and older. We also have approved MARINOL and SYNDROS for therapeutic uses in the United States, including for the treatment of anorexia associated with weight loss in AIDS patients. MARINOL and SYNDROS include the active ingredient dronabinol, a synthetic THC which is considered the psychoactive component of marijuana. Another FDA-approved drug, CESAMET, contains the active ingredient nabilone, which has a

---

[5] *https://www.accessdata.fda.gov/drugsatfda_docs/nda/2018/210365Orig1s000TOC.cfm.*

chemical structure similar to THC and is synthetically derived.

*B. Human Foods/Dietary Supplements*

By statute, any substance intentionally added to food is a food additive, and therefore subject to premarket review and approval by FDA, unless the substance is generally recognized as safe (GRAS) by qualified experts under the conditions of its intended use, or the use of the substance is otherwise excepted from the definition of a food additive (sections 201(s) and 409 of the FD&C Act (21 U.S.C. 321(s) and 348)). Three hemp seed ingredients—hulled hemp seeds, hemp seed protein, and hemp seed oil—have gone through the FDA GRAS process and can be legally marketed in human foods for certain uses without food additive approval, provided they comply with all other requirements. More specifically, these three ingredients were the subject of a GRAS notice in which the submitter concluded that the ingredients were GRAS for specific uses in human foods. FDA evaluated these notices and had no questions [6] regarding the submitter's conclusions.

No other cannabis-derived compounds have been the subject of a food additive petition, an evaluated GRAS petition, or have otherwise been approved for use in food by FDA. Food companies that wish to use cannabis or cannabis-derived compounds in their foods are subject to the relevant laws and regulations that relate to the food additive [7] and GRAS [8] processes.

In addition, it is prohibited by statute to introduce or deliver for introduction into interstate commerce any food (including any animal food) to which has been added a substance which is an active ingredient in a drug product approved under section 505 of the FD&C Act (21 U.S.C. 355) or a drug for which substantial clinical investigations have been instituted and for which the existence of such investigations has been made public (section 301(*ll*) of the FD&C Act (21 U.S.C. 331(*ll*)). There are exceptions, including when the drug was marketed in food before the drug was approved or before the substantial clinical investigations involving the drug had been instituted or, in the case of animal food, that the drug is a new animal drug approved for use in animal food and used according to the approved labeling. Based on available

evidence, FDA has concluded [9] that it is a prohibited act to introduce or deliver for introduction into interstate commerce any food (including any animal food) to which THC or CBD has been added. When this statutory prohibition applies to a substance, the substance cannot be added to any food that is sold into interstate commerce unless the Secretary of the Department of Health and Human Services (the Secretary),[10] in the Secretary's discretion, has issued a regulation approving the use of the substance in the food (section 301(*ll*)(2) of the FD&C Act. To date, no such regulation has been issued for any substance.

For similar reasons, FDA has determined that products that contain THC or CBD cannot be marketed as dietary supplements.[11] By statute, if an ingredient is approved as a new drug under section 505 of the FD&C Act or has been authorized for investigation as a new drug for which substantial clinical investigations have been instituted and for which the existence of such investigations has been made public, then products containing that substance are excluded from the statutory definition of a dietary supplement (sections 201(ff)(3)(B)(i) and (ii) of the FD&C Act. There is an exception if the substance was "marketed as" a dietary supplement or as a food before the new drug investigations were authorized. Based on available evidence, FDA has concluded that this is not the case for THC or CBD. There is also an exception if FDA has issued a regulation finding that the article would be lawful under the FD&C Act (section 201(ff)(3)(B) of the FD&C Act). At this time, no such regulation has been issued.

Some ingredients are derived from parts of the cannabis plant that may not contain THC or CBD, in which case those ingredients might fall outside the scope of this exclusion, and therefore might be able to be marketed as dietary supplements. However, the product must still comply with all other applicable laws and regulations governing dietary supplement products. For example, manufacturers and distributors who wish to market dietary supplements that contain "new dietary ingredients" (*i.e.*, dietary ingredients that were not marketed in the United States in a dietary supplement before October 15, 1994) generally must notify

FDA [12] about these ingredients (section 413(d) of the FD&C Act (21 U.S.C. 350b(d)). Generally, the notification must include information demonstrating that a dietary supplement containing a new dietary ingredient will reasonably be expected to be safe under the conditions of use recommended or suggested in the labeling. A dietary supplement is adulterated if it contains a new dietary ingredient for which there is inadequate information to provide reasonable assurance that the ingredient does not present a significant or unreasonable risk of illness or injury (section 402(f)(1)(B) of the FD&C Act (21 U.S.C. 342(f)(1)(B)).

Numerous other legal requirements apply to food and dietary supplement products, including requirements relating to CGMPs, labeling, allergens, and various provisions of the FDA Food Safety Modernization Act. Information about these requirements, and about FDA requirements across all product areas, can be found on FDA's website, *https://www.fda.gov*.

*C. Animal Food and Drugs*

FDA regulates animal food in a variety of ways, including by approving safe food additives and establishing standards for animal food contaminants. FDA has not reviewed any food additive petitions for cannabis-derived animal feed, nor have any cannabis-derived feed ingredients been the subject of a GRAS determination by FDA, a GRAS notice that underwent FDA evaluation and received a "no questions" response, or otherwise been approved for use in animal feed by FDA. Animal food companies that wish to use cannabis or cannabis-derived compounds in their animal food products are subject to the relevant laws and regulations that relate to the food additive and GRAS processes. With respect to THC and CBD specifically, as discussed above, it is a prohibited act under section 301(*ll*) of the FD&C Act, to introduce or deliver for introduction into interstate commerce any animal food to which THC or CBD has been added.

As stated above, a drug is an article intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals (section 201(g) of the FD&C Act. A drug is also defined as an article (other than food) intended to affect the structure or any function of the body of man or other animals. Thus, the determination of whether a product is a drug turns in part on the "intended use" of the product.

---

[6] *https://www.fda.gov/Food/NewsEvents/ ConstituentUpdates/ucm628910.htm.*

[7] *https://www.fda.gov/Food/IngredientsPackaging Labeling/FoodAdditivesIngredients/default.htm.*

[8] *https://www.fda.gov/Food/Ingredients PackagingLabeling/GRAS/.*

[9] *https://www.fda.gov/newsevents/ publichealthfocus/ucm421168.htm#legal.*

[10] The authority to make this determination has been delegated to FDA.

[11] *https://www.fda.gov/newsevents/public healthfocus/ucm421168.htm#dietary_supplements.*

[12] *https://www.fda.gov/Food/Dietary Supplements/NewDietaryIngredientsNotification Process/ucm109764.htm.*

Currently, there are no legally marketed new animal drugs that contain cannabis or cannabis-derived compounds. A new animal drug is deemed "unsafe" under section 512(a) of the FD&C Act (21 U.S.C. 360b(a)), and may not be sold into interstate commerce under section 301(a) of the FD&C Act), unless it has an approved new animal drug application (NADA), abbreviated NADA (ANADA), conditional approval (CNADA) or index listing. FDA reviews the data submitted in a marketing application to evaluate whether an animal drug product meets the statutory standards for approval. To conduct clinical research that can lead to an approved new animal drug, including research using materials from plants such as cannabis, researchers establish an Investigational New Animal Drug (INAD) file with FDA, and comply with the requirements described in 21 CFR part 511.

*D. Cosmetics*

Under the FD&C Act, cosmetic products and ingredients are not subject to premarket approval by FDA, except for most color additives. Certain cosmetic ingredients are prohibited or restricted by regulation,[13] but currently that is not the case for any cannabis or cannabis-derived ingredients. Ingredients not specifically addressed by regulation must nonetheless comply with all applicable requirements, and no ingredient—including a cannabis or cannabis-derived ingredient—can be used in a cosmetic if it causes the product to be adulterated or misbranded in any way. A cosmetic generally is adulterated if it bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling, or under such conditions of use as are customary or usual (section 601(a) of the FD&C Act (21 U.S.C. 361(a)).

*E. Tobacco Products*

The Family Smoking Prevention and Tobacco Control Act (Tobacco Control Act) (Pub. L. 111–31) was enacted on June 22, 2009, amending the FD&C Act and providing FDA with the authority to regulate tobacco products. Specifically, the Tobacco Control Act amends the FD&C Act by adding a new chapter that provides FDA with authority over tobacco products. Section 901(b) of the FD&C Act (21 U.S.C. 387a(b)), as amended by the Tobacco Control Act, states that the new chapter in the FD&C

Act (chapter IX—Tobacco Products) (21 U.S.C. 387 through 387u) applies to all cigarettes, cigarette tobacco, roll-your-own tobacco, smokeless tobacco, and any other tobacco products that the Secretary by regulation deems to be subject to chapter IX. In the **Federal Register** of May 10, 2016 (81 FR 28973), FDA issued a final rule deeming all products that meet the statutory definition of "tobacco product" in section 201(rr) of the FD&C Act (21 U.S.C. 321(rr)), except accessories of deemed tobacco products, to be subject to FDA's tobacco product authority (the deeming rule). The products now subject to FDA's tobacco product authority include electronic nicotine delivery systems (sometimes referred to as vapes, vaporizers, or electronic cigarettes, among other terms), cigars, waterpipes (hookah), pipe tobacco, nicotine gels, dissolvables that were not already subject to the FD&C Act, and other tobacco products that meet the statutory definition of "tobacco product" (other than accessories) that may be developed in the future. The term "tobacco product" means any product made or derived from tobacco that is intended for human consumption, including any component, part, or accessory of a tobacco product (except for raw materials other than tobacco used in manufacturing a component, part, or accessory of a tobacco product) (section 201(rr)(1) of the FD&C Act. For example, an e-liquid mixture that contains both a cannabis-derived ingredient and nicotine made or derived from tobacco, and that is intended for human consumption, would likely be subject to FDA's chapter IX authorities.

Numerous legal requirements apply to tobacco products, including legal requirements that relate to new tobacco products that are to be introduced, or delivered for introduction into interstate commerce. Other requirements relate to registration and listing, and sales and distribution, among other things. For more information on these topics, including the statutory standards that must be met for FDA to permit new tobacco products to be marketed, we encourage interested parties to go to the Center for Tobacco Products' web page at *https://www.fda.gov/Tobacco Products/Labeling/RulesRegulations Guidance/ucm246129.htm.*

*F. Medical Devices*

An article is a device if it is an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar related article which is intended for use in the diagnosis of disease or other conditions,

or in the cure mitigation, treatment, or prevention of disease, or is intended to affect the structure or any function of the body of man (section 201(h) of the FD&C Act). A device is also defined as not achieving its primary intended purposes through chemical action in or on the body of man and which is not dependent upon being metabolized for the achievement of its primary intended purpose (Id.). For example, an article that is used to aid intake of a product that contains cannabis or a cannabis-derived compound could be properly classified as a device if it meets all aspects of the above definition.

The FD&C Act establishes a comprehensive system for the regulation of medical devices intended for human use. The FD&C Act categorizes medical devices into one of three classes based on their risks and the extent of the regulatory controls needed to provide reasonable assurance of their safety and effectiveness (see section 513 of the FD&C Act (21 U.S.C. 360c)). The three categories of devices are class I (general controls), class II (special controls), and class III (premarket approval). Class I devices generally pose the lowest risk to the patient and/or user and class III devices pose the highest risk.

The class to which a device is assigned determines, among other things, the type of premarket submission required for FDA authorization to market. In general, if a device is classified as class I or II, and if it is not exempt, manufacturers must obtain FDA clearance of a premarket notification (also referred to as a 510(k) submission) (see sections 510(k) and 513(i) of the FD&C Act (21 U.S.C. 360(k) and 360c(i))). For class III devices, manufacturers generally must obtain FDA approval of a premarket approval application (PMA) (see section 515 of the FD&C Act (21 U.S.C. 360e)). It is a prohibited act to market a device without its requisite premarket approval (see section 501(f)(1) of the FD&C Act (21 U.S.C. 351)).

**V. Notice of Hearing Under 21 CFR Part 15**

The Commissioner of Food and Drugs is announcing that this public hearing will be held in accordance with part 15 (21 CFR part 15). The hearing will be conducted by a presiding officer, who will be accompanied by FDA senior management from relevant program areas. Under § 15.30(f), the hearing is informal and the rules of evidence do not apply. No participant may interrupt the presentation of another participant. Only the presiding officer and panel members can pose questions; they can question any person during or at the

---

[13] *https://www.fda.gov/Cosmetics/ GuidanceRegulation/LawsRegulations/ ucm127406.htm.*

conclusion of each presentation. Public hearings under part 15 are subject to FDA's policy and procedures for electronic media coverage of FDA's public administrative proceedings (21 CFR part 10, subpart C).

Under § 10.205, representatives of the media may be permitted, subject to certain limitations, to videotape, film, or otherwise record FDA's public administrative proceedings, including presentations by participants. Persons attending FDA's public hearings are advised that FDA is not responsible for providing access to electrical outlets.

The hearing will be transcribed as stipulated in § 15.30(b) (see **SUPPLEMENTARY INFORMATION**). To the extent that the conditions for the hearing, as described in this notice, conflict with any provisions set out in part 15, this notice acts as a waiver of those provisions as specified in § 15.30(h).

Dated: March 28, 2019.

**Lowell J. Schiller,**

*Acting Associate Commissioner for Policy.*

[FR Doc. 2019–06436 Filed 4–2–19; 8:45 am]

**BILLING CODE 4164–01–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**

**21 CFR Part 165**

**[Docket No. FDA–2018–N–1815]**

**RIN 0910–AI03**

**Beverages: Bottled Water**

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Proposed rule.

**SUMMARY:** The Food and Drug Administration (FDA or we) is proposing to revise the quality standard for bottled water to specify that bottled water to which fluoride is added by the manufacturer may not contain fluoride in excess of 0.7 milligrams per liter (mg/L). This action, if finalized, will revise the current allowable levels for fluoride in domestically packaged and imported bottled water to which fluoride is added. We are taking this action to make the quality standard regulation for fluoride added to bottled water consistent with the recommendation by the U.S. Public Health Service (PHS) for community water systems that add fluoride for the prevention of dental caries. This action, if finalized, will not affect the allowable levels for fluoride in bottled water to which fluoride is not added by the manufacturer (such bottled

water may contain fluoride from its source water).

**DATES:** Submit either electronic or written comments on the proposed rule by June 3, 2019.

**ADDRESSES:** You may submit comments as follows: Please note that late, untimely filed comments will not be considered. Electronic comments must be submitted on or before June 3, 2019. The *https://www.regulations.gov* electronic filing system will accept comments until midnight Eastern Time at the end of June 3, 2019. Comments received by mail/hand delivery/courier (for written/paper submissions) will be considered timely if they are postmarked or the delivery service acceptance receipt is on or before that date.

*Electronic Submissions*

Submit electronic comments in the following way:

• *Federal eRulemaking Portal: https://www.regulations.gov.* Follow the instructions for submitting comments. Comments submitted electronically, including attachments, to *https:// www.regulations.gov* will be posted to the docket unchanged. Because your comment will be made public, you are solely responsible for ensuring that your comment does not include any confidential information that you or a third party may not wish to be posted, such as medical information, your or anyone else's Social Security number, or confidential business information, such as a manufacturing process. Please note that if you include your name, contact information, or other information that identifies you in the body of your comments, that information will be posted on *https://www.regulations.gov.*

• If you want to submit a comment with confidential information that you do not wish to be made available to the public submit the comment as a written/paper submission and in the manner detailed (see "Written/Paper Submissions" and "Instructions.")

*Written/Paper Submissions*

Submit written/paper submissions as follows:

• *Mail/Hand delivery/Courier (for written/paper submissions):* Dockets Management Staff (HFA–305), Food and Drug Administration, 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852.

• For written/paper comments submitted to the Dockets Management Staff, FDA will post your comment, as well as any attachments, except for information submitted, marked and identified, as confidential, if submitted as detailed in "Instructions."

*Instructions:* All submissions received must include the Docket No. FDA–2018–N–1815 for "Beverages: Bottled Water." Received comments will be placed in the docket and, except for those submitted as "Confidential Submissions," publicly viewable at *https://www.regulations.gov* or at the Dockets Management Staff between 9 a.m. and 4 p.m., Monday through Friday.

• Confidential Submissions—To submit a comment with confidential information that you do not wish to be made publicly available submit your comments only as a written/paper submission. You should submit two copies total. One copy will include the information you claim to be confidential with a heading or cover note that states "THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION." We will review this copy, including the claimed confidential information, in our consideration of comments. The second copy, which will have the claimed confidential information redacted/ blacked out, will be available for public viewing and posted on *https:// www.regulations.gov.* Submit both copies to the Dockets Management Staff. If you do not wish your name and contact information to be made publicly available, you can provide this information on the cover sheet and not in the body of your comments and you must identify this information as "confidential." Any information marked as "confidential" will not be disclosed except in accordance with 21 CFR 10.20 and other applicable disclosure law. For more information about FDA's posting of comments to public dockets, see 80 FR 56469, September 18, 2015, or access the information at: *https://www.gpo.gov/ fdsys/pkg/FR-2015-09-18/pdf/2015- 23389.pdf.*

*Docket:* For access to the docket to read background documents or the electronic and written/paper comments received, go to *https:// www.regulations.gov* and insert the docket number, found in brackets in the heading of this document, into the "Search" box and follow the prompts and/or go to the Dockets Management Staff, 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852.

**FOR FURTHER INFORMATION CONTACT:** Yinqing Ma, Center for Food Safety and Applied Nutrition (HFS–317), Food and Drug Administration, 5001 Campus Dr., College Park, MD 20740, 240–402–2479.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Executive Summary
   A. Purpose of the Proposed Rule

**EXHIBIT 5**

21a-OO--O277---K.Doc
Showing 1 of 1 CGA document(s) retrieved

Sec. 21a-277. (Formerly Sec. 19-480). Penalty for illegal manufacture, distribution, sale, prescription, dispensing. (a)(1) No person may manufacture, distribute, sell, prescribe, dispense, compound, transport with the intent to sell or dispense, possess with the intent to sell or dispense, offer, give or administer to another person, except as authorized in this chapter, any controlled substance that is a (A) narcotic substance, or (B) hallucinogenic substance.

(2) Any person who violates subdivision (1) of this subsection (A) for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars, or be both fined and imprisoned, (B) for a second offense, shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned, and (C) for any subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned.

(b) (1) No person may manufacture, distribute, sell, prescribe, dispense, compound, transport with the intent to sell or dispense, possess with the intent to sell or dispense, offer, give or administer to another person, except as authorized in this chapter or chapter 420f, any controlled substance other than (A) a narcotic substance, or (B) a hallucinogenic substance, or (C) cannabis.

(2) Any person who violates subdivision (1) of this subsection (A) for a first offense, may be fined not more than twenty-five thousand dollars or imprisoned not more than seven years, or be both fined and imprisoned, and (B) for any subsequent offense, may be fined not more than one hundred thousand dollars or imprisoned not more than fifteen years, or be both fined and imprisoned.

(3) For purposes of this subsection, "cannabis" has the same meaning as provided in section 21a-420.

(c) No person may knowingly possess drug paraphernalia in a drug factory situation as defined by subdivision (20) of section 21a-240 for the unlawful mixing, compounding or otherwise preparing any controlled substance for purposes of violation of this chapter.

(d) As an alternative to the sentences specified in subsections (a) and (b) of this section, the court may sentence the person to the custody of the Commissioner of Correction for an indeterminate term not to exceed three years or the maximum term specified for the offense, whichever is less, and, at any time within such indeterminate term and without regard to any other provision of law regarding minimum term of confinement, the Commissioner of Correction may release the convicted person so sentenced subject to such conditions as the commissioner may impose including, but not limited to, supervision by suitable authority. At any time during such indeterminate term, the Commissioner of Correction may revoke any such conditional release in the commissioner's discretion for violation of the conditions imposed and return the convicted person to a correctional institution.